**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

—————————————————————— )

ASSOCIATION OF PRIVATE SECTOR )
COLLEGES AND UNIVERSITIES, )
 )
1101 Connecticut Avenue, N.W. )
Suite 900 )
Washington, D.C.  20036 )
 )
       Plaintiff, )
 )
     v. )           Case No. _____
 )
ARNE DUNCAN, in his official capacity as )
Secretary of the Department of Education, )
 )
Office of the Secretary )
400 Maryland Avenue, S.W. )
Washington, D.C.  20202; )
 )
UNITED STATES DEPARTMENT OF )
EDUCATION, )
 )
400 Maryland Avenue, S.W. )
Washington, D.C.  20202; and )
 )
UNITED STATES OF AMERICA )
Serve: )
The Honorable Eric H. Holder, Jr. )
Attorney General of the United States )
950 Pennsylvania Avenue, N.W. )
Washington, D.C.  20530 )
 )
c/o Ronald C. Machen Jr. )
United States Attorney's Office )
555 4th Street, N.W. )
Washington, D.C.  20530 )
 )
       Defendants. )
—————————————————————— )

**COMPLAINT AND PRAYER FOR DECLARATORY AND INJUNCTIVE RELIEF**

Plaintiff Association of Private Sector Colleges and Universities ("APSCU"), for its complaint against Defendants the Honorable ARNE DUNCAN, in his official capacity as Secretary of the Department of Education (the "Secretary"), THE DEPARTMENT OF EDUCATION (the "Department"), and THE UNITED STATES OF AMERICA allege, by and through their attorneys, as follows:

**INTRODUCTION**

1.      This is an action under the United States Constitution and the Administrative Procedure Act, 5 U.S.C. §§ 551-706 ("APA"), challenging recently adopted regulations that exceed the Department's statutory authority and depart from settled principles of agency rulemaking.  The final so-called "gainful employment" rule, 79 Fed. Reg. 64,889 (Oct. 31, 2014), is unlawful, arbitrary, and irrational, and will needlessly harm millions of students who attend private sector colleges and universities.

2.      As set forth more fully below, APSCU is a voluntary association of private sector educational institutions whose membership includes approximately 1,400 accredited, private postsecondary schools, institutes, colleges, and universities.  APSCU and its members fully support lawful, rational regulations governing financial aid, but the challenged regulations are neither lawful nor rational.  Rather, they are unconstitutional; contrary to Title IV of the Higher Education Act of 1985, as amended, 20 U.S.C. §§ 1070-1099d ("HEA"); arbitrary and capricious; and otherwise in violation of the APA.

3.      The Department has already tried and failed to construct a regulatory regime on the basis of the same statutory phrase it invokes now—"prepare students for gainful employment in a recognized occupation"—in a set of rules it promulgated in 2010 and 2011 (collectively, the "2011 rule" or "2011 regulations").  76 Fed. Reg. 34,386 (June 13, 2011); 75 Fed. Reg. 66,832 (Oct. 29,

2010).  That fruitless attempt spanned several years; left policymakers, schools, and their students facing uncertainty; and needlessly imposed costs on taxpayers.  The United States District Court for the District of Columbia struck down that previous attempt to regulate because a central feature of those regulations—the loan repayment rate test—lacked any reasoned basis.  *See APSCU v. Duncan*, 870 F. Supp. 2d 133, 152-55 (D.D.C. 2012) ("*APSCU I*").  The Court also struck down the reporting aspects of the 2011 rule, because they violated 20 U.S.C. § 1015c.  *See id.* at 155; *see also APSCU v. Duncan*, 930 F. Supp. 2d 210, 214-19 (D.D.C. 2013) ("*APSCU II*") (denying Department's motion to amend judgment to reinstate reporting requirements).

4.      Instead of correcting the flaws that rendered its 2011 rule invalid, the Department's new rule only repeats and exacerbates them.  The Department has since conceded that there was no reasoned basis for its loan repayment rate test, admitting that it "has found no expert studies or industry practice," nor any other alternative support or arguments in support of a threshold.  *See* 79 Fed. Reg. 16,426, 16,445 (Mar. 25, 2014).  In its Notice of Proposed Rulemaking ("NPRM"), the Department replaced the loan repayment rate test with another equally unsubstantiated test, the program cohort default rate ("pCDR") test.  *Id.* at 16,427.  But in the final rule, the Department jettisoned the pCDR measure, admitting that "further study is necessary," thus leaving only a single test—a debt-to-earnings test, which consists of two metrics related to students' earnings and debt—as the regulation's sole measure of whether programs prepare students for gainful employment.  79 Fed. Reg. at 64,915.  The Department did so despite its admission in the previous litigation that it "has found no perfect single test," *APSCU v. Duncan*, No. 1:11-cv-01314-RC, ECF No. 20, Dep't Reply, at 11 (D.D.C. Feb. 2, 2012), and the Department's conclusion that it is necessary to have multiple tests working together, to mitigate the errors and inaccuracies in any single test.

5.      Notably, this was not an ordinary-course rulemaking.  Instead, the regulatory process was marked by well-substantiated allegations of bias and misconduct that led several Members of Congress to accuse the Department of bad faith.  *See* Hon. Alcee Hastings, et al., Ltr. to Sec. Duncan (Dec. 13, 2013).  Relying primarily on error-ridden, partisan, and discredited sources, the Department pursued the proposed regulations with the singular premise of "cut[ting] [for-profits] out . . . of federal aid."  Roberto J. Rodriguez, Conference on Student Loans-Opening Plenary Session (Oct. 24, 2013).  After a negotiated rulemaking committee stacked with opponents of private sector education failed to achieve consensus, the Department shifted to notice-and-comment rulemaking, but failed to address serious legal defects identified by commenters and made troubling last-minute additions to the final regulation that were never subjected to commentary.

6.      As it did in connection with its vacated rule, the Department once again invokes a simple, clear statutory provision—"prepare students for gainful employment in a recognized occupation"—to impose hundreds of pages of unprecedented new limitations on the use of federal financial aid at private sector colleges and universities.  For close to fifty years, Congress has required by statute that certain postsecondary educational programs must "prepare students for gainful employment" in a recognized occupation or profession to be eligible to participate in Title IV financial aid programs.  But until the 2011 rulemaking, that phrase was never understood to mean that a program could only remain eligible for Title IV funding if its recent graduates who received Title IV aid have attained a particular level of earnings relative to the amount of debt that they incurred to attend the program.  The statutory "gainful employment" provision was never intended to authorize a complex regime of debt metrics.

7.     The Department's regulatory test is beyond the Department's statutory authority. In the HEA, Congress set forth in detail the Title IV eligibility requirements for institutions, programs, and students.

8.     The statutory provision that the Department mistakenly relies on as authority for its far-reaching regulatory test requires only that programs prepare students for employment that is gainful—i.e., a job that pays—not that the students actually secure employment at certain income levels relative to various measures of student debt.  The regulations impermissibly turn on demographics, the quality of a school's enrollees, the wealth of those students, those students' labor market decisions, and economic trends, among other factors, that are either beyond the school's ability to control or unrelated to the quality of the school's educational offerings.

9.     Indeed, the regulations impose massive disincentives on private sector schools that currently seek to educate low-income, minority, and other traditionally underserved student populations, because, as an historical matter, those demographics are widely recognized as most at risk of failing the Department's arbitrary test.  Thus, instead of increasing the availability of higher education, the Department's regulations will limit educational opportunities for traditionally underserved groups—leaving those students with diminished access to higher education and potentially causing them to forgo postsecondary education altogether.

10.     The regulations are also arbitrary and capricious and violate the APA in numerous other respects.  No single, one-size-fits-all statistical test can accurately measure whether all programs in all fields prepare students for gainful employment.  And the specific debt metrics the Department has adopted still lack any reasoned foundation.  The Department has departed without a reasoned explanation from its previous position that the debt tests must work together by promulgating a rule in which only a single debt test stands alone.

11.     The rule also violates the APA because it rests on premises that unfairly target private sector schools based on concerns that are not unique to them.  The Department's rhetoric and use of biased and notoriously flawed sources and statistics to support its rulemaking reveal its true intention to cut private sector schools out of participating in Title IV programs.  The severe consequences that would flow from application of the Department's metrics to "traditional" schools—massive failure by those schools—confirm the Department's bias.

12.     The rule is also arbitrary because the Department has failed to account sufficiently for the negative effects of its rule.  Two main assumptions behind the rulemaking—that public sector schools can absorb private sector students and that schools can regulate the debt their students incur—are patently false.  The Department also failed adequately to consider the role of private sector schools in educating students from disadvantaged backgrounds and the impact that its rule will have in creating strong disincentives for schools to recruit and enroll underserved students.  In addition, the Department failed meaningfully to account for the increased demands that state and federal treasuries will face if the Department succeeds in pushing private sector schools or programs out of business, leaving public sector schools to attempt to build sufficient capacity to handle the flood of students from shuttered private sector programs.

13.     The rule also arbitrarily threatens to revoke Title IV eligibility based on activities that schools undertook before the rule was even proposed (let alone issued).  In the first years of its operation, the regulations will punish programs for outcomes achieved by students who graduated before the adoption of the standards.  Punishing schools for outcomes that are already a matter of historical fact makes no sense; doing so by measuring employment outcomes arising out of the largest economic downturn since the Great Depression is absurd.

14.     The rule also arbitrarily threatens to revoke Title IV eligibility based on circumstances beyond a school's control, such as what job a student takes and the state of the economy.

15.     Further, the regulations are premised on incomplete and unreliable data.  The regulations deny schools adequate procedural protections, enabling the Department to deprive schools of financial aid eligibility on the basis of data that schools are not permitted to review, and calculations that schools are not meaningfully permitted to challenge.

16.     In addition, the Department has not lived up to its basic obligation under the APA to provide interested parties with notice of its proposed regulations and the opportunity to comment on them.  For example, the final regulation relies on a single test—the debt-to-earnings test—to attempt to evaluate whether programs prepare students for gainful employment.  That was not even hinted at in the proposed regulation, and indeed contravenes the Department's prior position that no single test is sufficient.  Similarly, the new rule imposes burdensome requirements regarding the means by which schools must send certain warnings to prospective students that were not set forth in its proposal.

17.     The reporting, disclosure, and certification aspects of the rule are also beyond the Department's statutory authority and are arbitrary and capricious in numerous respects, and the disclosure and certification requirements are unconstitutional.  The Department's previous attempt to impose reporting requirements was struck down on the basis that they violated 20 U.S.C. § 1015c, which prohibits the Department from maintaining a federal database of personally identifiable information unless the system meets certain requirements that are not present here.  The Department's new rule continues to violate 20 U.S.C. § 1015c.  The requirements are also

unduly burdensome and vague.  And the disclosure requirements, in particular, also violate the

First Amendment.

18.     For the reasons set forth herein, the Court should declare the rule unlawful and

vacate it.

## PARTIES

19.     Plaintiff APSCU is a voluntary association of private sector educational

institutions, incorporated under the provisions of the District of Columbia Non-Profit Corporation

Act, D.C. Code §§ 29-301.01-.114, with its principal place of business at 1101 Connecticut

Avenue, N.W., Suite 900, Washington, D.C. 20036.  APSCU represents approximately 1,400

accredited, private postsecondary schools, institutes, colleges, and universities that annually

provide educational opportunities to prepare more than three million students for employment in

over 200 occupational fields.  APSCU's members qualify as "institutions of higher education,"

20 U.S.C. § 1002(a)(1), (b), eligible to participate in student-aid programs under Title IV of the

HEA, 20 U.S.C. §§ 1070-1099d.  Virtually all of APSCU's member schools will be directly

subject to the new requirements in the gainful employment regulation.  Those schools face

additional regulatory burdens and increased regulatory compliance costs as a result of the

Department's promulgation of the challenged regulation.  The regulation forces schools to alter

their admissions policies and the programs that they offer, causing irreparable changes in the

make-up of their student bodies and limiting—and potentially eliminating—higher-education

opportunities for the traditionally underserved groups that are the most likely to fail the

Department's arbitrary test.  Those injuries are directly and immediately traceable to the

challenged regulations and would be remedied by a judgment vacating the challenged regulations.

The interests that APSCU seeks to protect in filing this lawsuit on behalf of its members are

germane to its organizational purposes to promote access to career education and to emphasize the

importance of workforce development.  Neither the claims asserted nor the relief requested in this lawsuit requires the participation of individual APSCU members.

20.     Defendant Arne Duncan is the Secretary of the Department of Education.  His official address is 400 Maryland Avenue, S.W., Washington, D.C. 20202.  He is being sued in his official capacity.  In that capacity, Secretary Duncan has overall responsibility for the operation and management of the Department.  Secretary Duncan, in his official capacity, is therefore responsible for the Department's promulgation of the challenged regulations and for related acts and omissions alleged herein.

21.     Defendant Department of Education is, and was at all times relevant hereto, an executive agency of the United States Government, 5 U.S.C. §§ 101, 105, subject to the APA, *id.* § 551(1).  The Department, in its current form, was created by the Department of Education Organization Act of 1979, 20 U.S.C. § 3401 *et seq.*, Pub. L. No. 96-88, 93 Stat. 668.  The Department is headquartered at 400 Maryland Avenue, S.W., Washington, D.C. 20202.

22.     Defendant United States of America is the federal government formed under the Constitution of the United States, with its capital in Washington, D.C.

## JURISDICTION AND VENUE

23.     This action arises under the Constitution of the United States, the HEA, the General Education Provisions Act ("GEPA"), and the APA.  This Court has subject-matter jurisdiction over this action under 28 U.S.C. § 1331.  The Court is authorized to issue the nonmonetary relief sought herein pursuant to 5 U.S.C. §§ 702, 705, and 706.

24.     Venue is proper in this Court under 28 U.S.C. § 1391(e)(l) because this is an action against the United States, an officer of the United States, and an agency of the United States.  Defendant Department of Education resides in this judicial district; Defendant Secretary Duncan performs his official duties in this judicial district; a substantial part of the events or omissions

giving rise to this action occurred in this judicial district; and Plaintiff resides in this judicial district, and no real property is involved in the action.

## FACTUAL ALLEGATIONS

### I.   THE ROLE OF PRIVATE SECTOR SCHOOLS.

25.   As the Department acknowledged in its previous rulemaking efforts, and has echoed in this rulemaking, private sector educational institutions have "long played an important role in the nation's system of postsecondary education," 75 Fed. Reg. 66,665, 66,671 (Oct. 29, 2010), and are "a diverse, innovative, and fast-growing group of institutions," 76 Fed. Reg. 34,386, 34,386 (June 13, 2011); *see also* 79 Fed. Reg. at 64,904.  Secretary Duncan has also acknowledged that private sector schools "play a vital role in training young people and adults for jobs. . . .  They are helping us meet the explosive demand for skills that public institutions cannot always meet."  Business Wire, *U.S. Education Secretary Arne Duncan Keynotes DeVry Policy Forum* (May 11, 2010), *available at* http://www.businesswire.com/news/home/20100511007302/ en/U.S.-Education-Secretary-Arne-Duncan-Keynotes-DeVry.

26.   Private sector education expanded in large part to satisfy the educational needs of low-income, first-generation, working-adult, and single-parent students that public and other private schools did not or were unable to serve adequately.  For example, among the students attending private sector schools:  76 percent live independently without parental support, 67 percent are at least twenty-five years old, 39 percent are minorities, 64 percent are women, 86 percent receive some sort of student aid based on their financial need, 63 percent receive federal Pell Grants based on exceptional financial need, and many are single parents.  *See* APSCU, *America's Private-Sector Colleges and Universities: Generating Real Value for Students & Society* 2 (2013), *available at* http://www.career.org/news-and-media/press-releases/upload/ APSCU-Generating-Real-Value-Final.pdf.  Each year, hundreds of thousands of students enroll in

programs offered by private sector schools to prepare for and advance their careers and to improve the quality of life for themselves and their families. Although students' reasons for choosing private sector schools vary, students are often attracted by private sector schools' flexible, innovative, and market-driven programs. Private sector schools also provide valuable educational opportunities for many students who are not prepared or are otherwise not in a position to attend more traditional higher-education institutions, helping to fill a gap left by such institutions.

27.     Private sector schools enroll students in a full range of educational programs: master's degree and doctoral degree programs, two-year and four-year associate's degree and bachelor's degree programs, and shorter-term certificate and diploma programs. Over the last decade, private sector schools have accounted for a significant percentage of certificates and associate's degrees awarded in this country; a significant percentage of the technically trained workers who enter the American workforce each year are educated at private sector schools. Private sector schools also meet an increased demand for retraining displaced workers and upgrading skills for a wide variety of public and private employers.

28.     Notably, graduation rates are substantially higher at two-year private sector schools than at two-year public sector schools even though, compared to their public and non-profit counterparts, private sector schools' student populations are more heavily comprised of students who are, historically, less likely to graduate. The National Center for Education Statistics ("NCES"), a division of the Department of Education, reports graduation rates of 21 percent for students attending a public two-year institution compared to a rate of 63 percent for students attending a private sector two-year institution. *See* NCES, *Enrollment in Postsecondary Institutions, Fall 2012; Financial Statistics, Fiscal Year 2012; Graduation Rates, Selected*

*Cohorts, 2004-09; and Employees in Postsecondary Institutions, Fall, 2012* (Dec. 2013), *available at* http://nces.ed.gov/pubs2013/2013183.pdf.

29.     APSCU's members are also indispensable in providing the postsecondary educational opportunities necessary to satisfy the nation's rapidly growing need for a highly educated workforce that can compete in a globalized economy.  As Secretary Duncan has recognized, President Obama's declared goal that the United States have the highest percentage of college graduates in the world by 2020 "cannot be achieved without a healthy and productive for-profit sector of higher education."  75 Fed. Reg. 43,616, 43,617 (July 26, 2010).

30.     Private sector schools have the required infrastructure—both brick-and-mortar facilities and online capacity—to cater to the educational needs of millions of students.  In fact, private sector schools, which consume far fewer taxpayer dollars than their public and non-profit counterparts (many of which receive large public subsidies), are investing their own funds to contribute to the necessary expansion of the nation's postsecondary educational opportunities.  Private sector schools also are increasing their capacity at higher rates than their public sector counterparts.

## II.      THE STATUTORY FRAMEWORK.

31.     Each year, millions of students are enabled to pursue postsecondary educational opportunities, including those offered by private sector schools, by federal financial aid administered by the Department of Education under Title IV of the HEA, 20 U.S.C. §§ 1070-1099d.  In Title IV, Congress established a comprehensive statutory framework for determining eligibility for that aid.  The central purpose of the HEA is "to assist in making available the benefits of postsecondary education to eligible students."  20 U.S.C. § 1070(a).

32.     Under the HEA, students may use Title IV funds only at an "institution of higher education."  20 U.S.C. § 1070.  "Institutions of higher education" include private sector

"proprietary institution[s] of higher education" and public sector "postsecondary vocational

institution[s]." *Id.* § 1002(a)(1).  These institutions generally must "provid[e] an eligible program

of training to prepare students for gainful employment in a recognized occupation."  *Id.* § 1002(b),

(c).

33.     Congress has imposed a host of requirements on schools that receive Title IV

funds.  As an initial matter, a school must be authorized in the State in which it operates to provide

postsecondary education, and the school ordinarily must be accredited by an accrediting agency

recognized by the Secretary.  *See* 20 U.S.C. § 1001(a)(2), (5); *id.* § 1002(b)(1)(B), (D); *id.*

§ 1002(c)(1)(B).  Among many other things, the HEA also imposes limitations on the

qualifications of students that the schools may enroll, the types of programs that schools may offer,

how long each program must last, and how a school is managed.  *See, e.g.*, *id.* § 1002(a)(3); *id.*

§ 1088(b).

34.     Section 1094 of the HEA requires that schools comply with twenty-nine separate

requirements, and imposes one requirement that is unique to private sector schools.  The so-called

"90/10" rule requires that at least 10 percent of a school's revenues from tuition, fees, and other

institutional charges be attributable to sources other than federal Title IV student aid.  *See*

20 U.S.C. § 1094(a)(24).

35.     Congress has also barred the Department from interfering with a school's

administration of its programs.  20 U.S.C. § 1232a.  Specifically, Section 1232a prohibits the

Department from exercising "any direction, supervision, or control over the curriculum, program

of instruction, administration, or personnel of any educational institution."  *Id.*

36.     As part of the statutory framework, Congress has also enacted a number of

provisions that specifically address student loan debt and costs.  These provisions apply to *all*

postsecondary institutions and do not single out private sector schools for disfavored treatment. *See, e.g.*, 20 U.S.C. §§ 1085(m)(1), 1087bb(g)(1).

37.     Some of these provisions reflect Congress's express choice to tie an institution's eligibility for federal funding to the performance of its students on prescribed institutional debt measures:  the HEA specifies that an otherwise eligible institution may participate in certain Title IV programs if its students' federal loan default rates, known as "cohort default rates" or "CDRs," do not exceed specified limits.  Those rates measure—on an institutional basis—the percentage of an institution's borrowers that have defaulted on their federal student loans within a certain period of time after their loans first entered repayment. *See, e.g.*, 20 U.S.C. §§ 1085(m)(1), 1087bb(g)(1).

38.     The statutory framework also recognizes that student demographics and economic forces, that are unrelated to program quality, can and do affect students' default rates, and that they therefore should be taken into account with regard to eligibility.  Congress, for example, does not curtail eligibility for an institution with high cohort default rates if at least two-thirds of its students are eligible for certain need-based Pell Grants or have an income below the poverty level. 20 U.S.C. § 1085(a)(5)(A)(i).  And, in considering the default rate on all loan types, Congress does not count against schools those students who participate in congressionally created deferment or forbearance programs to manage loan obligations. *See id.* §§ 1085(m)(2)(d), 1087bb(g)(1)(e)(i)(IV).

39.     With regard to costs, Congress has never set any caps on tuition.  Indeed, in 2005, the House of Representatives explained in a House Report that "the Federal government does not currently have the authority to dictate tuition and fee rates for institutions of higher education." H.R. Rep. No. 109-231, at 159 (2005) (emphasis added).

III.    **THE DEPARTMENT'S PREVIOUS FAILED EFFORTS TO REGULATE.**

A.      **Between 2009 And 2011, The Department Pushed Through Gainful Employment, Reporting And Disclosure, And Program Approval Regulations.**

40.    Nearly a half century after initial passage of the HEA, the Department in 2009 initiated a negotiated rulemaking process ostensibly to measure whether a program prepared students for "gainful employment" within the meaning of the HEA.  The rulemaking was rife with irregularities, ultimately leading to an inquiry by the Department's Inspector General, requests for congressional investigations, and referrals to the U.S. Attorney for the Southern District of New York and the Securities and Exchange Commission.

41.    The flawed negotiated rulemaking in 2009 and 2010 failed to reach consensus, but the Department pressed on, publishing two separate NPRMs containing three related sets of regulations, each of which purported to be authorized by the phrase "gainful employment."

42.    The vacated 2011 regulations that resulted from this flawed process claimed to measure program performance based on two complex debt measures—one based on debt-to-earnings ratios and one based on loan repayment rates.  76 Fed. Reg. at 34,448.  The debt-to-earnings test supposedly evaluated the ratios of (1) the estimated annual loan payment owed by students who graduated from a program to (2) either (a) the average annual earnings or (b) the average discretionary income of those graduates.  *See* 34 C.F.R. § 668.7(c)(1) (2011).  The loan repayment rate test purported to evaluate the percentage of former students that had paid their loans in full or reduced the outstanding balance of their loans.  *Id.* § 668.7(b).

43.    A program satisfied the 2011 regulations if a defined cohort of students had either: (1) a loan repayment rate of at least 35 percent, *or* (2) either (a) a debt-to-annual earnings ratio of 12 percent or less, or (b) a debt-to-discretionary income ratio of 30 percent or less.  34 C.F.R. § 668.7(a)(1)(i)-(iii), (d)(2) (2011).  A program failing both tests faced increasing sanctions, and,

15

after failing all of the metrics in three out of four years, would be declared ineligible.  *Id.*
§ 668.7(h)-(j).

44.     Among other things, the regulations also required programs to report to the
Department personally identifiable information, including "[t]he amounts [each] student
[completing the program] received from private education loans and the amount from institutional
financing plans that the student owes the institution upon completing the program."  34 C.F.R.
§ 668.6(a)(1)(i)(C)(2) (2011).

45.     The regulations also required programs that did not meet these criteria to issue a
"warning" to students that the student "should expect to have difficulty" repaying loans.  *See*
34 C.F.R. § 668.7(j)(2)(i)(D) (2011).

**B.     The District Court Vacates The Regulations.**

46.     On July 20, 2011, APSCU filed suit in this Court, challenging the regulations as
exceeding the Department's authority under the HEA, constituting an arbitrary and capricious
exercise of the Department's authority, failing to adhere to the APA's notice-and-comment
requirements, violating the First Amendment, and depriving schools of due process.  *See APSCU
v. Duncan*, No. 1:11-cv-01314-RC, ECF No. 1, Complaint (D.D.C. July 20, 2011).

47.     On June 30, 2012, this Court vacated almost the entire regulatory regime, including
the debt metrics and the reporting requirements.  *See APSCU I*, 870 F. Supp. 2d 133.

48.     This Court concluded that the loan repayment rate test lacked a reasoned basis
because it "was not based upon any facts at all.  No expert study or industry standard suggested
that the rate selected by the Department would appropriately measure whether a particular
program adequately prepared its students."  *APSCU I*, 870 F. Supp. 2d at 154.  This Court
explained that the 2011 rule fell in its entirety because the defective loan repayment rate test was
inextricable from the other metrics.  *Id*. at 154.

16

49.     Without deciding the issue, the Court also expressed concern that the mandated warning for programs failing the debt metrics in any single year—that a student enrolling in the program "should expect to have difficulty" repaying loans—might violate the First Amendment. *APSCU I*, 870 F. Supp. 2d at 154 n.7.

50.     This Court also held that the reporting provisions of the rule—requiring programs to provide the Department with student information necessary to calculate the debt measures—violated 20 U.S.C. § 1015c, which prohibits the collection of personally identifiable information from students receiving Title IV assistance.  *See APSCU I*, 870 F. Supp. 2d at 155.

51.     On July 30, 2012, the Department moved to amend the judgment, arguing that certain aspects of the reporting requirements and the procedures for calculating the debt metrics should be revived because they were necessary to allow schools to make the required disclosures under the still-intact disclosure provisions.  The Court denied the Department's motion, clarifying its previous holding that, under the HEA, the Department cannot force schools to collect and report information regarding students and their debt.  *See APSCU II*, 930 F. Supp. 2d at 214-19.

## IV.    THE DEPARTMENT'S FLAWED AND TAINTED 2013-2014 RULEMAKING PROCESS.

52.     Rather than appeal this Court's rulings, the Department decided to propose a new set of regulations.  As with its previous attempt to regulate "gainful employment," this was not a normal rulemaking:  the regulatory process was marked by well-substantiated allegations of bias and misconduct and assertions that the Department lacked statutory authority to issue the challenged regulations.  These concerns have led several Members of Congress to accuse the Department of bad faith.  *See* Hon. Alcee Hastings, et al., Ltr. to Sec. Duncan (Dec. 13, 2013).

A.      **The Department's Biased Negotiated Rulemaking.**

53.      On June 12, 2013, the Department published a notice in the *Federal Register* of its intention to establish another negotiated rulemaking committee, as required by 20 U.S.C. § 1098a, to promulgate new regulations regarding Title IV eligibility.  *See also* Negotiated Rulemaking Act, 5 U.S.C. §§ 561-570a.  Under 20 U.S.C. § 1098a, unless impracticable, unnecessary, or contrary to the public interest, the Department must subject all regulations pertaining to student financial aid programs to public negotiated rulemaking sessions before publishing any proposed regulations. By requiring such negotiations, Congress intended to guide the Department to produce final regulations that are workable and acceptable to affected constituencies.

54.      As it was required to do under the HEA, the Department identified various constituencies as "having interests that are significantly affected by the topic proposed for negotiations," and invited those groups to propose nominees to serve on the negotiated rulemaking committee.  *See* 78 Fed. Reg. 35,179, 35,181 (June 12, 2013).

55.      Many stakeholders—including APSCU and the United States Chamber of Commerce (the "Chamber")—wrote to the Department, asking it to consider selecting specific individuals to serve on the negotiated rulemaking committee.  The Department ignored their nominees even though APSCU's nominees were deeply familiar with the challenges facing higher education and the Chamber's nominees were well-positioned to explain how the regulations might affect job creation.

56.      Both APSCU and the Chamber wrote timely letters to the Department expressing these concerns, but the Department refused to reconsider its appointments.  Although the Department selected twenty-eight representatives, only four of its selections represented private sector colleges and universities.  And the one purported "business and industry" selection represented veterans, a vital constituency to be sure, but not the business community as a whole.

Thus, from the beginning of the negotiated rulemaking process, the Department seemed intent on giving short shrift to the sector's views.

57.      At the first negotiating session (held between September 9-11, 2013), APSCU and the Chamber once again tried to ensure adequate representation on the committee.  The Chamber nominated two more nominees and the private sector schools proposed one additional nominee. The Department refused to accept these nominees, and chose to move forward with the rulemaking despite the committee's skewed composition.

58.      Throughout each of its sessions (September 9-11, 2013; November 18-20, 2013; and December 13, 2013), the Department refused to heed the advice of the negotiators that it had called together.  Some negotiators, including the president of an accrediting agency, "questioned efforts to hold programs accountable for the labor market successes and failures of their graduates," explaining that "[c]olleges can't control the economy."  Michael Stratford & Paul Fain, *Agree to Disagree*, Inside Higher Educ. (Sept. 10, 2013), *available at* http://www.insidehighered.com/news/2013/09/10/gainful-employment-negotatiors-face-long-odds-reaching-consensus.  Other negotiators similarly encouraged the Department to pursue a different regulatory path, noting that colleges and universities cannot control the availability of jobs, where students decide to live and work, and individual choices about borrowing.  *See* Ben Miller, *Gainful Employment Negotiations Day 1 Liveblog*, Higher Educ. Watch (Sept. 9, 2013), *available at* http://higheredwatch.newamerica.net/blogposts/2013/gainful_employment_negotiations_day_1_liveblog-91371.

59.      Despite this chorus of opposition, the Department insisted on introducing proposals based on students' earnings and other factors that are unrelated to program quality.  Indeed, the Department's own negotiator eventually admitted that "the tests are less about judging the quality

of a program and more about the performance of loan debt."  Ben Miller, *Gainful Employment Liveblog Session 2: Day 1*, Educ. Central (Nov. 18, 2013), *available at* http://www.edcentral.org/gainful-employment-liveblog-session-2-day-1.

60.     Throughout the negotiated rulemaking process, the Department also failed to explain many assumptions behind its proposals or provide data.  Accordingly, a number of negotiators objected to continuing the process, with one explaining that the group could not "negotiate on something without data," especially as the last rule was vacated based on a lack of supporting data.  *See* Miller, *Session 2: Day 1*, above.  Even one of the most vocal opponents of private sector schools complained that the "Department is almost grasping at straws, picking numbers and putting gigantic fudge factors" in its proposals.  *See* Miller, *Day 1 Liveblog*, above.

61.     Near the end of the negotiated rulemaking process, a request was made that the Department reevaluate its proposal once it had data.  *See* Ben Miller, *Gainful Employment Liveblog Session 2: Day 3*, Educ. Central (Nov. 20, 2013), *available at* http://www.edcentral.org/gainful-employment-liveblog-session-2-day-3.  Some of the negotiators asked that additional negotiating sessions be added so that the important issues at stake could be thoroughly vetted and discussed, but the Department insisted that only a session lasting a single day (on December 13, 2013) would be held.  *Id.*  Unsurprisingly, a consensus was not reached in the single additional day, and the Department abandoned the negotiated-rulemaking process.

62.     In light of these flaws, a group of thirty Democratic Members of Congress wrote to Secretary Duncan expressing serious concerns regarding "the process by which the Department" conducted the negotiated rulemaking.  These Members of Congress were particularly concerned with the fact that the Department had "targeted" private sector schools and had not provided "data regarding the impact on students by demographic," and expressed their belief that "every effort

should be made to limit adverse impacts on individuals who face limited access to educational opportunities." Hon. Alcee Hastings, et al., Ltr. to Sec. Duncan, Dec. 13, 2013.

**B.    The Department's Flawed Notice-And-Comment Rulemaking Process.**

63.    After the Department abandoned the negotiated rulemaking, it published an NPRM in the *Federal Register* on March 25, 2014.  *See* 79 Fed. Reg. at 16,426.  The proposal did not solve, but rather exacerbated the problems inherent in the vacated gainful employment rule.  It also managed to contradict many of the Department's previous, allegedly reasoned conclusions.

64.    The Department received approximately 95,000 comments in response to the NPRM.  79 Fed. Reg. at 64,892.  Numerous commenters, including APSCU, submitted detailed comments to the Department explaining the myriad legal and other problems with the proposed regulations.  *See, e.g.*, *APSCU GE 2014 Comment Letter*, ED-2014-OPE-0039 (May 27, 2014); *Comments of ITT Educational Services, Inc. on Program Integrity: Gainful Employment*, ED-2014-OPE-0039 (May 27, 2014); *Comments of Chamber of Commerce of the United States of America*, ED-2014-OPE-0039 (May 27, 2014); *Association of Proprietary Colleges, Comments on Gainful Employment Notice of Proposed Rulemaking*, ED-2014-OPE-0039 (May 27, 2014); *Comments of Education Management Corporation*, ED-2014-OPE-0039 (May 27, 2014).

65.    Notably, several Members of Congress also submitted comments to the Department expressing disapproval of the Department's proposed regulations.  *See, e.g.*, *Comments of Congressman Cory Gardner*, ED-2014-OPE-0039 (May 15, 2014); *Comments of Congressman Mike Coffman*, ED-2014-OPE-0039 (May 15, 2014); *Comments of Congressman Peter J. Visclosky*, ED-2014-OPE-0039 (May 13, 2014).

66.    On October 31, 2014, the Department published the new gainful employment regulations as a final rule with an effective date of July 1, 2015.  79 Fed. Reg. at 64,889-90.

67.     Although the final regulations differ—sometimes significantly—from the original proposal, these changes did not address the serious legal defects that commenters identified or the fatal flaws on which the Court relied when it invalidated the vacated 2011 regulations.

68.     Moreover, in some instances, the changes between the proposed and final regulations introduced new legal defects.  For example, the final rule forbids a school whose program is deemed ineligible for Title IV funding from establishing any new program—at *any* credential level—that shares the same four-digit Classification of Instructional Programs ("CIP") code as the ineligible program.  The Department offers no basis for its illogical assumption that programs in the same field at different credential levels will result in similar employment outcomes or debt levels for students.

69.     The final regulations also are not "logical outgrowths" of the proposed regulations because key provisions were not included in the proposed regulations.  For example, the final regulation relies on a single test—the debt-to-earnings test—to attempt to evaluate whether programs prepare students for gainful employment.  The choice to rely on a single test was not even hinted at in the proposed regulation, and indeed contravenes the Department's prior position—on which this Court relied in *APSCU I, see* 870 F. Supp. 2d at 152—that no single test is sufficient.

70.     The Department also failed meaningfully to address significant comments.  For example, the Department failed to address APSCU's argument (*APSCU GE 2014 Comment Letter, ED-2014-OPE-0039*, at 23-24) that the Department's definition of "gainful employment" is inconsistent with the Department's own regulation, 34 C.F.R. § 668.8(g).  Nor did it address APSCU's comments about the new requirement that schools certify that their graduates would qualify to take licensure or certification examinations that are required for employment in an

occupation that the programs prepare graduates to enter.  *See* 34 C.F.R. § 668.414(d)(3).

Specifically, the Department did not respond to APSCU's request for clarification about "what it

means to be 'qualified' to take a licensure or certification exam" or about "which programs must

satisfy which licensure or certification requirements."  *APSCU GE 2014 Comment Letter*,

ED-2014-OPE-0039, at 72-73.

> ### C.   The Department's Consideration Of The Regulations Was Tainted.

71.     It is clear that the Department's rulemaking was tainted.  As with its vacated

regulation, the Department had a predetermined agenda to target private sector education.

72.     The Department's closed mind is evident in its comments about private sector

schools throughout the rulemaking process.  In the midst of the negotiated rulemaking sessions, for

example, notwithstanding the benefits that private sector for-profit schools provide—and

notwithstanding the government's prior statements that private sector educational institutions have

"long played an important role in the nation's system of postsecondary education" (75 Fed. Reg. at

66,671)—the President's Special Assistant for Education publically stated that the Administration

"believe[s] [it] need[s] to cut [for-profits] out . . . of federal aid," and explained that this was "the

whole premise behind [the] [gainful] employment regulation[s]."  Roberto J. Rodriguez,

Conference on Student Loans-Opening Plenary Session (Oct. 24, 2013).

73.     The Department also revealed the sweeping extent of its bias by basing its concerns

regarding the private sector almost entirely on three notoriously flawed sources.  First, throughout

the NPRM and final regulation, the Department relied on unsubstantiated allegations in *qui tam*

lawsuits to assail private sector schools.  *See, e.g.*, 79 Fed. Reg. at 64,890, 64,907, 65,034; *see also*

79 Fed. Reg. at 16,426, 16,434, 16,538.  The Department fails to mention that the vast majority of

these lawsuits have been dismissed at the pleading stage and a few have been found to be so

frivolous that fees were awarded to the schools.  These suits often reflect nothing more than a speculative gamble by the professional plaintiffs' bar.

74.     Second, the Department placed undue weight on an error-riddled Government Accountability Office ("GAO") report that has been widely discredited.  *See* 79 Fed. Reg. at 64,907, 64,970, 65,034; *see also* 79 Fed. Reg. at 16,538.  The initial GAO report, released on August 4, 2010, purported to show that private sector schools engaged in "high pressure" recruiting practices.  79 Fed. Reg. at 64,907.  The Department relied on this report in promulgating the rule, but largely ignores the fact that the report was ultimately "reissued" because it was permeated with errors and inaccuracies.  *Id.* at 64,906; *see also* 79 Fed. Reg. at 16,538 n.140.  On November 30, 2010, the GAO published a revised report that contained fifteen corrections, each of which revealed an error that had cast private sector schools in an unjustifiably unfavorable light.  Nick Anderson, *GAO Revises Its Report Critical of Practices at For-Profit Schools*, Wash. Post (Dec. 7, 2010), *available at* http://www.washingtonpost.com/wp-dyn/content/article/2010/12/07/ AR2010120706803.html.  For example, the original report claimed that a college representative told an applicant to a massage therapy school that she could make up to $100 per hour, when 90 percent of massage therapists in the state made less than $34 per hour.  *Original vs. Revised Sections of GAO Report on For-Profit Colleges*, Wash. Post (Dec. 8, 2010), *available at* http://www.washingtonpost.com/wp-dyn/content/graphic/2010/12/07/GR2010120707604.html**.**  In the revised report, the GAO clarified that the applicant was told she could earn up to $30 per hour as a massage therapist.  *Id.*

75.     Additionally, shortly after the publication of the revised report, the GAO restructured its investigative unit and reassigned personnel, including removing the lead author of the original report from his position.  *See* Jonathan Strong, *GAO Replaces Top Official Behind*

*Error-Riddled Report on For-Profit Colleges*, The Daily Caller (Mar. 3, 2011), *available at*

http://dailycaller.com/2011/03/03/gao-replaces-top-official-behind-error-riddled-report-on-for-

profit-colleges.  Reports have also emerged that GAO was put under pressure by agenda-driven

congressional staffers and by the "extreme short time frames" in drafting the report, which led to

many of its inaccuracies.  *See id.*  While the Department claims without explanation that it may

rely on the "re-released version of the report," 79 Fed. Reg. at 64,906, the circumstances of the

report's preparation and the many errors made by the GAO cast serious doubt on the accuracy and

reliability of the report as a whole.

      76.    Third, the Department relied on a deeply flawed, partisan document that it

misleadingly labeled as a report of the Senate Committee on Health, Education, Labor and

Pensions ("HELP"), even though the Committee never voted on it.  *See* 79 Fed. Reg. at

64,906-907, 64,911, 64,970, 65,033; *see also* 79 Fed. Reg. at 16,434-35, 16,537-38.  The

Committee majority released that document at the end of a biased investigation, in which it:

(1) headlined a Committee hearing with a key witness who was actually a short seller with

undisclosed financial interests in the failure of private sector schools; (2) heavily relied on the

flawed GAO report; (3) misused and misrepresented information produced to the Committee,

selectively releasing confidential documents and misconstruing data to reach inaccurate and

unsupported results; and (4) failed to follow well-established procedures, resulting in the

Committee minority's boycott of a hearing and issuance of a signed letter of protest.  *See* Hon.

Michael Enzi, et al., Ltr. to Hon. Tom Harkin (Apr. 13, 2011).

      77.    The Department's press release in support of the NPRM, *see* Dep't of Educ., Press

Release:  Obama Administration Takes Action to Protect Americans from Predatory,

Poor-Performing Career Colleges (Mar. 14, 2014), *available at* http://www.ed.gov/news/press-

releases/obama-administration-takes-action-protect-americans-predatory-poor-performing-ca,

also highlights the Department's bias against private sector schools.  Its main contention is that 72

percent of private sector programs have graduates making less than high school dropouts.  That is

incorrect.  Indeed, according to *The Washington Post*'s Fact Checker, this statistic is "bogus" and

based on faulty data.  Glenn Kessler, *Do 72 percent of for-profit programs have graduates making

less than high school dropouts?*, The Fact Checker, Wash. Post (Apr. 11, 2014), *available at*

http://www.washingtonpost.com/blogs/fact-checker/wp/2014/04/11/the-obama-administrations-

claim-that-72-percent-of-for-profits-programs-have-graduates-making-less-than-high-school-

dropouts.  Unsurprisingly, experts—including Department of Labor officials—have resoundingly

criticized the Department's method and conclusion.  *See Feds Accused of Using Sloppy Factoid on

For-Profits*, Inside Higher Educ. (Apr. 14, 2014), *available at* http://www.insidehighered.com/

quicktakes/2014/04/14/feds-accused-using-sloppy-factoid-profits; Kessler, *The Fact Checker*,

Wash. Post, above.

78.     The Department's efforts to impose this rule have been broadly criticized by

stakeholders and opposed by a large, bipartisan group in Congress.  In fact, on July 24, 2013, the

House Committee on Education and the Workforce approved with bipartisan support the

Supporting Academic Freedom through Regulatory Relief Act (H.R. 2637), which would repeal

the Department's rule.  The bill is currently awaiting consideration on the House floor.  Previously,

the full House in the 112th Congress expressed its clear view that the Department should not

proceed with this rulemaking.  *See, e.g.*, H.R. 2117 (2012) (passing the House by a vote of

303-114).  Given the serious irregularities throughout the rulemaking process, this rule does not

benefit from a presumption of regularity.

## V.      THE CHALLENGED REGULATIONS.

79.      Just like the vacated regulations, the new gainful employment rule imposes arbitrary new metrics on private sector schools based on an untenable, expansive interpretation of the "gainful employment" language found in 20 U.S.C. §§ 1001, 1002, and 1088.  As before, the Department has declared that it will once again assess whether a program provides training that leads to gainful employment by applying debt metrics that depend not on program quality, but on factors outside of a school or program's control:  students' choices of what jobs to pursue, the state of the economy and the job market in the relevant industry, and students' individual financial circumstances and the amount of debt that they consequently incur to attend a program.  *See* 34 C.F.R. § 668.403(a)(2), (b)-(c); 79 Fed. Reg. at 64,891.  The new regulations, however, are even more onerous than the vacated rule.

80.      The Department seeks to establish two frameworks for regulating Title IV eligibility beyond what Congress has authorized:  a debt-to-earnings test, referred to by the Department as the "accountability framework," and a series of reporting and disclosure requirements, referred to by the Department as the "transparency framework."  79 Fed. Reg. at 64,890.  The rule also requires schools to certify that their programs meet certain accreditation and licensing standards.

### A.      The Debt-To-Earnings Test.

81.      As in the vacated 2011 regulations, the Department has again attempted to define what it means to prepare students for gainful employment in what the Department deems a recognized occupation based on metrics related to students' earnings and debt.  Unlike both the vacated 2011 regulations, which established two tests designed to work in tandem, and the proposed rule, which adopted two independent tests, the Department's new rule relies on a single test—a debt-to-earnings test—which consists of two metrics:  a debt-to-annual earnings ratio and a

debt-to-discretionary income ratio.  A program that does not pass this single test faces punitive sanctions.

### 1.    The Debt-To-Earnings Metrics.

82.    The debt-to-earnings test evaluates the ratio of (1) the estimated annual loan payment owed by students who graduated from a program and received Title IV aid to (2) either (a) graduates' average annual earnings or (b) their discretionary income.  This complex calculation requires three steps:  *First*, the Department calculates the median loan debt of the relevant "cohort" of students, i.e., the students who completed the program during the relevant "cohort period." *Second*, the Department computes an estimated annual payment from the median loan debt statistic.  *Third*, the estimated annual loan payment is divided by two earnings formulas:  (a) the current mean (or median, whichever is higher) annual earnings for the same cohort of former students and (b) the current "discretionary income" for the same cohort of former students, which is the amount of annual earnings in excess of 150 percent of the Poverty Guidelines established by the Department of Health and Human Services for the relevant year.  *See* 34 C.F.R. § 668.404.

83.    A program is deemed "passing" under the debt-to-earnings test if the relevant cohort has a debt-to-annual earnings ratio of 8 percent or less, or a debt-to-discretionary income ratio of 20 percent or less.  *See* 34 C.F.R. § 668.403(c)(1).  These thresholds are even more demanding than those established in the vacated 2011 regulation, under which a program would pass if its debt-to-annual earnings ratio was 12 percent or less or if its debt-to-discretionary income ratio was 30 percent or less.

84.    The new rule also establishes a "zone" for gainful employment programs that have a debt-to-discretionary income ratio between 20 percent and 30 percent or a debt-to-annual earnings ratio between 8 percent and 12 percent.  *See* 34 C.F.R. § 668.403(c)(3).

85.     Gainful employment programs with a debt-to-discretionary income ratio over 30 percent and a debt-to-annual earnings ratio over 12 percent would fail the debt-to-earnings test. *See* 34 C.F.R. § 668.403(c)(2).

86.     The Department does not itself compute the mean and median earnings of a program's former students in the third step.  Rather, the Secretary obtains from the Social Security Administration ("SSA") the most currently available mean and median annual earnings.  Notably, a school may not challenge the accuracy of the mean or median annual earnings the Secretary obtained from SSA to calculate the initial debt-to-earnings ratios for the program.  34 C.F.R. § 668.404(c).

87.     The calculations for both the debt-to-annual earnings and the debt-to-discretionary income metrics used in the Department's new debt-to-earnings test are generally made using data for students who graduated in the two-year period usually consisting of the third and fourth fiscal years prior to the most recently concluded award year (the "two-year cohort period").  *See* 34 C.F.R. §§ 668.402, 404(b)-(d).  The calculated ratios for the 2014-2015 award year, for example, would be based on the outcomes of students' experiences in award years 2010-2011 and 2011-2012 for a two-year cohort period.  If there are fewer than 30 students who completed the program, then the calculations are made using data for students who graduated or entered repayment during a four-year period usually consisting of the third, fourth, fifth, and sixth award years prior to the most recently concluded award year (the "four-year cohort period").  Again, for the 2014-2015 award year, for example, if a program has 30 or fewer students, the calculated ratios would be based on outcomes of students' experiences in award years 2008-2009, 2009-2010, 2010-2011, and 2011-2012.  *See id.*

88.     The regulations purportedly allow institutions to use alternative earning figures to attempt to satisfy the debt-to-earnings test:  schools may rely on alternative earnings from a state-sponsored data system or an institutional survey conducted in accordance with NCES standards.  *See* 34 C.F.R. § 668.405.  In practice, however, it will be impractical for schools to rely on state-sponsored or survey data.  Not every State will have an earnings database, and even if it does, that database may reflect only the average earnings of total workers and conflate occupation and industry.  *See* Jonah Newman, *The Pitfalls of Comparing Colleges Based on Postgraduate Earnings*, Chron. of Higher Educ. (Mar. 26, 2014), *available at* http://chronicle.com/blogs/data/2014/03/05/the-pitfalls-of-comparing-colleges-based-on-postgraduate-earnings.  An NCES earnings study would be costly to create and apply, especially for smaller institutions.  Moreover, institutions simply cannot conduct these surveys in the time in which they must appeal the calculations—fourteen days after the Secretary issues final debt-to-earnings ratios, *see* 34 C.F.R. § 668.406(e)(1)(i).  Among other difficulties, the alternative-earnings regulations require schools to locate former students who graduated three or four years earlier, and even if schools can get in touch with those graduates, there is no guarantee that the graduates will respond to the survey.

89.     The Department estimates that approximately 1,445 programs—more than 26 percent of all programs subject to the gainful employment statute provisions—will not pass under its new regulation.  *See* 79 Fed. Reg. at 65,064-65.  That is more than *seven times* the number of programs (193) that the Department estimated would not have passed under the vacated 2011 regulations.  *See* Dep't of Educ., *Obama Administration Announces Final Rules to Protect Students from Poor-Performing Career College Programs* (Oct. 30, 2014), *available at* http://www.ed.gov/news/press-releases/obama-administration-announces-final-rules-protect-students-poor-performing-care.

90.     Strikingly, according to a recent study by the Department itself, if its new debt-to-earnings thresholds were applied to public and private non-profit colleges, more than 26 percent of graduates from four-year public colleges and 39 percent of graduates of private non-profit four-year colleges would fail the Department's metrics, and therefore would not be deemed "gainfully employed," because their monthly debt payments exceed 12 percent of their income.  *See* Jennie H. Woo, U.S. Dep't of Educ., *Degrees of Debt: Student Borrowing and Loan Repayment of Bachelor's Degree Recipients 1994, 2001, and 2009*, at 12 (2014), *available at* http://eric.ed.gov/?id=ED544217.

### 2.     Sanctions Under The Debt-To-Earnings Test.

91.     Programs that fail to satisfy the Department's new debt-to-earnings test are subject to a variety of mandatory sanctions.  A program faces ineligibility if it fails the debt-to-earnings test for two out of three consecutive years, or if it has a debt-to-annual earnings ratio or a debt-to-discretionary income ratio that is either failing *or* "in the zone" for four consecutive years. 34 C.F.R. § 668.403(c)(4)(i)-(ii).

92.     The new rule is thus much more onerous than the vacated rule.  Under the vacated 2011 rule, a program needed to fail each of *two* tests—the debt-to-earnings test and the abandoned loan repayment test—at least *three out of four* years.  *See* 34 C.F.R. § 668.7(h)-(j) (2011).  Under the new rule, a program that fails just one test—the debt-to-earnings test—in *two out of three* years becomes ineligible.  And even a program that does not fail the new, more stringent debt-to-earnings test will become ineligible if it is in the "zone" for four consecutive years.

93.     A program also becomes ineligible if, after the Department issues "draft" debt-to-earnings rates for the program, the program is voluntarily discontinued, unless the Department issues final debt-to-earnings rates that show the program is passing.  34 C.F.R. § 668.410(b)(2)(ii).

31

94.     A program that loses eligibility for Title IV funds cannot seek to reestablish eligibility for that program until at least three years later. 34 C.F.R. § 668.410(b)(2)(i).  In addition, during that three-year period, the school also may not establish a new program that is "substantially similar" to the program that lost eligibility.  *See id.*  Under the Department's new rule, a new program is "substantially similar" to a prior program if the two programs share the same four-digit CIP code, even if the two programs are at different credential levels—for example, if the ineligible program would lead only to a certificate or associate's degree, but the new program would lead to a master's or bachelor's degree.  *See id.* § 668.410(b)(2)(iv); 79 Fed. Reg. at 64,973.

95.     Programs facing ineligibility must also provide written warnings to "[current] students and prospective students" about their programs.  34 C.F.R. § 668.410(a)(1).  Schools with a program that could become ineligible under either metric in the following year must provide a written warning to each prospective and current student, informing them that they "may not be able to use" federal funding to pay for the program because it has failed the Department's debt metrics.  *Id.* § 668.410(a)(2)(i).

96.     The rule's requirement that schools send this warning to "prospective students" is much more burdensome than the requirements that were vacated in the previous rule.  Under the vacated rule, schools needed only warn prospective students who had contacted the institution requesting admission information.  34 C.F.R. § 668.7(j)(3)(ii).  Under the new rule, however, schools must also provide a warning to any student who "has contacted . . . or who has been contacted" by an "institution or by a third party on behalf of the institution"—which is a much larger group.  *Id.* § 668.402.  And schools must now provide that warning "at first contact" with the student or any "third party acting on behalf of the student."  *Id.* § 668.410(a)(6).  The new rules

governing third parties were each added to the final rule without notice or opportunity for comment.  79 Fed. Reg. at 64,968.

97.    In addition, unlike the vacated rule, the new rule imposes burdensome delivery requirements.  Schools that attempt to send the warning by email must resend it "using a different address or method of delivery if the institution receives a response that the email could not be delivered."  34 C.F.R. § 668.10(a)(5)(ii)(C).  However, the Department has not indicated how schools will be able to deliver the warning if they cannot reach students at their primary email address used for communication by the program.  The new delivery requirements were also added to the final rule without notice or opportunity for comment.

98.    Moreover, the Department now requires schools to provide "[t]o the extent practicable, alternatives to the English language warnings for those students and prospective students for whom English is not their first language."  34 C.F.R. § 668.410(a)(4).  The preamble to the final rule asserts that school should provide these warnings whenever "the language principally used in marketing and recruiting for the program was a language other than English."  79 Fed. Reg. at 64,970.  But the regulation itself does not contain this limitation, and the preamble itself emphasizes that "[o]ther methods . . . might also be practicable," and therefore required, even though even the Department could not identify such methods at the time of the rulemaking.

99.    The Department also requires a school to wait three business days after a prospective student is given a student warning before enrolling or registering the prospective student in a program or entering into a financial commitment with the prospective student with respect to a program.  34 C.F.R. § 668.410(a)(6)(ii)(B).

### B.    The Reporting And Disclosure Requirements.

100.    Through the new reporting and disclosure requirements, the Department mandates a number of reporting, disclosure, and certification requirements, which purportedly would

"increase the transparency of student outcomes of GE programs so that information is disseminated to students, prospective students, and their families." 79 Fed. Reg. at 65,024.  Just like the debt provisions, these provisions apply only to programs that are subject to the gainful employment requirements, i.e., mostly private sector school programs.

101.    Under the reporting requirements, a school must report several pieces of information regarding its students and programs to the Department.  This information includes personally identifiable information about students including:  a student's social-security number, enrollment date, attendance dates, attendance and enrollment status (e.g., enrolled, withdrawn, or completed, full-time, half-time), and completion or withdrawal dates.  Schools must also report information related to student loans:  the total amount the student received from private education loans (of which the school is aware), the total amount of institutional debt the student owes or will owe after completing or withdrawing from the program, the total amount of tuition and fees assessed the student for the student's enrollment in the program, and the total amount of the allowance for books, supplies, and equipment included in the student's cost of attendance. Additionally, schools must report for each student in a program the name of the program, the CIP code for the program, the credential level of the program, the length of the program, and whether the program is a medical or dental program whose students are required to complete an internship or residency.  34 C.F.R. § 668.411.

102.    Under the disclosure requirements, the Department may require each program to calculate and disclose to enrolled and prospective students, on their websites and in their promotional materials, up to sixteen discrete metrics about their programs (*see* 34 C.F.R. § 668.412(a)(1)-(16)), many of which include multiple data points (*see*, *e.g. id.* § 668.412(a)(7), (11), (14)) or which must be calculated for multiple student populations (*see*, *e.g.*, *id.*

§ 668.412(a)(2), (6)(i)-(iii), (10)(i)-(iii), (11)(i)-(iii)) or multiple locations (*see*, *e.g.*, *id.*

§ 668.412(a)(8), (14), (15)).  In addition to the existing disclosures required by the Higher

Education Opportunity Act ("HEOA"), Pub. L. No. 110-315, 122 Stat. 3078 (2008), the new rule

purports to authorize the Secretary to mandate the disclosure of information that may include (but

is not limited to) information regarding the primary occupation that the program prepares students

to enter; completion and withdrawal rates (broken out by enrollment status); the length of the

program in months or years; the number of clock or credit hours in the program; the number of

enrolled individuals in the program; loan repayment rates for students who enrolled, completed,

and withdrew from the program; the total cost of tuition and fees; the total cost of books, supplies,

and equipment that a student would incur for completing the program within the length of the

program; placements rates; the percentage of individuals who completed the program to incur

debt; the median loan debt of completers and those who withdrew; the program cohort default ratio

and the debt-to-earnings ratio; whether the program satisfies prerequisites to obtain a professional

license; and whether the program holds a programmatic accreditation.  The requirement also

requires schools to include several website links on their websites and in their promotional

materials.  Where space or airtime constraints would preclude the inclusion of all of this

information, schools may provide a link to a "disclosure template" that includes this information.

34 C.F.R. §668.412.

        103.    The new rule further provides that "[b]efore a prospective student signs an

enrollment agreement, completes registration, or makes a financial commitment to the institution,

the institution must provide the prospective student or a third party acting on behalf of the

prospective student . . . a copy of the disclosure template."  34 C.F.R. § 668.412(e)(1).

### C.     The Certification Requirements.

104.     Under the certification requirements, programs must sign a Program Participation Agreement ("PPA") with the Department in which they certify that each of their gainful employment programs meets applicable institutional and program-level accreditation requirements and state or federal licensure standards.  34 C.F.R. § 668.414.

105.     The certification requirements in the Department's final rule differ in an important respect from the proposed rule.  In its NPRM, the Department proposed that, to remain eligible to receive Title IV funds, a school must certify that each of its "gainful employment" programs meets accreditation, licensure, and certification requirements in the States in which the school is located and in all other States within its local Metropolitan Statistical Area ("MSA").  *See* 79 Fed. Reg. at 16,486.  In its final rule, however, the Department significantly broadened the certification requirement by eliminating the limitation to States within the school's MSA; instead, the final rule requires schools to provide "applicable program certifications in *any* State where the institution is otherwise required to obtain State approval under 34 CFR 600.9," i.e., the Department's state authorization regulations.  79 Fed. Reg. at 64,992 (emphasis added).

106.     Although the current state authorization regulations apply only to States where an institution has a physical location, the Department explains that "if any changes are made in the future to extend the State authorization requirements . . . in other States," the certification requirements will also apply in those same States as well.  79 Fed. Reg. at 64,992.  Notably, the Department attempted but failed to promulgate a state authorization regulation that would have required online programs to meet standards in *each* State it was offered (which could be all fifty States), and the Department convened a negotiated rulemaking committee to attempt to promulgate such a regulation again in May 2014.  *See* Michael Stratford, *No Consensus On Debit Cards, State Authorization*, Inside Higher Educ. (May 21, 2014), *available at*

36

https://www.insidehighered.com/news/2014/05/21/federal-panel-fails-reach-consensus-debit-card-state-authorization-rules.  If the Department is successful in promulgating a state authorization regulation, schools with online programs will be forced—under the Department's certification requirement adopted in this rulemaking—to certify that their programs comply with numerous requirements in a much larger number of States than the Department proposed to the public through the notice-and-comment process.

## VI.    THE CHALLENGED REGULATIONS EXCEED THE DEPARTMENT'S STATUTORY AUTHORITY, VIOLATE THE ADMINISTRATIVE PROCEDURE ACT, AND VIOLATE THE CONSTITUTION.

### A.    The Debt-To-Earnings Test Exceeds The Department's Statutory Authority And Is Arbitrary And Capricious.

107.    The final regulations impose dramatic limitations on private sector and certain other schools that far exceed the Department's authority under the HEA and are arbitrary and capricious in numerous ways.  Indeed, the regulations are contrary to the very purpose of federal higher-education funding—to provide access to higher education to students from all walks of life—because the regulations incentivize private sector schools to curtail educational opportunities to low-income and non-traditional students who are the most likely to fail the Department's arbitrary debt-related test.

#### 1.    The Debt-To-Earnings Test Is Beyond The Department's Authority Under The HEA.

108.    The Department's convoluted interpretation of the statutory phrase "gainful employment" is contrary to the widely understood meaning of the phrase—simply, a job that pays.  Moreover, the word "gainful" modifies "employment in a recognized occupation"—not the entire process of embarking on a program of study, borrowing money to pay for it, and then obtaining a job.  It is not the "program of training," 20 U.S.C. § 1002(b)(1)(A)(i), that must be "gainful" or profitable, but the employment for which the program prepares the student.  Schools must offer

courses that provide marketable skills; the HEA does not, however, make schools responsible for making sure their students have jobs four years after graduation that provide them a certain amount of total or disposable income.

109.    The Department's interpretation of the HEA is also at odds with the normal rule of statutory construction that identical words used in different parts of the same Act are intended to have the same meaning.  For example, Congress has used the phrase "gainful employment" at least nine other times in Title 20 of the U.S. Code (the Title governing "Education") in a manner that is consistent with the term's plain meaning—a job that pays—and inconsistent with the Department's debt-focused regime.  Indeed, reading the phrase across the HEA to include complex debt metrics would lead to untenable results.  That the regulations depend on the phrase having different meanings in different parts of the HEA shows that they are impermissible.

110.    The Department's interpretation of "gainful employment" is further undercut by Congress's repeated use of that phrase in other contexts.  Congress has used the phrase "gainful employment"—or "gainfully employed"—in dozens of statutory provisions outside of Title 20.  Yet, nowhere has Congress in any way suggested that the phrase is a placeholder for debt tests of any sort.

111.    Notably, the Department's own existing regulation defining eligible programs makes clear that employment is "gainful" as long as it is paying—not paying enough in terms of some after-the-fact debt-related calculations.  Section 668.8(e)(1)(ii) provides that certain kinds of programs at proprietary institutions of higher education and postsecondary vocational institutions are eligible to participate in Title IV programs only if they have "a substantiated placement rate of at least 70 percent."  *See also* 20 U.S.C. § 1088(b)(2)(A)(ii).  To calculate this placement rate, an institution must "determine the number of students who, within 180 days of the day they received

[a recognized educational credential], obtained *gainful employment* in the recognized occupation for which they were trained or in a related comparable recognized occupation." 34 C.F.R. § 668.8(g)(1)(ii) (emphasis added). For an institution to document that a graduate is gainfully employed under these regulations, it must produce (among other acceptable documents) only a "written statement from the student's employer," "[s]igned copies of State or Federal income tax forms," or "[w]ritten evidence of payments of Social Security taxes." *Id*. Section 668.8 does not require a school to demonstrate that the student's earnings from that job rise to a particular level in relation to the student's debt. The Department's new rule does not purport to alter these requirements. The Department does not address this inconsistency in its own regulations.

112.    The Department's gainful employment analysis is also fatally flawed because it rests upon the erroneous premise that an educational program qualifies for federal funding only if it actually *leads to* gainful employment in what the Department deems a recognized occupation. Indeed, the Department's final rule refers repeatedly to students' "secur[ing] employment." *E.g.*, 79 Fed. Reg. at 64,891, 64,933. The Department's debt-to-earnings test purportedly measures the actual earnings of students who complete a program relative to their debt burden: for a program to remain eligible, its students must actually obtain jobs that yield a particular level of earnings that the Department deems sufficient. Although the Department denies that its rule requires a school to ensure a particular employment outcome for any given individual student, 79 Fed. Reg. at 64,895, its regulation on its face makes schools' eligibility depend on the actual job outcomes for a program's students in the aggregate. The statutes enacted by Congress, however, impose no such requirement: The educational program that an institution of higher education offers must be intended merely "to *prepare* students for gainful employment." 20 U.S.C. § 1002(b)(1)(A)(i) (emphasis added). Institutions need not—nor could they—guarantee students that their programs

will lead to gainful employment after graduation, whether measured by the Department's novel test or any other metric.  Indeed, whether a student obtains a job with a particular income relative to his or her debt depends heavily on factors beyond the school's control, including job-market conditions and the student's individual choice.

113.    Even if it were reasonable to conclude that students are not truly prepared for gainful employment simply because *some* students in a program do not in fact obtain jobs (and it is not), the Department offers no justification for imposing complicated debt metrics that evaluate only in a very limited and artificial sense whether students make enough to pay off their loans in the years immediately following their completion of a program.

114.    Relatedly, although it may be difficult to assess whether a program adequately prepares students for gainful employment, the Department needs—but has failed—to explain why or how its debt test assesses the adequacy of how well a program prepares students for gainful employment.

115.    The Department's expansive reading of the HEA is also absurd.  Under its regulation, two schools in different States that offer identical programs and that place the same number of graduates into the same jobs, might fare differently on the Department's debt metrics. Job-market conditions in the relevant industry may vary from one locale to another.  Thus, a student in one locale may be able to obtain a job at a particular earnings level, while a student in a different locale who received identical training and incurred the same amount of debt may not be able to find a job in the same industry at the same earnings level.  And even if two students attend identical programs in the same locale, which charge the same amount in tuition and costs, and each student obtains a job at the same earnings level as the other, the amount of loans that each student incurred to attend the program will affect the eligibility of the program that he or she attended; if

the student who attends program X incurs a smaller amount in loans than the student who attends

program Y, program X may remain eligible while program Y may become ineligible.  Congress

could not have intended for a program's eligibility to turn on local idiosyncrasies, or on the

particular financial circumstances of individual students, which have nothing to do with the quality

of an educational program.  Nor did Congress authorize the Department to create a patchwork

standard that treats similar programs differently based on their location or students' circumstances.

116.    The Department claims that its regulation is also authorized by additional statutory

provisions, namely, 20 U.S.C. §§ 1221e-3 and 3474.  79 Fed. Reg. at 64,890-91.  That is incorrect.

Neither Section 1221e-3 nor Section 3474 represents a plenary grant of authority to the Secretary

to make any rule governing any program that receives Title IV funding.  Instead, those provisions

merely authorize regulations that are necessary or appropriate to "carry out functions otherwise

vested in the Secretary by law," *id.* § 1221e-3, or "administer and manage the functions of the

Secretary or the Department," *id.* § 3474.  Those functions do not independently authorize the

Department to invent new requirements unsupported by any specific provision of the HEA.

117.    Indeed, the Department itself elsewhere conceded that Section 1221e-3 and

Section 3474 do not authorize the Department's regulation.  In response to comments arguing that

the new regulation unfairly targets private sector schools by imposing on them burdens that other

schools (such as traditional, four-year universities) do not face, the Department claimed that it

could not expand the regulation beyond programs that are subject to the statutory "gainful

employment" requirements.  79 Fed. Reg. at 64,904.  The Department stated that its "regulatory

authority in this rulemaking with respect to institutional accountability is limited to defining the

statutory requirement that these programs are eligible to participate in the title IV, HEA programs

because they provide training that prepares students for gainful employment in a recognized

41

occupation." *Id.*  Accordingly, the Department explained, it "does not have the authority in this rulemaking to regulate other higher education institutions or programs" that are not subject to the statutory gainful employment requirements. *Id.*  Thus, in justifying the scope of its new regulation, the Department admitted that its regulation is authorized (if at all) only by the statutory "gainful employment" requirements.

118.   The Department's interpretation of "gainful employment" is also inconsistent with the structure and purpose of the HEA.  The statute sets forth a comprehensive CDR scheme to place limits on student loan debt levels measured at the institutional level.  Congress in 2008 altered the CDR calculations to extend measurement an additional year and raised the threshold levels to correspond to the lengthened time period.  *See* HEOA, Pub. L. No. 110-315, 122 Stat. 3078.  Notably, Congress did not amend the gainful employment provisions of the HEA to include anything resembling the debt-to-earnings test.  By establishing additional requirements that assess students' debt levels at the program level, rather than the institutional level, the Department's rule contravenes the statutory scheme.  While the Department may disagree with Congress's policy choice, it is the choice Congress made, and the Department lacks the authority to override Congress's judgment, and its rule is therefore invalid.  *See* 5 U.S.C. § 706(2)(C).

119.   Moreover, student debt concerns are not limited to one sector of higher education. Congress understood that, and it enacted the cohort default regime to address debt at all institutions of higher education—including traditional four-year public universities.  *See, e.g.*, 20 U.S.C. § 1085(a).  Yet the Department's rule applies only to certain schools and not to others such as traditional four-year universities.

120.   The regulation also impermissibly undermines the central purpose of the HEA:  "to assist in making available the benefits of postsecondary education to eligible students."  20 U.S.C.

§ 1070(a).  The regulation shuns that goal in favor of ensuring that programs prepare students for certain high-paying jobs.  Congress, however, did not authorize the Department to funnel students into only high-paying jobs; rather, it authorized the Department to ensure access to higher education for all *eligible* students.  Indeed, the regulation actively thwarts the HEA's purpose of making postsecondary education available to all eligible students, because the regulation will cause the closure of some private sector schools, and the remaining available alternatives simply do not have the capacity to enroll the students that will be displaced, causing eligible students to be denied access to higher education.  The Department readily admits that over one-third of displaced students will not have higher-education alternatives available:  "Our analysis indicates that, under a static scenario assuming no reaction to the regulations, about 32 percent of students in in-person zone and failing programs will not have nearby transfer options to an in-person program with the same six-digit CIP code and credential level."  79 Fed. Reg. at 65,074.

121.    Further, the regulation runs afoul of both 20 U.S.C. § 1232a and the 90/10 rule.  The Department states that lowering tuition is a primary means by which schools will attempt to comply with the Department's debt test.  *See* 79 Fed. Reg. at 64,924.  And the Department's regulatory approach assumes that schools will either lower their tuition or drop certain programs that do not funnel students into high-paying jobs.  Yet Section 1232a forbids the Department from interfering with school administration, and the Department lacks the authority to dictate tuition and fee rates.  Even if the Department had such authority, it is indisputable that one consequence of lowering program costs is that a greater percentage of students' tuition will be paid for with Title IV funds, which could cause institutions to run afoul of the 90/10 rule.  Indeed, the regulation forces many schools into a "catch 22" situation:  either lower their tuition, thereby courting

sanctions under the 90/10 rule, or maintain existing tuition levels, thereby putting their Title IV eligibility at risk under the new regulation.

122.     The rule is also inconsistent with the Department's prior interpretations.  Prior to promulgating the 2011 rule, the Department adopted a limited interpretation of "gainful employment" consistent with its ordinary meaning, in administrative decisions and regulations. For example, in administrative proceedings interpreting the gainful employment provisions of the HEA, the Department considered only whether the primary goal of a program was to prepare students for work; it did not consider student debt.  *See, e.g.*, *In re Acad. for Jewish Educ.*, No. 94-11-EA, 1994 WL 1026087, at *3 (Dep't of Educ. Mar. 23, 1994) (requiring that the "statutorily intended goal or result of [a 'gainful employment'] program be preparation for gainful employment in such an occupation; not that such a goal or result be potentially derived or incidentally available at the conclusion of the program").  The Department has not adequately explained its about-face.

123.     The rule also cannot be reconciled with the statute's legislative history.  Congress has amended the HEA numerous times and has never questioned the Department's earlier, limited interpretation.  In fact, in 2008, in the same legislation in which Congress altered the institutional cohort default calculations (the HEOA), it amended the definition of a proprietary institution of higher education to exempt institutions that offer certain programs "leading to a baccalaureate degree" from the HEA's gainful employment requirement.  *See* HEOA § 102(d)(1), 122 Stat. at 3085-86.  Yet Congress did not alter the requirement that most proprietary institutions of higher education "prepare students for gainful employment."  If Congress believed the Department's prior interpretation of "gainful employment" was incorrect, the HEOA offered a relevant legislative mechanism to enact a different regime.  Congress chose not to do so.

124.    The legislative history of another "gainful employment" provision also confirms that Congress intended to give the phrase its ordinary meaning.  In the Education Amendments Act of 1972, Congress amended the Vocational Education Act to provide that training for volunteer firemen constitutes training for gainful employment even though volunteer firemen are unpaid.  *See* Pub. L. No. 92-318, § 202(b), 86 Stat. 235; *see also* S. Rep. No. 92-346, at 75 (1971).  This exception thus proves the rule that Congress has consistently understood the phrase "gainful employment" to mean a job that pays; otherwise the "volunteer firemen" amendment would not have been necessary.

125.    In defending the vacated rule and its new rule, the Department relied on the legislative history of the National Vocational Student Loan Insurance Act of 1965 ("NVSLIA"), Pub. L. No. 89-287, 79 Stat. 1037.  *See* 79 Fed. Reg. at 64,893.  The Department's reliance is misplaced.  Congress merged the requirements of the NVSLIA into the HEA in the Higher Education Amendments of 1968, Pub. L. No. 90-575, § 293, 82 Stat. 1014, 1050-51.  Nothing in that statutory merger supports the Department's strained construction of the pre-existing phrase "gainful employment."  In passing the 1968 amendments, Congress explained that the use of the phrase "gainful employment" in another provision of the HEA was meant only to expand the definition of "institution of higher education" beyond business or technical schools. S. Rep. No. 90-1387, at 79 (1968).  Nowhere did Congress suggest that it was using the phrase to authorize complex debt-related requirements aimed at disqualifying programs from Title IV.  Moreover, the operative phrase in the NVSLIA is not "gainful employment"—the phrase Congress adopted and retained in the HEA—but instead "useful employment."  NVSLIA, Pub. L. No. 89-287, § 17(a)(2), 79 Stat. at 1048.  The history of the NVSLIA thus provides little insight into the meaning of "gainful employment."

126.    In defending the vacated rule and its new rule, the Department also relied on snippets of testimony by private individuals, quoted in Senate and House Reports on the NVSLIA, and in particular testimony by Dr. Kenneth B. Hoyt regarding graduates of vocational programs. *See* 79 Fed. Reg. at 64,893.  That testimony does not demonstrate that Congress was concerned about graduates receiving certain incomes, or that Congress intended to authorize the Department to adopt debt tests.  Indeed, both the House and Senate Reports preface the testimony of Dr. Hoyt by noting that he testified regarding the "need for such legislation and about the caliber of student attending a vocational institution."  H.R. Rep. No. 89-308, at 3 (1965); *see also* S. Rep. No. 89-758, at 3 (1965).  Thus, the Reports quote the testimony for what it said about student quality—not program quality.  Those are very distinct concerns, which are reflected in the text of Title IV.  *See, e.g.*, 20 U.S.C. § 1091 (student eligibility provisions).

127.    Although the Court in *APSCU I* concluded that the phrase "gainful employment" was sufficiently ambiguous to allow the Department to supply its own reasonable interpretation, 870 F. Supp. 2d at 149, that conclusion was not necessary to the Court's holding, which invalidated the regulatory scheme on other grounds, *see id.* at 154.  Even the Department does not argue otherwise in promulgating the final rule.  Nor could APSCU have appealed that conclusion because it obtained the relief it sought (a decision vacating the regulation).  Consequently, the Court's discussion of statutory authorization does not control.

### 2.    The Debt-To-Earnings Test Violates The APA.

128.    The regulation is also arbitrary and capricious in violation of the APA for numerous reasons.

> **a)** **The Department has arbitrarily abandoned its prior position that no single debt metric can reliably measure whether a program prepares students for gainful employment.**

129.   In promulgating and defending the prior regulations, the Department acknowledged that "there can be no single percentage that answers the question of how much students can borrow without risking repayment difficulties." *APSCU v. Duncan*, No. 1:11-cv-01314-RC, ECF No. 16, Dep't Cross-Motion for Summ. J., at 20 (D.D.C. Dec. 13, 2011) (quoting AR 004016) (alteration omitted).  And it conceded that it "has found no perfect single test" and that "the Department has no magic mirror through which it can identify programs that are not preparing their students for gainful employment." *APSCU v. Duncan*, No. 1:11-cv-01314-RC, ECF No. 20, Dep't Reply, at 11.

130.   The Department was correct that no single, one-size-fits-all statistical test can accurately measure whether all educational programs, across all fields, prepare students for gainful employment, especially given the rich diversity among programs nationwide.

131.   Recognizing that a single test would not accurately and logically measure program performance, the Department adopted two different tests—the debt-to-earnings test and the loan repayment test—that the Department boasted were "designed to work together." *APSCU v. Duncan*, No. 1:11-cv-01314-RC, ECF. No. 16, Dep't Cross-Motion for Summ. J., at 20; *see also APSCU v. Duncan*, No. 1:11-cv-01314-RC, ECF. No. 20, Dep't Reply, at 12.  The Department repeatedly stressed the importance of the two debt tests' working together, such that any potential errors in one test would be mitigated because a program would maintain eligibility unless it failed fail both tests.

132.   Indeed, the interaction between the debt-to-earnings and loan repayment tests was central to this Court's decision in *APSCU I.*  After determining that the loan repayment rate test lacked a reasoned basis, this Court also invalidated the debt-to-earnings test because it concluded

that the two tests were "obviously 'intertwined'" and incapable of surviving independently. 870 F. Supp. 2d at 154.

133.    Despite its own statements and this Court's admonitions, the Department has now attempted to promulgate a new, harsher debt-to-earnings test without any meaningful assurance that such a test can function independently.  In its NPRM, the Department admitted there was no reasoned basis for the vacated loan repayment test, *see* 79 Fed. Reg. at 16,445, but instead dreamt up a new test, the pCDR test, to replace it, *id.* at 16,427.  Moreover, contradicting its position in the prior rulemaking that no single test is sufficient and that no program thus should become ineligible for failing a single test, the Department proposed to require that programs satisfy *both* the debt-to-earnings test *and* the pCDR test—instead of only one of them.

134.    As many commenters (including APSCU) demonstrated, the pCDR test was just as unlawful and arbitrary as the loan repayment test, and moreover it contravened the statutory scheme that established *institutional* default-rate requirements.  79 Fed. Reg. at 64,915.  In addition, the pCDR test included data regarding students who did not complete the program at issue, and thus irrationally attempted to evaluate whether a program prepared students for gainful employment based on the experience of students who did not receive the full benefit of the program.

135.    In the final rule, the Department has flip-flopped yet again.  The Department now admits that, in light of "the wealth of feedback [the Department] received on this issue through the comments," "further study is necessary before [it] adopt[s] pCDR or another accountability metric that would take into account the outcomes of student who do not complete a program."  79 Fed. Reg. at 64,915.  Indeed, the Department admits that "further study is necessary" before adopting any other metric based on the CDR.  *Id.*

136.    Yet, instead of replacing the pCDR test with another measure—or deferring further rulemaking until such time as the Department could undertake the "further study" it acknowledged was "necessary," *see* 79 Fed. Reg. at 64,915—the Department chose to proceed with a rule that strips programs of eligibility if they fail only a single test, the debt-to-earnings test.  This latest about-face is the epitome of arbitrary and capricious agency action.  The Department's current view that a single debt test is sufficient flatly contradicts its position in the 2011 rulemaking and its representations to this Court in defense of the 2011 rule that a "single percentage" cannot possibly "answe[r] the question of how much students can borrow without risking repayment difficulties," *APSCU v. Duncan*, No. 1:11-cv-01314-RC, ECF. No. 16, Dep't Cross-Motion for Summ. J., at 20 (quoting AR004016)—much less answer whether a program prepares students for gainful employment—and that multiple metrics are therefore necessary.  And the Department's conclusion that the debt-to-earnings test by itself is adequate contradicts the Department's reasoning in both the 2011 rulemaking and the NPRM.  The Department, however, has utterly failed to explain these fundamental changes in its position.

137.    Moreover, the Department's justifications for its proposed single metric make no sense.  In defending the pCDR test in the NPRM, the Department explained that the test would address the so-called "'churn' problem," i.e., "where many students are enrolling, but are dropping out."  79 Fed. Reg. at 16,483.  "By including an accountability metric that reflects the outcomes of students who do not complete the program," the Department explained, "institutions would have incentive to address any high dropout and 'churn' issues or face the loss of eligibility."  *Id*. at 16,541.  Now, the Department has jettisoned the only metric intended to address the churn problem (pCDR), but still justifies the debt-to-earnings test by referencing the so-called churn problem.  79 Fed. Reg. at 64,890 (listing the "churn" as one of three concerns motivating the rulemaking).

The Department fails to explain, however, how the debt-to-earnings measure addresses churn; nor could it.  Unlike the pCDR proposal, the debt-to-earnings metric measures the debt and earnings of program *completers* only.  The Department's say-anything approach to regulation is the antithesis of reasoned decisionmaking.

138.    Similarly, the Department claims that the rule addresses the concern that private sector programs do "not *train* students in the skills they need to obtain and maintain jobs," 79 Fed. Reg. at 64,890 (emphasis added), yet its rhetoric throughout the final rule's preamble demonstrates that the rule is intended to measure something very different than training.  Specifically, the Department admits that the rule is intended to measure whether students are earning an amount of money that the Department has subjectively decided is "enough to cover . . . major expenses." 79 Fed. Reg. at 64,894.  Again, the Department's purported justifications for the rule do not relate to what the rule actually measures.  The lack of rational connection between the Department's justification for the rule and the operation of the rule also evidences the rule's arbitrariness.

> **b)      The debt-to-earnings test lacks any reasoned basis and is based on flawed assumptions, and the Department has failed adequately to consider the rule's negative consequences.**

139.    The debt-to-earnings test is arbitrary and capricious because the metrics lack any reasoned basis and are based on flawed premises, and because the Department failed adequately to consider the negative effects of the rule.

140.    The Department claims that its authority is limited to measuring whether programs "provide training that prepares students for gainful employment in a recognized occupation." 79 Fed. Reg. at 64,904.  But the debt-to-earnings test measures neither whether a student was prepared for gainful employment, because earnings can be affected by myriad factors independent of a student's preparation, nor whether a student is working in a recognized occupation, because

the metric relies on SSA earnings data that does not address the type of employment in which a

student is actually engaged.

141.    Moreover, the Department's claim that the debt-to-earnings test measures program

quality is laid bare by the fact that the debt metrics evaluate *only* those students in a program that

have received Title IV funds.  For example, a student who was able to pay for her education

without relying on loans or grants would not be included in the Department's debt-to-earnings

calculation for the program that the student completed; whether the program prepared that student

for gainful employment will have no effect on the program's performance under the Department's

metrics.  The Department's debt-to-earnings test thus does not test for program quality, but instead

reflects the Department's own skewed view of whether a subset of students in a program earn

enough to satisfy an arbitrary ratio.

142.    The new debt metrics punish schools based on factors that are outside of their

control.  If a student chooses to defer employment after graduating to raise a family or takes a

lower-paying job—or even if the student simply chooses not to work for any other

reason—schools cannot control those choices.  Schools also have no control over job-market

conditions that may exist several years after a student completes a program, a student's individual

financial circumstances, or the amount of a program's cost that a student pays for using Title IV

funds as opposed to other sources.  Indeed, the Department's own guidance explains that schools

may not limit "on an across-the-board or categorical basis" the amount of funds that students may

borrow.  Dep't of Educ., *2013-2014 Federal Student Aid Handbook* 3–86 (2013), *available at*

http://ifap.ed.gov/fsahandbook/attachments/1314FSAHandbookCompleteActiveIndex.pdf.

Moreover, none of these factors speak to whether a program is preparing students for gainful

employment.  Yet schools would nonetheless be punished under the debt metrics based on those same choices.

143.    The debt-to-earnings test selects arbitrary percentages, relies on incomplete income data, and fails to account for long-term educational benefits.  Both the 8 percent and the 20 percent thresholds are flawed.  The Department admits that the 8 percent earnings threshold is not derived from student loan underwriting criteria, but is instead based on "mortgage underwriting criteria." 79 Fed. Reg. at 64,919; *see also* 79 Fed. Reg. at 16,638.  The experts relied upon by the Department as authorities for its metric thresholds—Sandy Baum and Saul Schwartz—have already stated that the 8 percent threshold should not necessarily be applied to higher education loans.  *See* Sandy Baum & Saul Schwartz, Project on Student Debt and the College Board, *How Much Debt is Too Much? Defining Benchmarks for Manageable Student Debt* 5-7 (2005), *available at* http://research.collegeboard.org/publications/content/2012/05/how-much-debt-too-much-defining-benchmarks-manageable-student-debt.

144.    The Department also has decreased the passing debt-to-discretionary income ratio from its previous rules—from 30 percent to 20 percent—but it provides no adequate justification for doing so.  Rather, it merely states its "belie[f] that the stated objectives of the 2011 Prior Rule—to identify poor performing programs, to build a 'tolerance' into the thresholds, and to ensure programs are accurately evaluated as to whether they produce graduates with acceptable levels of debt—are better achieved by" using a stricter threshold and by creating a "zone" for certain programs.  79 Fed. Reg. at 64,918.  Thus, while in the prior rule the Department arbitrarily inflated the threshold to 30 percent to create a cushion that purportedly would mitigate some of the negative effects of the rule—which the Department at the time concluded would have made a 20 percent threshold untenable—now the Department has chosen to jettison that cushion and to revert

to the overly stringent 20 percent threshold and all the negative effects that it invites.  As a result, schools will now inexplicably be required to prepare their students to earn 50 percent more income than under the prior rule just for those students to be classified as gainfully employed.  These confusing and arbitrary justifications are inconsistent with reasoned decisionmaking.

145.   Although the Department claims that the "zone" will give programs the opportunity to improve, it never explains how programs can do this without reducing tuition and fees:  the Department states, "[b]ecause institutions have the ability to affect the debt that their students accumulate by lowering tuition and fees, we believe it is possible for zone and failing programs to improve as a result of the transitional D/E rates calculation."  79 Fed. Reg. at 64,924.  But programs in the zone—that would have passed under the vacated 2011 tests—would be required to lower tuition enough to decrease students total debt loads by as much as 33 percent (or increase their annual or discretionary income by 50 percent) to move into the passing range.  Forcing schools to so dramatically lower costs is not a legitimate justification for lowering the debt-to-earnings threshold.  Moreover, as explained above, Congress never intended the Department to have the power to implement de facto price controls on schools, and the Department's efforts to impose these unauthorized price controls would create perverse incentives.  In addition, the 90/10 rule makes it even more difficult for schools to lower tuition, as schools would risk violating that statutory command.  Thus, the "zone" is no cushion at all; it is illusory.

146.   Even if lowering tuition were a legitimate objective, the assumption that schools have the *ability* to do so—and to thereby systematically solve any perceived issues of student debt—is simply wrong.  *See* 79 Fed. Reg. at 65,080 ("Students will benefit from lower costs, and as a result, lower debt, and better program quality as institutions improve programs that fail or fall in the zone under the D/E rates measure.").  Debt levels are largely driven by students' existing

financial resources and their lifestyle choices rather than tuition costs. Furthermore, a school may not know that it is "failing" the Department's debt measure until several years after a program's tuition is fixed; changes made today would not be reflected in the Department's metrics until years down the road, at which point it may be too late for schools whose programs the Department deems "failing."

147.     The formulas that the Department proposes to measure student earnings are also deficient. Among other things, the formulas rely on SSA data that may be inaccurate or incomplete and measure earnings only during the initial years after graduation. The Department's formulas are also based on a ten-year repayment schedule for associate's degrees and a fifteen-year schedule for bachelor's degrees, which is problematic because the Department's own studies have shown that students, regardless of the educational institution attended, have an exceedingly difficult time paying off their loans within ten or even fifteen years, *see* 79 Fed. Reg. at 64,939. For example, the Department acknowledges that, "of undergraduate borrowers from two-year institutions who entered repayment in 2002," barely half—only "55 percent"—"had fully repaid their loans" within ten years, yet the Department calculates students' loan payments assuming that *all* students in such programs do so. *Id*. The Department also acknowledges that recent cohorts of undergraduate students "are repaying their loans at slower rates." *Id.* It notes that "[o]f borrowers who entered repayment in 2002, only 44 percent of undergraduate borrowers from four-year institutions . . . had fully repaid their loans within 10 years," and simply speculates that the majority of such students will have repaid their loans in fifteen years. *Id.* Such conjecture is not reasoned decisionmaking.

148.     Not only are the debt-to-earnings test and underlying metrics flawed, but two main assumptions behind the rulemaking—that public sector schools can absorb private sector students

and that schools can regulate the debt their students incur—are also fundamentally untrue.  The Department thus has failed to adequately consider central aspects of the problem that it purports to address, and it has failed to take into account potential adverse consequences.

149.   One of the main premises of the Department's rule is that public sector schools will be able to absorb an influx of students no longer able to attend private sector schools.  *See* 79 Fed. Reg. at 64,911; *see also* 79 Fed. Reg. at 16,608.  Indeed, the Department admits that the annual transfer rate will increase by nearly 100,000—to 330,484 students—and the drop-out rates will more than double, to 110,161 students.  *See* 79 Fed. Reg. at 65,090.  But public and non-profit schools are either unwilling or unable to serve many of the students enrolled at private sector institutions.  This is due to a variety of factors including that state governments are currently suffering from budget shortfalls, and funding has steadily declined for public colleges and universities.  *See* Dep't of the Treasury with the Dep't of Educ., *The Economics of Higher Education* 4 (Dec. 2012), *available at* http://www.treasury.gov/connect/blog/Documents/ 20121212_Economics%20of%20Higher%20Ed_vFINAL.pdf.  Even the Department admits that "[r]ecent evidence . . . suggests that for-profit institutions absorb students where public institutions are unable to respond to demand due to budget constraints."  79 Fed. Reg. at 64,904; *see also id.* at 65,074.

150.   The Department also fails to account for the role of private sector schools in educating students from disadvantaged backgrounds and the impact of the rule on incentives to enroll at-risk students.  As the Department admitted in the NPRM, the private sector "serves older students, women, Black students, Hispanic students, and students with low incomes at disproportionately high rates."  79 Fed. Reg. at 16,536; *see also* 79 Fed. Reg. at 69,904.  As this Court has recognized in a similar context, the Department's failure adequately to address the effect

of its rule on educational opportunities for such students renders its regulation arbitrary and capricious and violates the APA's notice-and-comment requirements.  *See APSCU v. Duncan*, __ F. Supp. 3d __, 2014 WL 4923023, at *7-8 (D.D.C. Oct. 2, 2014) (remanding Department's regulation regarding compensation of school personnel because Department had failed, for the second time, to address concerns about regulation's effect on minority students' enrollment).

151.    The Department suggests that there is no statistically valid correlation between institutional loan repayment rates and demographic factors such as race, gender, age, and the financial resources of incoming students.  *See* 79 Fed. Reg. at 64,910.  The Department's analysis is deeply flawed.  Indeed, the Department admits that these variables explain 36 percent of the variance in the debt-to-annual earnings ratio in the program cohort default rate.  *See id*. at 65,042; *see also* 79 Fed. Reg. at 16,544.

152.    Moreover, the Department's proposal creates a disincentive for schools to offer programs with low projected earnings.  To remain eligible for Title IV funds, schools may be tempted to limit enrollments in or cut programs that prepare students for socially valuable but low-paying jobs in areas such as education and social work.  This could have a profound effect on women in particular, who are highly concentrated in these fields.  *See* Anthony P. Carnevale, Jeff Strohl, & Michelle Melton, Georgetown University, *What's It Worth?: The Economic Value of College Majors* 33 (2011), *available at* http://cew.georgetown.edu/whatsitworth .

153.    The Department also completely ignored President Obama's call to rate all colleges based on measures of access, affordability, and student outcomes, and to allocate aid based on those ratings.  Under that plan, prospective students would be enabled to compare institutions on several criteria—not just on the debt and earnings of their students.  *See* Kelly Field, *Obama Plan to Tie Student Aid to College Ratings Draws Mixed Reviews*, Chron. Higher Educ. (Aug. 22,

2013), *available at* http://chronicle.com/article/Obama-Plan-to-Tie-Student-Aid/141229.   In

support of that proposal, Secretary Duncan noted that the Department would consider judging

colleges on how accessible they are to students from all walks of life, which would include how

many students receive Pell Grants.  *See* Michael Stratford, *Duncan Chides Critics of College*

*Ratings System, Pledges To Advance Metrics*, Inside Higher Educ. (Sept. 23, 2013), *available at*

http://www.insidehighered.com/news/2013/09/23/duncan-chides-critics-college-ratings-system-

pledges-advance-metrics.  The Department does not explain how it would reconcile this rule with

the rating proposal.  Nor does the Department explain why it accounts for demographics and takes

a holistic approach in the ratings proposal, but does not apply the same approach in these

regulations.

154.    Similarly, the Department has completely ignored President Obama's recent

expansion of the Pay As You Earn ("PAYE") student loan repayment program.  *See* Peter Jacobs,

*Obama Announces Expansion Of Student Loan Relief Plan That Will Help 5 Million With College*

*Debt*, Business Insider (June 9, 2014), *available at* http://www.businessinsider.com/obama-

student-loan-announcement-2014-6.  Under the PAYE program, the government caps a student's

loan payments at 10 percent of his or her discretionary income—income above 150 percent of the

poverty level—and forgives any remaining loan debt after a student makes qualifying payments

for twenty years, or for only ten years if the student is employed by the government or a non-profit

organization.  Prior to the President's expansion of the PAYE program, only a limited subset of

borrowers could take advantage of this program.  The President, however, now has expanded the

program to cover an additional five million borrowers.  The expanded PAYE program undermines

the Department's reasoning because, among other things, the expanded PAYE programs rewards

with faster loan forgiveness those students who enter low-paying jobs in government or at

non-profit organizations.  *Id.*  The President's PAYE program provides an incentive for students to seek lower-paying jobs, but if they do, the Department's regulation will punish the educational program in which those students were enrolled.  The Department's failure to consider the PAYE program is not consistent with reasoned decisionmaking.

155.    The Department's debt-to-earnings test is also arbitrary and capricious because the SSA earnings data from which the Department will calculate the metrics captures all of a student's earnings, not just the portion (if any) of those earnings that was obtained from employment in a recognized occupation related to the educational program that the student completed.  The Department concedes this deficiency in its data, explaining that the Department "has no way of obtaining this information because SSA cannot disclose the kind of individual tax return data" that would be necessary to distinguish the portion of a student's income attributable to one job from that attributable to another, and that "there is no practical way to directly connect a particular GE program with earnings achieved relatively soon after completion."  79 Fed. Reg. at 64,953.  The fact that the Department admittedly lacks any data that is actually probative of the outcome that the Department seeks to measure does not mean the Department may base findings of ineligibility on the next-best data it can find.  Rather, it means that Department has no reasoned basis to impose such regulations unless and until it can identify reliable data that addresses the relevant question. The Department argues that its "regulations are built on the inference that earnings in the period measured are reasonably considered to be the product of the quality of the GE program that the wage earner completed," *id.*, but it cites no evidence in support of that conjecture.

156.    The Department's debt-to-earnings test is arbitrary and capricious also because it bars a school whose program is deemed failing not only from offering that particular program for a period of three years, but offering any other program—at *any* credential level—that shares the

same four-digit CIP code.  *See* 34 C.F.R. § 668.410(b)(2)(iv); 79 Fed. Reg. at 64,973.  There is no reason why a school whose certificate or associate's degree program in a particular field is deemed ineligible based on the earnings and debt of its students should be prohibited from offering a program in the same field that leads to a *different* credential, that may differ in length, cost, curriculum, and that may result in different career opportunities for the student.

157.    The Department's debt-to-earnings test is arbitrary and capricious for the additional reason that it renders ineligible for three years programs that are voluntarily discontinued by an institution in response to the Department's preliminary calculations.  In applying the debt-to-earnings test, the Department will first calculate a "draft" debt-to-earnings ratio, which it publishes to the school and allows limited opportunity for challenge, before issuing a final ratio.  34 C.F.R. § 668.405(a).  If a school elects to voluntarily discontinue a program that is deemed "failing" or "in the zone" in the Department's *draft* calculation, the Department will nonetheless deem the program ineligible for three years—just as if the program had actually failed for two out of three years or been in the zone or failing for four years—unless the program passes under the *final* debt-to-earnings ratio.  34 C.F.R. § 668.410(b)(2).  A program may be voluntarily discontinued for any number of reasons, including because a school may wish to suspend a program temporarily to consider possible improvements.  And when a school has discontinued a program, it has little incentive aside from this regulation, and may lack the time and resources, to challenge a *draft* finding by the Department regarding the program's debt-to-earnings ratio.  But under the Department's regulation, whatever the reason for voluntarily discontinuing the program, it would be deemed ineligible for three years based on the Department's untested draft determination.

### c)   The debt-to-earnings test unfairly targets private sector schools.

158.   The regulation rests on premises that unfairly target private sector schools based on concerns that are not unique to them and that are entirely unrelated to whether these schools prepare students for a job that pays.

159.   The Department justified its final rule, in part, on the flawed assumption that private sector schools cost taxpayers more than their public sector counterparts.  *See* 79 Fed. Reg. at 64,905.  But private sector schools consume far fewer taxpayer dollars than their public and non-profit counterparts.  Bradford Cornell & Simon M. Cheng, Charles River Assoc. for the Coalition for Educ. Success, *An Analysis of Taxpayer Funding Provided for Post-Secondary Education: For-profit and Not-for-profit Institutions* 2 (Sept. 8, 2010), *available at* http://www.intered.com/storage/deptofed/TotalTaxpayerCost_Sept09.pdf.  And the Title IV funds that private sector schools receive are generally in the form of loans, which, through repayment and interest, reap huge profits for the government.  Unlike private sector schools, public institutions benefit from state subsidies—which are generally not paid back to the government—so the cost to the public is higher.  *See* Bob Kerrey and Jeffrey T. Leeds, A Federal Anti-Education Plan, Wall Street J. (Nov. 19, 2013), *available at* http://online.wsj.com/articles/ SB10001424052702303531204579204212758620396 .

160.   The Department also justifies the rule on the ground that there are lower rates of completion at private sector schools.  *See* 79 Fed. Reg. at 64,906.  Again, this concern has nothing to do with whether a private sector school offers programs that prepare students who do complete the program for a job that pays.  It is also entirely misplaced.  The Department itself has found that private sector students who attend a two-year institution graduate at much higher rates than

students who attend two-year public institutions.  *See* NCES, *Enrollment in Postsecondary Institutions, Fall 2012*, above.

161.    The Department also contends that private sector schools engage in aggressive sales and recruiting practices.  *See* 79 Fed. Reg. at 64,907.  Once more, these concerns are entirely unrelated to whether students will graduate and ultimately be successful in the working world.  In any event, Congress and many States have already addressed these concerns through other laws, regulations, and enforcement mechanisms.

162.    As explained above, the Department's bias and bad faith are also evident in its comments about private sector schools, in its refusal to allow APSCU's nominees to participate in the negotiated rulemaking sessions even though they represented the institutions that would be disproportionately affected by the proposed rule, and in its reliance, in justifying the regulation, on multiple flawed sources—untested *qui tam* suit allegations, an error-ridden GAO report, the partisan document that it misleadingly refers to as the HELP report, and a bogus statistic comparing high school dropouts to private sector school graduates.

163.    The Department's bias against private sector schools was also clear in its most recent calculation of institutional CDRs, in which the Department admitted to adjusting its calculations in a manner that benefited public institutions like two-year community colleges.  *See* Jeff Baker, Director, Policy Liaison and Implementation, Federal Student Aid, *Adjustment of Calculation of Official Three Year Cohort Default Rates for Institutions Subject to Potential Loss of Eligibility* (Sept. 23, 2014), *available at* http://www.ifap.ed.gov/eannouncements/092314 AdjustmentofCalculationofOfc3YrCDRforInstitutSubtoPotentialLossofElig.html; *see also* Michael Stratford, *Reprieve on Default Rates*, Inside Higher Educ. (Sept. 24, 2014),

https://www.insidehighered.com/news/2014/09/24/education-dept-tweaks-default-rate-calculatio n-help-colleges-avoid-penalties.

164.    The disproportionate effect of the regulations on private sector schools also illustrates the Department's bias.  By the Department's own calculation based on 2012 data, of 1,445 programs subject to the gainful employment regulations that would have been deemed failing or in the zone under the new regulations, 99 percent (1,431) were for-profit private sector programs.  79 Fed. Reg. at 65,064.  The 99 percent figure is a change from the proposed rule, which would have affected private sector and public sector schools more evenly.  *See* 79 Fed. Reg. at 16,493.  Additionally, 34.1 percent of for-profit private sector programs would fail or fall in the zone, compared to just 0.3 percent of public sector programs and 4.3 percent of non-profit private sector programs.  *Id.*

165.    The consequences that would flow from application of the Department's metrics to more "traditional" schools also demonstrate the Department's bias.  Indeed, according the Department's own study, more than 26 percent of graduates from four-year public colleges and 39 percent of graduates of private four-year colleges are not "gainfully employed" under the Department's metrics.  *See* Jennie H. Woo, U.S. Dep't of Educ., *Degrees of Debt*, above.  Yet, the Department is not prepared to say that these programs do not prepare students for gainful employment, and targets only private sector schools and the students that they serve.

166.    The Department also ignores well-substantiated studies that show that student outcomes at private sector schools are almost identical to student outcomes at comparable traditional schools, even though private sector schools serve a high proportion of at-risk students. *See, e.g.*, David J. Deming, Claudia Goldin, & Lawrence F. Katz, *The For-Profit Postsecondary School Sector: Nimble Critters or Agile Predators?*, 26 J. of Econ. Perspectives 139, 158 (Winter

2012) (finding that private sector schools have a higher first-year retention rate than comparable public and non-profit schools and that first-year retention correlates with a higher probability of obtaining a degree); GAO Report, *Postsecondary Education: Student Outcomes Vary at For-Profit, Nonprofit, and Public Schools*, GAO-12-143, at 63 (Dec. 7, 2011), *available at* http://www.gao.gov/products/GAO-12-143 (finding that private sector schools had higher or similar graduation rates compared to public and non-profit schools).  In many cases, nearly identical programs offered at both traditional and private sector schools would lead to the same student outcomes, but only the private sector schools are regulated based on those outcomes.

167.    The Department has yet to offer any plausible explanation of why it is reasonable to use the "gainful employment" language in the HEA to punish private sector schools for perceived student debt issues that are not unique to them.  Indeed, the Department's choice to target private sector schools in this way has led many in government to denounce the rule as discriminatory.  *See, e.g.*, Senator Roger Wicker, "*Gainful Employment" Rule Discriminates [Against] Vocational Schools, Community Colleges* (May 6, 2014), *available at* http://votesmart.org/public-statement/ 870622/wicker-gainful-employment-rule-discriminates-vocational-schools-community-colleges; Education & The Workforce Committee, *Members Denounce New Gainful Employment Regulation* (Mar. 14, 2014), *available at* http://edworkforce.house.gov/news/documentsingle. aspx?DocumentID=372950; *see also* Janet Napolitano Ltr. to Sec. Duncan, et al. (May 13, 2014) (explaining that the Department should abandon the gainful employment rule and adopt a measure that will apply to "all participating institutions, including public and private universities, and for-profit and non-profit colleges").  The Department claims that the "gainful employment" provisions of the statute do not permit the Department to impose similar regulations on traditional schools, yet it claims the regulations are independently authorized by other statutory provisions.

79 Fed. Reg. 64,890-91 (citing 20 U.S.C. §§ 1221e-3 and 3474).  If those other statutory

provisions did authorize the Department to regulate in this area (and they do not), the

Department's only asserted basis for singling out private-sector schools for disfavor is illusory.

**d)      The rule is impermissibly retroactive.**

168.      The rule is arbitrary and capricious because it is impermissibly retroactive.  The

rule will (absent this Court's intervention) take effect on July 1, 2015.  79 Fed. Reg. at 64,890.  The

calculated debt-to-earnings ratios for the 2014–2015 award year would be based on the earnings

and debt of students who completed a program in the 2010–2011 or 2011–2012 award years

(where the two-year cohort period applies) or in 2008–2009, 2009–2010, 2010–2011, or 2011–

2012 award years (where the four-year cohort period applies).  34 C.F.R. §§ 668.401, .402, .404;

*see also* 79 Fed. Reg. at 64,929, 64,961.  Even if schools were able to affect their students'

employment outcomes and decisions regarding how much debt to incur, so as to alter the schools'

performance on the proposal's metrics going forward, schools cannot do anything to alter

debt-to-earnings ratios for *past* years.  No action schools take today can alter decisions that

students made years ago to enroll in the program or how much debt to incur.  Nor can schools

change now the curriculum and other benefits that they provided to former students who

completed a program years ago so as to affect their employment opportunities.

169.      These concerns are particularly acute here because the inclusion of income and

debt data from 2009, 2010, and 2011 will skew programs' performance significantly downward

due to the severe recession during those years.

170.      The Department purports to mitigate this retroactive effect in part by providing an

alternate debt-to-earnings metric during a "transition period" after the rule initially takes effect, the

length of which is based on the credential level of the program.  *See* 79 Fed. Reg. at 64,947-48.

"For a GE program that is failing or in the zone for any award year during the transition period, in

addition to calculating the regular D/E rates the Department will calculate alternate, or transitional, D/E rates using the median loan debt of the students who completed the program during the most recently completed award year instead of the median loan debt for the two-year cohort." *Id.* at 64,948. For example, for the 2014-2015 award year, a program that fails the debt-to-earnings test based on the current earnings and debt of students who completed the program in 2010-2011 or 2011-2012 may nonetheless satisfy that test by calculating the debt-to-earnings ratios using the median load debt of students who completed the program in 2014-2015. *Id.*

171.    The transitional debt-to-earnings metrics do not cure the impermissible retroactivity of the Department's rule. Even for the transitional rates, the data used to calculate the earnings component remain the same, i.e., the transitional debt-to-earnings calculation still will depend on the earnings of students who completed the program years earlier. The numerator of the debt-to-earnings ratio will change, but the denominator will not. *See* 34 C.F.R. § 668.404(g)(2)(ii). Schools, however, cannot do anything today to alter the employment opportunities available to students who have already completed a program, let alone affect the individual employment choices that prior students made.

172.    The debt component of the debt-to-earnings ratio also will depend, even under the transitional rates, on the experiences of students that occurred prior to the rule's publication or effective date. As the Department explains, for the 2014–2015 award year, it will rely on the median loan debt of students who completed the program during the 2014–2015 award year. 79 Fed. Reg. at 64,948. Many if not all of the students who have completed or who will complete a program in the 2014-2015 award year decided how much debt to incur long before the rule's publication on October 31, 2014, or its effective date in July 2015. Schools can do nothing today to alter the amount of loan debt that such students chose to incur.

e)      **The rule is arbitrary and capricious because schools cannot review and challenge the Department's calculations.**

173.    Wholly independent of other flaws in the regulations, the final rule violates the rights of schools to review and challenge the Department's calculations.  Although the Department explained in the NPRM that its rule is "intended to provide institutions with an adequate opportunity" to challenge the Department's determination of those institutions' debt-to-earnings ratios (79 Fed. Reg. at 15,457), this statement is mistaken.  The final rule severely limits a school's ability to review—and, therefore, challenge—the Department's debt-to-earnings calculations in several ways.

174.    Among other things, schools cannot adequately challenge the Department's calculation of their debt-to-earnings ratios because they will not have access to the underlying earnings data.  Institutions will not have access to the individual wage records, and in fact, the Department concedes that schools cannot challenge this data because the Department is legally barred from providing it.  *See* 79 Fed. Reg. at 64,957.

175.    The Department claims that the rule addresses this severe deficiency by allowing schools to appeal the calculations, using alternate earnings evidence from a state earnings database or an earnings study conducted in accordance with requirements established by the NCES.  79 Fed. Reg. at 64,951, 64,955.  But schools are still denied the ability to rebut the Department's income calculations.  Not every State will have an earnings database, and even for those States that do, the databases may reflect only the average earnings of total workers and conflate occupation and industry.  *See* Newman, *The Pitfalls of Comparing Colleges Based on Postgraduate Earnings*, above.

**B.    The Reporting And Disclosure Requirements Exceed The Department's Statutory Authority, Are Arbitrary And Capricious, And Violate The Constitution.**

**1.    The Reporting Requirements.**

176.    The new reporting requirements are similarly invalid for a number of reasons, including that they are in excess of the Department's statutory authority, contrary to statutory provisions designed to protect student privacy, and arbitrary and capricious.

177.    *First*, the reporting requirements are beyond the Department's statutory authority. Neither the gainful employment provisions of the HEA nor any other statute independently authorizes the Department to compel reporting of *private* borrowing and other information called for by the final regulations.  Instead, the reporting regulations are intended to "facilitate the Department's evaluation of the GE programs under the accountability framework" and "support the goals of the transparency framework."  79 Fed. Reg. at 64,891; *see also* 79 Fed. Reg. at 16,429. Because the so-called accountability framework (the debt metrics) and the rest of the so-called transparency framework (the disclosure requirements) are themselves unauthorized, the Department cannot piggyback off of those frameworks to justify the reporting requirements.

178.    Indeed, even if the debt metrics are upheld, they cannot provide the anchor for requiring schools to report information that is not relevant to the calculation of the new debt metrics.  For example, the new rule requires schools to report information about the amount of the private and institutional debt of students who "withdrew from [a] GE program during [an] award year."  34 C.F.R. § 668.411(a)(2)(ii)-(iii).  But that information cannot affect the debt metrics, which are based on only those "students who completed the program" during a given period.  *Id.* § 668.404(b)(1)(i); *see also id.* § 668.404(c)(1).  The *proposed* rule included the separate pCDR test based on the default rate of *all* borrowers who entered repayment in a given year, including those who withdrew from a program without completing it.  *See* 79 Fed. Reg. at 16,158.  Despite

67

eliminating that test in the final rule, *see* 79 Fed. Reg. at 64,916, the Department continues to require that schools report irrelevant information about students who withdrew from the program. That requirement cannot be justified as necessary for the new debt metrics.

179.    *Second*, the requirements violate 20 U.S.C. § 1015c, which protects student privacy by prohibiting "the development, implementation, or maintenance of a Federal database of personally identifiable information on individuals receiving assistance under this chapter" unless that system "is necessary for the operation of programs" authorized by Title IV and was in use by the Department prior to August 14, 2008.

180.    As this Court held in *APSCU II*, the addition of information to an existing database violates Section 1015c(b)(2) if it effectively creates a new database.  930 F. Supp. 2d at 218-21. The reporting requirements violate this prohibition by expanding the National Student Loan Data System ("NSLDS") to include personally identifiable information regarding the amounts a "student received from *private* education loans." 34 C.F.R. § 668.11(a)(2)(ii) (emphasis added). Such information is not currently included in the NSLDS, which is instead limited to "information regarding loans made, insured, or guaranteed under'' various federal programs.  20 U.S.C. § 1092b(a).  The addition of private loan data to the NSLDS would dramatically expand the database beyond its original purpose, effectively creating a new database of personally identifiable information in violation of Section 1015c.

181.    In addition, the Department's assertion that the new debt metrics are "designed to operate independently of" the reporting requirements, 79 Fed. Reg. at 16,488; *see also* 79 Fed. Reg. at 64,993; 34 C.F.R. § 668.415, would, if credited, necessarily imply that the reporting requirements are not "necessary for the operation of" the debt metrics—or any other Title IV program—as required by Section 1015c(b)(1).

182.    *Third*, the reporting requirements are arbitrary and capricious for numerous reasons, including that the Department has failed to provide a reasoned basis for their promulgation.  For example, the Department has not provided a satisfactory justification for requiring schools to report loan information on a student-by-student basis rather than an aggregate basis, or for requiring schools to report information regarding *private*, non-Title IV loans.

### 2.    The Disclosure Requirements.

183.    The new disclosure requirements are also invalid for a number of reasons, including that they are in excess of the Department's statutory authority and arbitrary and capricious, and violate the First Amendment.

184.    *First*, the disclosure requirements are beyond the Department's statutory authority under the gainful employment provisions of the HEA, *see* 79 Fed. Reg. at 64,890; *see also* 79 Fed. Reg. at 16,346, because the required disclosures do not ensure that institutions eligible for Title IV funding "prepare students for gainful employment in a recognized occupation," 20 U.S.C. § 1002(b), (c).  An institution's willingness or ability to make the required disclosures has no bearing on its ability to prepare students for gainful employment, and no provision of the HEA authorizes the Department to withhold funding from—or otherwise penalize—an institution that fails to make the required disclosures.

185.    The disclosure requirements are also beyond the Department's statutory authority under Section 431 of the HEA, *see* 79 Fed. Reg. at 64,891; 79 Fed. Reg. at 16,437, which directs the "*Secretary*" to "inform the public regarding federally supported education programs," 20 U.S.C. § 1231a(b) (emphasis added), but does not authorize the Department to shift the burden of complying with that obligation to *schools*.  As the Department concedes, "[i]institutions will largely bear the costs of the regulations," 79 Fed. Reg. at 64,892, contrary to the statutory scheme established by Congress in Section 1231a(b).

186.    Similarly, 20 U.S.C. §§ 1221e-3 and 3474 do not independently authorize the Department's regulation.  *See* 79 Fed. Reg. at 64,904.  As explained above, those provisions merely authorize regulations necessary or appropriate to the Department's existing functions. Developing dramatically new disclosure requirements is not an existing function of the Secretary or the Department, so Sections 1221e-3 and 3474 are inapplicable by their own terms.

187.    *Second*, the disclosure requirements are arbitrary and capricious for numerous reasons, including that the Department has failed to provide a satisfactory justification for augmenting the disclosures already compelled by an existing statute.  Under the Student Right-to-Know and Campus Security Act of 1990 (codified at 20 U.S.C. § 1092) ("Student Right-to-Know Act"), schools must already disclose information in 15 categories, ranging from "the cost of attending the institution," to "the completion or graduation rate of certificate- or degree-seeking, full-time, undergraduate students."  20 U.S.C. § 1092(a)(1)(A), (E), (L).  The Department cites no evidence that the disclosures already required by Congress are insufficient to ensure that "students, prospective students, and their families have accurate and comparable information to help them make informed decisions about where to invest their time and money," 79 Fed. Reg. at 64,890; *see also* 79 Fed. Reg. at 16,475, and indeed it mistakenly views Congress's establishment of these numerous disclosure requirements as license to impose still more, *see* 79 Fed. Reg. at 64,968.

188.    Needlessly adding another layer of disclosures on top of these existing regulations would force schools to provide students with a bewildering array of statistics that have little, if any, informational content.  For example, the regulation would require schools to disclose any program placement rates that an accrediting agency or state requires them to calculate.  34 C.F.R. § 668.412(a)(3).  Some schools operating in various States and subject to different accreditation

regimes may therefore be compelled to disclose numerous placement rates for a given

program—on top of the *institutional* placement rates already disclosed under the Student

Right-to-Know Act, *see* 34 C.F.R. § 668.41(d)(5)—and those rates may differ depending on how

they are calculated.  Requiring these duplicative and potentially conflicting disclosures is more

likely to confuse students than to help them make informed decisions and will undermine the

disclosure scheme mandated by Congress.

189.    The disclosure requirements are also arbitrary and capricious because they are

unduly vague.  For example, the schools in danger of ineligibility must, "to the extent practicable,"

provide non-English language warnings to "prospective students for whom English is not their

first language."  34 C.F.R. § 668.410(a)(4).  The preamble provides "one simple test . . . that *could*

be used by institutions in determining whether alternatives to non-English warnings are

warranted," but it emphasizes that "[o]ther methods . . . might also be practicable," and therefore

required.  79 Fed. Reg. at 64,970.  The Department's vague "practicability" standard arbitrarily

exposes schools to sanction for failing to identify students in need of non-English language

warnings using methods that even the Department could not identify at the time of the rulemaking.

190.    In addition, it is arbitrary and capricious to compel schools to make these

disclosures when that the Department itself could publicize information related to schools' debt

measures.

191.    *Third*, several aspects of the disclosure provisions violate the First Amendment's

limitations on compelled speech because they require the disclosure of non-factual information

and grant the Secretary unbridled discretion to dictate the content of schools' speech.

192.    For example, the new rule requires schools to disclose "the cost that a prospective

student would incur to attend and complete a GE program."  79 Fed. Reg. at 64,977; *see* 34 C.F.R.

§ 668.412(a)(7).  The Department now recognizes, however, that "institution[s] may not know [this cost] precisely."  79 Fed. Reg. at 64,977.  Accordingly, without changing the text of the final rule, the Department announced for the first time in the preamble to the rule that schools may treat these calculations as mere "estimates" and may provide a disclaimer to that effect.  *Id*. at 64,978.  But this new "estimate" requirement, adopted without notice or opportunity to comment, renders the disclosure rule unconstitutional.  As this Court recognized in *APSCU I*, the First Amendment narrowly limits the government's authority to require market participants to disclose information unless that information is "purely factual and uncontroversial."  870 F. Supp. 2d at 154 n.7.  The required cost estimates cannot meet this standard because they are necessarily imprecise and dependent on controversial assumptions about future changes in the cost of delivering quality education.

193.    Indeed, the controversial nature of these estimates undermines their value to students without reducing their burden on schools.  Requiring schools that "may not know . . . the cost" of future attendance, 79 Fed. Reg. at 64,977, to nonetheless publish arbitrary and meaningless estimates of those same costs will not "assist students . . . in making critical decisions about their educational investment and in understanding potential outcomes of that investment"—the sole object of requiring such disclosures, *see id.* at 64,892.  Instead, the required disclosure will merely spur confusion and frivolous lawsuits when schools' estimates inevitably prove "imprecise" in hindsight.  At the very least, imposing this requirement without assessing schools' ability to make meaningful estimates is arbitrary and capricious.

194.    In addition, the disclosure provisions violate the First Amendment by allowing the Secretary unbridled discretion to compel speech on schools' websites.  The proposal requires that schools post a "link to the disclosure template" for each gainful employment program "[o]n any

Web page containing academic, cost, financial aid, or admissions information about [that] program," and authorizes the Secretary to "require the institution to modify a Web page if it provides a link to the disclosure" that is not, in the Secretary's sole judgment, sufficiently "prominent, readily accessible, clear, conspicuous, and direct."  34 C.F.R. § 668.412(c).  The regulation would give the Secretary limitless discretion to alter a school's website to enhance the prominence or accessibility of this link.  Such limitless discretion to restrict or compel speech cannot survive First Amendment scrutiny, and is in any event arbitrary and capricious.

### C.    The Certification Requirement Exceeds The Department's Statutory Authority, Violates The First Amendment, And Is Arbitrary And Capricious.

195.    The Department lacks the statutory authority to tie HEA fund eligibility to a program's satisfaction of any applicable state or Federal program-level accrediting requirements. 79 Fed. Reg. at 64,892.  The HEA specifically defines an eligible institution as one that is accredited by a "nationally recognized accrediting agency or association," 20 U.S.C. § 1001(a)(5), and does not require each of an institution's individual *programs* to meet other state or Federal program-level accrediting requirements.  The Department's attempt to impose new accrediting requirements on schools by tying the requirements to HEA fund eligibility impermissibly second-guesses Congress's decision to require compliance only with certain institution-level accreditation requirements.

196.    The requirement that each institution certify that each of its gainful employment programs meets applicable accreditation requirements and state or federal licensure standards, *see* 34 C.F.R. § 668.414, is also arbitrary and capricious, as well as unconstitutional.  The regulations fail to define clearly which licensure requirements any given program must satisfy.  For example, it is unclear from the text of the rule whether a culinary program must certify that it meets butcher's license requirements, or whether a cosmetology program must certify that it meets the

73

requirements for training licensed manicurists.  Absent clearer guidance from the Department, schools lack notice of what is required to conform their behavior to the law.  Moreover, the vagueness of this requirement will expose even compliant schools to frivolous lawsuits alleging that individual programs failed to live up to the plaintiffs' distorted and overly broad interpretation of those programs' compulsory certifications.  Those risks make compliance with the certification requirement an unduly burdensome form of compelled speech, in violation of the First Amendment.  And the Department's utter failure to address these potential negative consequences—even after APSCU raised them in its comment letter, *see APSCU GE 2014 Comment Letter*, ED-2014-OPE-0039, at 72-73—is at the very least arbitrary and capricious.

197.    The certification requirement also is arbitrary and capricious because it increases the risk that schools will be subject to conflicting requirements of multiple States.  As explained above, the Department's final rule requires each school to provide "applicable program certifications" not only in States where the school operates, but "in *any* State where the institution is otherwise required to obtain State approval under 34 CFR 600.9," i.e., the Department's state authorization regulations.  79 Fed. Reg. at 64,992 (emphasis added).  And the Department has attempted previously, and is in the process of attempting again, to adopt state authorization regulations that would require online programs to meet standards of every state in which the program is offered—which could be all fifty States.  As the Department itself has recognized, however, "State requirements may conflict in such a way that it would be impossible to concurrently meet the requirements of multiple States."  *Id*.  By requiring schools to certify that their programs satisfy requirements of a larger number of States, the final regulations increase the risk that schools will face inconsistent requirements, and may invite additional baseless *qui tam* and other lawsuits against schools.

74

## COUNT I
## (NO STATUTORY AUTHORITY)

198.    Plaintiffs incorporate the preceding paragraphs as if fully set forth herein.

199.    The regulation constitutes final agency action.

200.    APSCU and its members are adversely affected and aggrieved by the regulation.

201.    The regulation is not authorized under the Higher Education Act of 1965, 20 U.S.C.

§ 1001(a) *et seq.*

202.    The regulation exceeds the Department's statutory jurisdiction and authority.

203.    Accordingly, the regulation exceeds statutory authority, jurisdiction, and

limitations, in violation of 5 U.S.C. § 706(2)(C), and is not in accordance with law, in violation of

5 U.S.C. § 706(2)(A).

## COUNT II
## (VIOLATIONS OF THE APA)

204.    Plaintiffs incorporate the preceding paragraphs as if fully set forth herein.

205.    The Department's decision to promulgate the regulation was arbitrary and

capricious.  Among other things, the Department failed to engage in reasoned decisionmaking; to

consider important aspects of the problem it believed it faced; to provide an adequate explanation

for its decision; to provide notice of important aspects of the rule; and to respond adequately to

significant arguments raised in comments.  The regulation is also premised upon a flawed

rationale; it arbitrarily discriminates against private sector schools; and it unfairly imposes

retroactive consequences for past decisions by APSCU's members and their students.

206.    Accordingly, the regulation is arbitrary, capricious, was adopted without

observance of procedure required by law, and is otherwise not in accordance with the law, in

violation of 5 U.S.C. § 706(2)(A) and (D).

## COUNT III
## (VIOLATION OF THE FIRST AMENDMENT)

207.    Plaintiff incorporates the preceding paragraphs as if fully set forth herein.

208.    The final rule violates APSCU's members' right to free speech by compelling them to utter non-factual and highly controversial statements.

209.    The final rule violates APSCU's members' right to free speech by compelling them to speak in an unduly burdensome manner.

210.    The final rule violates APSCU's members' right to free speech by giving the Secretary unbridled authority to restrict or compel their speech.

211.    Accordingly, the rule is contrary to constitutional right, power, privilege, or immunity, in violation of 5 U.S.C. § 706(2)(B).

## PRAYER FOR RELIEF

Plaintiffs pray that this Court:

1.    Declare the regulation unlawful.

2.    Vacate and set aside the regulation.

3.    Issue all process necessary and appropriate to postpone the effective date of the regulation and to maintain the status quo pending the conclusion of this case.

4.    Award Plaintiffs their costs and reasonable attorney's fees as appropriate.

5.    Grant such further and other relief as this Court deems just and proper.

Respectfully submitted,


Dated:  November 6, 2014                    __/s/  Douglas R. Cox_____
                                            DOUGLAS R. COX, D.C. Bar No. 459668
                                            DCox@gibsondunn.com
                                            GIBSON, DUNN & CRUTCHER LLP
                                            1050 Connecticut Avenue, N.W.
                                            Washington, D.C.  20036
                                            Telephone:  (202) 955-8500
                                            Facsimile:  (202) 467-0539

                                            TIMOTHY J. HATCH, D.C. Bar No. 374694
                                            THatch@gibsondunn.com
                                            GIBSON, DUNN & CRUTCHER LLP
                                            333 South Grand Avenue
                                            Los Angeles, CA  90071
                                            Telephone:  (213) 229-7500
                                            Facsimile:  (213) 229-7520

                                            *Attorneys for Plaintiff Association of Private Sector
                                            Schools*