## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____

|  |  |  |
|---|---|---|
| ASSOCIATION OF PRIVATE SECTOR COLLEGES AND UNIVERSITIES, | ) ) ) | |
| Plaintiff, | ) | |
| | ) | Civil Action No. 14-1870 (JDB) |
| v. | ) | |
| | ) | |
| ARNE DUNCAN, in his official capacity as Secretary of the Department of Education, *et al.*, | ) ) ) | |
| Defendants. | ) | |

_____

### BRIEF OF AMICI CURIAE
### AIR FORCE SERGEANTS ASSOCIATION; AMERICAN FEDERATION OF TEACHERS, AFL-CIO; CENTER FOR PUBLIC INTEREST LAW; CENTER FOR RESPONSIBLE LENDING; CHILDREN'S ADVOCACY INSTITUTE; CONSUMER ACTION; CONSUMER FEDERATION OF CALIFORNIA; DEMOS; THE INSTITUTE FOR COLLEGE ACCESS & SUCCESS; LEAGUE OF UNITED LATIN AMERICAN CITIZENS; MILITARY OFFICERS ASSOCIATION OF AMERICA; MISSISSIPPI CENTER FOR JUSTICE; NATIONAL COUNCIL OF LA RAZA; NEW ECONOMY PROJECT; PUBLIC ADVOCATES INC.; PUBLIC CITIZEN, INC.; PUBLIC COUNSEL; PUBLIC GOOD LAW CENTER; PUBLIC LAW CENTER; SERVICE EMPLOYEES INTERNATIONAL UNION; UNITED STATES STUDENT ASSOCIATION; UNIVERSITY OF SAN DIEGO SCHOOL OF LAW VETERANS LEGAL CLINIC; VETERANS EDUCATION SUCCESS; VETERANS' STUDENT LOAN RELIEF FUND; VETJOBS; VIETNAM VETERANS OF AMERICA; WOODSTOCK INSTITUTE; AND YOUNG INVINCIBLES
### IN OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND IN SUPPORT OF DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT

Julie A. Murray
D.C. Bar No. 1003807
Allison M. Zieve
D.C. Bar No. 424786
PUBLIC CITIZEN LITIGATION GROUP
1600 20th Street NW
Washington, DC 20009
(202) 588-1000
jmurray@citizen.org

*Counsel for Amici Curiae*

Dated: March 6, 2015

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ...................................................................................................... ii

STATEMENT OF AMICI CURIAE'S INTEREST .................................................................... 1

BACKGROUND ......................................................................................................................... 2

SUMMARY OF ARGUMENT .................................................................................................. 4

ARGUMENT .............................................................................................................................. 5

I.     The Department Considered The Rule's Impact on Students And Rightly Concluded
That The Rule Would Benefit Them. ................................................................................ 5

     A.     APSCU Disregards Portions of the Department's Rulemaking Analysis. ............ 5

     B.     APSCU Wrongly Assumes That Students Benefit from Enrolling in Schools
That Do Not Provide A Quality Education. ........................................................... 7

          1.     Some for-profit educational institutions engage in manipulative and
fraudulent recruitment practices. ............................................................... 8

          2.     Many for-profit career training programs charge high prices that leave
students deeply in debt. .............................................................................. 13

          3.     Despite taking large amounts of federal money, for-profit career
training programs routinely offer students an inferior education with
little support. .............................................................................................. 15

          4.     Many students leave for-profit institutions without graduating, and
graduates often have low earning potential and few job prospects. ........... 17

          5.     Students at for-profit institutions often default on student loans, with
devastating consequences. ......................................................................... 19

II.     The Disclosure Requirement Is Consistent with The First Amendment. ........................ 20

III.     The Certification Requirement Is Consistent with The First Amendment. ...................... 23

CONCLUSION .......................................................................................................................... 24

APPENDIX: DESCRIPTIONS OF AMICI .............................................................................. A1

# TABLE OF AUTHORITIES

## CASES

*American Meat Institute v. U.S. Department of Agriculture,*
760 F.3d 18 (D.C. Cir. 2014) (*en banc*)............................................................................21

*Central Hudson Gas & Electric Corp. v. Public Service Commission,*
447 U.S. 557 (1980)............................................................................22

*Discount Tobacco City & Lottery, Inc. v. United States,*
674 F.3d 509 (6th Cir. 2012) ............................................................................21

*Ibanez v. Florida Department of Business & Professional Regulation,*
512 U.S. 136 (1994)............................................................................24

*International Dairy Foods Ass'n v. Boggs,*
622 F.3d 628 (6th Cir. 2010) ............................................................................24

*Milavetz, Gallop & Milavetz, P.A. v. United States,*
559 U.S. 229 (2010)............................................................................23

*National Ass'n of Manufacturers v. SEC,*
748 F.3d 359 (D.C. Cir. 2014) ............................................................................21

*Spirit Airlines, Inc. v. Department of Transportation,*
687 F.3d 403 (D.C. Cir. 2012) ............................................................................22

*West Virginia State Board of Education v. Barnette,*
319 U.S. 624 (1943)............................................................................21

*Zauderer v. Office of Disciplinary Counsel,*
471 U.S. 626 (1985)............................................................................20, 21, 23

## STATUTES AND REGULATIONS

20 U.S.C. § 1001............................................................................2

20 U.S.C. § 1002............................................................................2

20 U.S.C. § 1070............................................................................2

20 U.S.C. § 1094............................................................................8

*\* Authorities upon which we chiefly rely are marked with asterisks.*

34 C.F.R. § 668.403 ......................................................................................................3

34 C.F.R. § 668.404 ......................................................................................................3

34 C.F.R. § 668.412 ..................................................................................................3, 20

34 C.F.R. § 668.414 ..................................................................................................3, 23

Department of Education, Program Integrity: Gainful Employment Final Rule, 79 Fed.
      Reg. 64,890 (2014) ..................................................................................... *passim*

**MISCELLANEOUS**

Press Release, A.G. Schneiderman Announces Groundbreaking $10.25 Million
      Dollar Settlement With For-Profit Education Company That Inflated Job Placement
      Rates To Attract Students (Aug. 19, 2013)..................................................................12, 13

Press Release, Attorney General Suthers Announces Consumer Protection
      Settlement with Argosy University (Dec. 5, 2013),
      http://www.coloradoattorneygeneral.gov/press/news/2013/12/05/
      attorney_general_suthers_ announces_consumer_protection_settlement
      _argosy_unive ..................................................................................................12

U.S. Senate Health, Education, Labor and Pensions Committee, For Profit Higher
      Education: The Failure to Safeguard the Federal Investment and Ensure Student
      Success (2012) ............................................................................... *passim*

## STATEMENT OF AMICI CURIAE'S INTEREST

Amici curiae are twenty-eight groups that advocate for students and college access, civil rights, veterans, and consumers. Amici are deeply concerned that some career colleges that target low-income students, veterans, and others seeking to improve their financial lives are exploiting the federal Title IV student aid program, which is intended to help students afford a college education. Collectively, amici have deep experience working with students affected by the Department of Education's Gainful Employment regulation at issue in this case. *See* Department of Education, Program Integrity: Gainful Employment Final Rule, 79 Fed. Reg. 64,890 (2014). They also have expertise related to career training programs regulated by the rule, including those programs provided by for-profit educational institutions, which receive billions of dollars each year in federal student aid and whose students hold nearly half of the nation's student loan defaults. Amici have been leading voices sounding the alarm on the for-profit college industry's harmful and sometimes unlawful practices, which frequently leave students saddled with a lifetime of debt and little to no improvement in their capacity to earn a living. Additional information about each of the amici is provided in the Appendix.

Nearly all of the amici participated in the rulemaking that led to the Gainful Employment rule. They urged the Department to adopt a robust rule that would protect students and taxpayers from career education programs that leave students worse off than when they started. They also submitted comments addressing the potential impact of various policy alternatives on students— including students of color, low-income students, and veterans—and described the critical need for the rule's protections. Although amici advocated for a stronger rule than the one ultimately issued, they believe that the Gainful Employment rule remains a valuable tool to address some of the most egregious, harmful conduct by career training programs.

Amici submit this brief to provide useful context regarding the need for the rule and to address various arguments by plaintiff Association of Private Sector Colleges and Universities (APSCU) that either purport to be in the best interest of students or ignore the interests of students altogether. Although amici do not address each of APSCU's arguments in this brief, they urge this Court to uphold the rule in full.

Plaintiff does not oppose and defendants take no position on amici's motion to participate.

## BACKGROUND

The federal government spends billions of dollars each year on student aid under Title IV of the Higher Education Act (HEA), 20 U.S.C. § 1070 *et seq*. This aid, which includes Stafford, PLUS, and Perkins loans and Pell grants, is the largest stream of federal postsecondary education funding. To obtain Title IV funds, students must attend an HEA-eligible institution. As a condition of eligibility, the HEA has long required certain postsecondary programs (hereinafter, career training programs) to provide "training to prepare students for gainful employment in a recognized occupation." 20 U.S.C. § 1001(b)(1); *id.* § 1002(a)(1), (b)(1)(A)(i). This requirement advances Congress's goal of ensuring that "training offered by these programs . . . equip[s] students to earn enough to repay their loans." Gainful Employment Rule, 79 Fed. Reg. at 64,893. Career training programs—for example, those intended to prepare students to be hairdressers or barbers, medical assistants, nurses, or massage therapists—include nearly all programs at for-profit educational institutions, along with some others at public and private, non-profit schools. *Id.* at 64,890, 65,025. Students attending career training programs received $9.7 billion in federal student aid grants and approximately $26 billion in federal student aid loans in Fiscal Year 2010. *Id.* at 65,025.

2

In 2014, the Department of Education adopted the Gainful Employment rule to address overwhelming evidence that some career training programs, particularly at for-profit institutions, were failing to prepare students for jobs that would enable them to repay their federal student debt, thus endangering the federal government's investment and leaving some students worse off than they would have been had they never pursued postsecondary education. The rule imposes, as a condition of continued receipt of Title IV funding, new accountability requirements by "defin[ing] what it means to prepare students for gainful employment in a recognized occupation," as the HEA requires. *Id.* at 64,890; 34 C.F.R. § 668.403 (setting forth gainful employment program framework). Schools must certify that they meet certain requirements with respect to their accreditation and the sufficiency of their programs to satisfy educational prerequisites for licensure or occupational certifications. 34 C.F.R. § 668.414. They must also demonstrate that their debt-to-earnings rates, which measure graduates' debt burden relative to their earnings, meet defined thresholds. *Id.* §§ 668.403, 668.404. Although programs at for-profit institutions account for only one-third of the nation's career training programs, *id.* at 65,025, the Department predicts that nearly all programs whose debt-to-earnings rates will be marginal or failing under the rule will be at for-profit institutions, *id.* at 65,065.

In addition to the accountability measures, the Gainful Employment rule imposes new transparency requirements for all career training programs that rely on federal Title IV funding. Schools must, among other things, make new disclosures to students, their families, and the public using a standardized template developed by the Department. 34 C.F.R. § 668.412. As relevant here, the Department may require schools to disclose "[t]he total cost of tuition and fees, and the total cost of books, supplies, and equipment, that a student would incur" to complete a career training program. *Id.* § 668.412(a)(7).

Plaintiff APSCU, which represents for-profit education industry members, contends, among other things, that the rule runs afoul of the Administrative Procedure Act because it fails to account for harm to students and violates schools' First Amendment rights.

## SUMMARY OF ARGUMENT

The government considered the costs and benefits to students of the debt-to-earnings measures and reasonably concluded that the rule would provide overall benefits. The assertion by APSCU and its amicus to the contrary is erroneous. Indeed, as overwhelming evidence in the administrative record demonstrates, some for-profit institutions have been responsible for charging high prices to provide low-quality training, with few to no job placement opportunities and abysmal graduation rates. They have preyed on underserved populations of students, targeting them with shameful, and sometimes outright fraudulent, recruitment practices that have prompted numerous state and federal agencies to investigate and have resulted in significant enforcement actions. And the industry has saddled many students with a lifetime of debt that often ends in default, with devastating consequences for those students and the federal fisc. Thus, far from being torchbearers for equal access to education, some predatory, for-profit schools engage in cynical practices that threaten the economic lives of the very students they claim to serve.

In addition, neither the disclosure requirement nor the certification requirement violates the First Amendment. The disclosure requirement compels only factual information about the cost of a program and expressly permits estimates and disclaimers, further lessening any concern about the accuracy of the disclosure. Likewise, the certification requirement is not unduly burdensome. It does not impinge on schools' limited resources for conveying their commercial

message. That schools may face liability for false or misleading statements does not render the requirement itself burdensome in any way.

## ARGUMENT

### I.   The Department Considered The Rule's Impact on Students And Rightly Concluded That The Rule Would Benefit Them.

APSCU argues that the rule is arbitrary and capricious because, among other things, the Department failed to analyze the harm that the rule's debt-to-earnings rates will impose on students. It contends that many students in programs rendered ineligible for Title IV funds under the rule will not be able to enroll in alternative programs. Doc. 13, Pl.'s Summ. J. Memo. at 33; *accord* Doc. 14, Chamber of Commerce Amicus Br. at 5-6. It also asserts that schools will respond to the rule by reducing new enrollment of "at-risk" students, thus disproportionately harming students of color, low-income students, and other underserved groups. Pl.'s Summ. J. Memo. at 34; *see also* Chamber of Commerce Amicus Br. at 5-6 (discussing purported harms to these students). APSCU's argument is based on a cherry-picked reading of the regulation and the false premise that students benefit from enrolling in failing schools that take students' money without providing a quality education.

### A.   APSCU Disregards Portions of the Department's Rulemaking Analysis.

APSCU's argument ignores parts of the rulemaking record and misrepresents others. The Department determined that in the short term "the substantial majority of students" will find alternatives to their failing programs. Gainful Employment Rule, 79 Fed. Reg. at 65,074; *see also id.* at 65,080 (stating that many students "will be able to transfer to passing programs, new programs, or non-GE programs that provide equivalent training" and that many others are expected to reenroll in postsecondary education at a later time). APSCU's contention "that 'about 32 percent of students in in-person zone and failing programs will not have nearby

transfer options,'" Pl.'s Summ. J. Memo. at 33 (quoting 79 Fed. Reg. at 65,074), takes the Department's statement to this effect entirely out of context. The Department made clear that this estimate was based on a "static scenario assuming no reaction to the regulations," Gainful Employment Rule, 79 Fed. Reg. at 65,074, so it did not account for the possibility that a higher-quality program would expand enrollment as lower-quality providers exited the market. In addition, the Department's estimate did not account for transfer options through online providers or to less specific fields of study. *Id.* The Department determined that, once these options were considered, only about six percent of students would not have a transfer option in the short term. *Id.* In addition, the Department concluded that although some students will be unable to find immediate alternatives if their program is rendered ineligible under the rule, "over the long term, all students will have increased access to programs that lead to successful outcomes." *Id.* at 65,080.

The Department also explored the impact, if any, of student demographics on a school's ability to pass the debt-to-earnings rate measures and concluded that these factors were not "strong predictors." *Id.* at 64,910; *see also*, *e.g.*, *id.* at 65,054 (concluding that various demographic variables "have little impact on annual earnings rates"). Accordingly, it was reasonable for the Department to conclude that the regulations would not "substantially reduce educational opportunities for minorities, economically disadvantaged students, first-generation college students, women, and other underserved groups of students." *Id.* at 64,910. Rather, programs that wish to improve their performance under the debt-to-earnings rates will likely resort to approaches that clearly *will* have an effect on such rates: lowering tuition, offering better student services, such as job placement and career planning assistance, and increasing program quality. *Id.* at 65,080; *see also id.* at 64,916.

**B.**   **APSCU Wrongly Assumes That Students Benefit from Enrolling in Schools That Do Not Provide A Quality Education.**

APSCU and amicus the Chamber of Commerce also err by assuming that students would be better off by staying in programs that would fail the rule's debt-to-earnings measures than they would be were those schools deemed ineligible for Title IV funding. In reality, some for-profit colleges, which will compose nearly all failing programs under the rule, *see id.* at 65,065, do students no favor by opening their doors to federal aid recipients. These colleges often prey on underserved populations of students, targeting them with misleading, and sometimes fraudulent, recruitment practices. They then extend to students an inferior product: an "education" often marked by low quality programs and faculty, few if any student support services, and abysmal graduation and job placement rates. And the majority of those students who withdraw—in some cases more than half of all entrants—and those who graduate are saddled with student loan debt. Many of these students will never be able to repay these loans, an inability that has devastating consequences.

Such predatory for-profit colleges are thus far from the torchbearers for equal access to education that APSCU and the Chamber of Commerce portray them to be. Indeed, their cynical practices threaten hundreds of thousands of students of color, veterans, low-income students, and others who turn to these schools for career advancement. As one commenter told the Department, strong regulation of these schools is necessary to ensure that fewer students report that going to college was the worst mistake of their lives. Center for Responsible Lending Comments, ED-2014-OPE-0039-1727, AR-H-073977.

1.   *Some for-profit educational institutions engage in manipulative and fraudulent recruitment practices.*

The failure of some for-profit schools to adequately serve students begins at the outset, with the institutions' relentless recruitment and marketing practices. Based on a two-year investigation of the for-profit education industry, the U.S. Senate Health, Education, Labor and Pensions (HELP) Committee concluded that, among the schools it analyzed, "almost 23 percent of revenues were spent on marketing and recruiting" (compared to 17 percent on instruction). U.S. Senate Health, Education, Labor and Pensions Committee, For Profit Higher Education: The Failure to Safeguard the Federal Investment and Ensure Student Success 6 (2012) (hereinafter HELP Report), AR-G-001364; *accord* Gainful Employment Rule, 79 Fed. Reg. at 65,033 (citing same). In recent years, for-profits have received criticism in particular for their aggressive marketing toward veterans and service members.[1] For example, one commenter told the Department about an individual who provided his name to a website that promised to help veterans access their military-related education funding. Veterans Education Success Comments at 4, ED-2014-OPE-0039-2363, AR-H-106996 (describing National Public Radio interview). In reality, the website was a service for for-profit colleges to identify potential recruits, and within three to four days, the individual received more than 70 phone calls and 300 e-mails from for-profit schools. *Id.* The recruitment onslaught continued for more than a year. *Id.* Kaplan, a for-profit company, has even "operate[d] recruiting sites fronted as 'study centers' inside military and [Veterans Affairs] hospitals." *Id.* at 5, AR-H-106997.

---

[1] Under federal law, career training programs must obtain at least 10 percent of their revenues from non-Title IV sources. 20 U.S.C. § 1094(a)(24), (d). This requirement, called the "90/10" rule, creates strong incentives for schools to recruit veterans and service members, who have access to federal student aid programs that do not originate under Title IV. That some for-profit schools cannot find a sufficient number of students, families, and employers willing to pay

Recruiters at some schools also exploit students' negative emotions to make them feel vulnerable and therefore more likely to enroll. As one admissions employee for APSCU member school Argosy University Online admitted, recruiters would attempt to uncover students' previous mistakes during the admissions process. *Id.* "You basically take all that failure and all those bad decisions, and you spin it around and right back in their face as guilt" to induce them to enroll and take out loans. *Id*. Likewise, the Senate HELP Report described evidence, including school training manuals, internal memoranda, and undercover visits by the Government Accountability Office, showing that schools have targeted students' pain—such as students' feelings about "dead-end job[s]" or their "inability to support their children"—as a recruiting tactic. HELP Report at 60, AR-G-001418.

Substantial record evidence also demonstrates that some for-profit institutions mislead or outright lie to students about material information, including program cost, job placement rates, and accreditation, before enrollment. Some of this evidence comes straight from former recruiters in the industry. For example, one salesman for DeVry—an APSCU member company—testified before Congress that he was "instructed to pose as a 'military advisor' affiliated with the Pentagon" in his efforts to recruit veterans; four other DeVry salesmen subsequently told Congress that they were instructed to do the same thing. Veterans Education Success Comments at 5, AR-H-106997. And a former recruiter at for-profit South University— another APSCU member school—stated, "It just got to the point where I felt like I was lying to these people on a regular basis. . . . Honestly, I just felt dirty doing the things I was doing. It's almost like they were trying to make me take advantage of people's belief in what this education was going to get them, when I didn't buy into it myself." *Id.* at 6, AR-H-106998.

---

any amount out-of-pocket for a for-profit education to meet the 90/10 requirement is telling with respect to the quality of education on offer at many for-profit programs.

Many students also report being misled about a particular program's accreditation, its sufficiency for students to seek professional certification or licensure, and the transferability of its credits to other schools. "Too many programs exploit the confusion between national, regional, and programmatic accreditation." American Federation of Teachers Comments at 4, ED-2014-OPE-0039-1620, AR-H-063295. For-profit schools may have only national accreditation, for example, which impairs students' ability to obtain licensure or certification under some circumstances and to transfer their credits with for-profit institutions to non-profit private or public schools.

Many students, "especially first-in-the-family college students, . . . do not find out until it is too late" that the programs they are attending do not meet necessary certification or licensing exam criteria. Consumer Federation of California, et al., Comments at 31, ED-2014-OPE-0039-1932, AR-087180. One commenter described to the Department the story of a Marine Corporal, who stated, "When I attempted to transfer my units from [the for-profit APSCU member] Brown Mackie to [a public college], I found out that none of my units transferred because they didn't have the right level of accreditation." Veterans Education Success Comments at 8, AR-H-110059. Another former student of a for-profit, a single mother with two kids, testified in a congressional hearing that only after she finished a sonography program at a for-profit college did she learn that it lacked programmatic accreditation. *Id.* at 13, AR-H-110064.

The Senate HELP Committee also examined accreditation-related online information provided by for-profit companies and found it lacking in some instances. For example, in analyzing programs offering Clinical Psychology Doctorates, it noted that some states require accreditation by the American Psychological Association for an individual to receive a license to practice as a psychologist. One institution offering this program, APSCU member Argosy

University, correctly noted on its website that some of its campuses were accredited, but it did not mention on the same page "that two of its [eleven] programs were not accredited, nor that graduates from those two programs would not be able to practice in several States." HELP Report at 109, AR-G-001467. Concord Law School, which is owned by the for-profit company Kaplan and was not accredited by the American Bar Association (ABA), stated on its JD web page that graduates were eligible to sit for the California Bar Exam (which does not require a degree from an accredited law school), but it did "not mention that the program was not accredited by the [ABA] and that as a result, even students who ultimately passed the California Bar Exam would not be allowed to sit for the required bar examination in many other States." *Id.*; *see also id.* at 104, AR-G-001462 (stating that a prospective student would have had to "click on a small-print section titled 'Concord Law School accreditation and disclosure information' and to read multiple small-print paragraphs" to learn this information).

Misleading and false recruitment practices have led numerous government entities to investigate and take action against for-profit institutions. At the time of the Gainful Employment rulemaking, more than two dozen state attorneys general, the U.S. Department of Justice, the Federal Trade Commission, the Securities and Exchange Commission, and the Consumer Financial Protection Bureau had investigated for-profit companies. *See* David Halperin Comments at 5, ED-2014-OPE-0039-1820, AR-H-075394; *see also* The Institute for College Access and Success (TICAS) Comments at 1-2, ED-2014-OPE-0039-1935, AR-H-087209-10. Although many of those investigations were pending or had settled without companies' admissions of guilt, allegations by these government entities were consistent with other accounts regarding problems within the industry. *See* David Halperin Comments at 5, AR-075394; *see*

*also id.* Attachment, AR-H-075401-22 (collecting descriptions of government investigations and actions regarding for-profit colleges).

In 2013, for example, the Attorney General of Colorado entered into a $3.3 million settlement with APSCU member school Argosy University, Denver, involving allegations that the school misled students about the accreditation of its doctorate of education program in counseling psychology. Press Release, Attorney General Suthers Announces Consumer Protection Settlement with Argosy University (Dec. 5, 2013), http://www.coloradoattorney general.gov/press/news/2013/12/05/attorney_general_suthers_announces_consumer_protection_ settlement_argosy_unive, *as cited in* TICAS Comments at 2, AR-H-087210. The Attorney General concluded that Argosy had engaged in "a long and elaborate pattern of deceptive behavior," including statements that led students to believe that the program was seeking accreditation by the American Psychological Association when it was not. *See id.* The state observed that the school's deceptive behavior began in 2007, and as of 2013, no student in the program "ha[d] become licensed as a psychologist in Colorado or any other state." *Id.*

Likewise, in another recent investigation, the Attorney General of New York discovered that Career Education Corporation, a member company of APSCU, had inflated its graduates' job placement rates in disclosures to students, accreditors, and the state. Press Release, A.G. Schneiderman Announces Groundbreaking $10.25 Million Dollar Settlement With For-Profit Education Company That Inflated Job Placement Rates To Attract Students (Aug. 19, 2013), at 1, AR-G-000001. The state alleged that company employees had counted graduates' "employment at single one-day health fairs, including fairs initiated at the request" of the company, as job placements, and had mischaracterized "graduates' job duties in order to improperly count such students as employed in the field in which the student trained or a related

field." *Id.* Although the company did not admit wrongdoing, it entered into a $10.25 million settlement with the state, which included an agreement to pay more than $9 million toward restitution for eligible consumers. *Id.* As part of the Attorney General's investigation, the company audited its job placement reports and "announced that it was revising placement rates for 49 of its campuses, and that 36 of those no longer met its accreditor's standards for placement." HELP Report at 164, AR-G-001522.

### 2. *Many for-profit career training programs charge high prices that leave students deeply in debt.*

Once enrolled in for-profit institutions, students often pay exceedingly high prices as compared to public or private non-profit alternatives. For example, "tuition and fees at for-profit colleges are twice what they are for equivalent programs at less-than-two-year public colleges and four times what they are for equivalent programs at two-year public institutions." Education Trust Comments, ED-2014-OPE-0039-1729, AR-H-074016. Although public institutions receive government subsidies that defray students' cost of attendance, evidence suggests that the high cost of for-profits remains even after controlling for these subsidies. Gainful Employment Rule, 79 Fed. Reg. at 65,032.

Unsurprisingly, students at for-profit programs are more likely than those at other institutions to rely on loans, including federal student aid, to finance their educations. *Id.* at 65,033. The Senate HELP Committee concluded that 96 percent of students at for-profit schools have student loans, compared to 13 percent at community colleges, 48 percent at 4-year public colleges, and 57 percent at 4-year private, non-profit colleges. HELP Report at 7, AR-G-001365.

On average, students at for-profit schools also have larger amounts of debt than students who attend non-selective public or non-profit institutions. Gainful Employment Rule, 79 Fed. Reg. at 65,033. For example, 57 percent of those students who graduate with a Bachelor's degree

from a for-profit school owe $30,000 or more in student loans, compared to 25 percent of those graduating from private, non-profit colleges and 12 percent graduating from public colleges. HELP Report at 7, AR-G-001365; *see also*, *e.g.*, Gainful Employment Rule, 79 Fed. Reg. at 65,033 (documenting higher median loan amounts among students attending for-profit certificate and Associate's degree programs than at public alternatives).

Certain groups of students—including students of color, low-income students, veterans, and women—feel acutely the impact of for-profits' high costs (and their poor quality and outcomes, as discussed below). These students are targeted for enrollment by for-profit institutions and matriculate there in large numbers. *See*, *e.g.*, NAACP Legal Defense and Educational Fund Comments at 2, ED-2014-OPE-0039-1927, AR-H-087119; National Education Association Comments at 1, 3, ED-2014-OPE-0039-1412, AR-H-053446-48; American Association of University Women (AAUW) Comments at 1, ED-2014-OPE-0039-2072, AR-H-090032. In some cases, their enrollment has recently skyrocketed. For example, "[b]etween 2004 and 2009, African American enrollment in for-profit college bachelor's degree programs increased by 218 percent, compared with a 24 percent increase in public four-year university programs." Education Trust Comments at 2-3, AR-H-74015-16. One in five African American undergraduates now begins his or her education at a for-profit college. *Id.* at 3, AR-H74016; *see also* Veterans Education Success Comments at 2, AR-H-106994 (describing an increase in for-profits' recruitment of veterans and students in the military of more than 200 percent in just one year).

These students, like for-profit students more generally, often find that student loans are necessary to finance their education. And to keep up with costs, they must in turn borrow more. In one recent year, 74 percent of African American students and 72 percent of Hispanic students

attending for-profit colleges took out federal loans to finance their education, compared to 24 percent and 27 percent, respectively, of their peers at other institutions. Education Trust Comments at 4, AR-H-074017; *see also* AAUW Comments at 1, AR-H-090032 (stating that women who enroll in for-profit colleges are more than twice as likely to take out federal student loans than women at other colleges and universities).

### 3. Despite taking large amounts of federal money, for-profit career training programs routinely offer students an inferior education with little support.

Because their students must frequently borrow—often from the federal government—to attend, career training programs at for-profit institutions rely heavily on federal money to keep their doors open and their profits up. One recent analysis of the finances of thirty for-profit colleges concluded that the schools received more than 79 percent of their revenue from federal Title IV aid. HELP Report at 24, AR-G-001382. That share was even larger when other forms of federal educational assistance, such as military-related education aid, were included. *See id.* In addition, federal student aid used at career training programs has increased dramatically in recent years. For example, between the 2000-01 and 2009-10 school years, for-profit schools' receipt of Pell grants increased from $1.1 billion to $7.5 billion. *Id.* at 25, AR-G-001383. The Apollo Group, the parent company of the University of Phoenix, saw students' Pell grants increase from $24 million in 2000-01 to an eye-popping $1.2 *billion* in 2010-11. *Id.* at 26, AR-G-001384.

Despite this flood of federal cash, some for-profit career training programs are notorious for providing students with a substandard education, marked by poor quality instructors, few if any student support services, and high rates of withdrawal. These programs are a far cry from the beneficial programs that APSCU conjures in its brief. The National Consumer Law Center (NCLC), which frequently provides legal assistance to students attending for-profit programs, noted in the rulemaking that its clients often "complained about unqualified instructors, a

school's failure to provide books or other materials, the lack of up-to-date, operational or sufficient instructional equipment, and internships that do not involve any of the skills the students have learned." NCLC Comment at 4, ED-2014-OPE-0039-0585, AR-H-029557; *see also*, *e.g.*, Veterans' Student Loan Relief Fund Fact Sheet, ED-2014-OPE-0039-2368, AR-H-107861-66 (collecting veterans' experiences with low program quality at for-profit schools).

Low program quality is due in part to relatively low expenditures on instruction: Instead of directing additional funding to improve instructional quality, many for-profit schools use students' tuition and fees to pad school profit margins and pay for recruitment and marketing. HELP Report at 6, AR-G-001364. On average, for-profit institutions that responded to a document request by the Senate HELP Committee spent $2,050 per student on instruction in 2009—a spending level that generally fell below that for public and non-profit schools. *Id.* at 86-87, AR-G-001444-45. In 2009, the Apollo Group spent less than $900 per student on instruction, compared to per-student instructional costs exceeding $11,000 at the University of Arizona, a public school. *See* HELP Report Part II at 289-90, *as cited in* Veterans Education Success Comment at 3, AR-H-106995, *available at* http://www.help.senate.gov/imo/media/for_profit_report/PartII/Apollo.pdf.

For-profit schools keep instructional costs low in part by using part-time faculty, a tactic that may lead to worse student outcomes. HELP Report at 94-95, AR-G-001452-53. At those institutions examined by the HELP Committee, 80 percent of faculty were part-time. *Id.* at 94, AR-G-001452. At one school, Bridgepoint, more than 98 percent of faculty were part-time. *Id.*

For-profit schools often cut corners with respect to student support services as well. The HELP Committee found that for-profit institutions included in its analysis employed roughly ten

recruiters for every career services professional. *Id.* at 7, AR-G-001365. Two of the largest for-profit schools "provide[d] *no* career services" at all. *Id.* at 162, AR-G-001520.

### 4.    Many students leave for-profit institutions without graduating, and graduates often have low earning potential and few job prospects.

Far from benefiting from their education, many students never graduate from for-profit career training programs. Gainful Employment Rule, 79 Fed. Reg. at 65,033. The HELP Report concluded that more than half a million students (or 54 percent) who enrolled in 2008-2009 in a for-profit institution examined by the Committee dropped out without a degree or certificate by the middle of 2010. HELP Report at 73, AR-G-001431. At some institutions, withdrawal rates were even higher. For example, 59 percent of students who enrolled in 2009-10 at Ashford University, a school operated by APSCU member Bridgepoint Education, withdrew *in a single year*. *Id.* at 128, AR-G-001486.

A variety of factors contribute to these high withdrawal rates, including low program quality and students' inability to continue to pay their share of the high cost of a for-profit education. *See*, *e.g.*, *id.* at 43-44, AR-G-001401-02 (describing internal documents from for-profit institutions that discuss the impact various changes in tuition and fees will have on enrollment). Students may also find themselves unprepared for or incapable of completing the programs because, in their quest to obtain federal student aid, for-profit institutions often admit students who have no realistic prospect of graduating. For example, a former DeVry salesman testified before Congress that the company instructed recruiters to enroll service members even if they were not ready for the program or were going to be deployed. *See* Veterans Education Success Comments at 5, AR-H-106997. One report indicated that the for-profit and APSCU member school Ashford University "signed up a Marine with traumatic brain injury convalescing in a military hospital" who was injured to such an extent that, although he knew that he had

enrolled at the school, he could not remember what course he was taking. *Id.* at 4, AR-H-106996. In another case, a woman "was pressured into signing up for a proprietary school medical assistant program even though she dropped out of school in ninth grade and had only a sixth grade reading level." NCLC Comment at 5, AR-H-029558. Unsurprisingly, that student did not complete the course and defaulted on her student loan. *Id.* In another example, a person with limited English skills was misled into signing up for a cosmetology program after a Spanish-speaking representative falsely told her that the school's instructors were bilingual. *Id.* at 6, AR-H-029559. Although students' reasons for withdrawal vary, one thing is certain: Many students incur loan debt before withdrawing, and, without the credential they sought, they receive little to no bump in earning potential that would enable them to repay that debt.

Even students who graduate from for-profit programs often struggle to pay off their loans due to low earning potential and few job prospects. *See* Gainful Employment Rule, 79 Fed. Reg. at 65,031. For example, more than a quarter of career training programs that will be subject to the debt-to-earnings measures under the challenged rule produce graduates with mean and median earnings below $15,080 per year, the earnings of a full-time worker earning the federal minimum wage. *Id.* In addition, for-profit schools often have abysmal records with respect to job placement. The National Consumer Law Center reported that "[a] large percentage of the many clients [it had] represented attended for-profit schools" and "[o]nly a handful reported finding a job in the field related to their program of instruction." NCLC Comments at 1, AR-H-029554. Indeed, many of NCLC's clients were "told by employers that they never hire graduates from the for-profit schools they attend." *Id.* at 5, AR-H-029558.

5.      *Students at for-profit institutions often default on student loans, with devastating consequences.*

For-profit institutions' toxic mix of high student debt, low program quality, and poor employment prospects unsurprisingly leads to high rates of student loan default. The Department estimated that more than one in five students who attend career training programs subject to the accountability metrics in the rule will default on their federal student loans within the first three years of repayment. Gainful Employment Rule, 79 Fed. Reg. at 65,031. Student loan default rates are "consistently . . . highest among students attending for-profit institutions." *Id.* at 65,033; *see also* HELP Report at 114, AR-G-001472 (stating that students who attend for-profit schools "default at nearly three times the rate of students who attend[] other types of institutions"). As a result, nearly half of all student loan defaults are held by students who attended for-profit educational institutions. HELP Report at 114, AR-G-001472.

While the default rates among for-profit schools are high, the rates at some schools are downright shocking. For example, internal e-mails between executives at Apollo Group, a large for-profit company, estimated lifetime default rates for students in a two-year program in one of the company's schools to be greater than 77 percent. HELP Report at 117, AR-G-001475. An analysis conducted by the Institute for College Access and Success (TICAS) "found 114 programs—all at for-profit colleges—where there were more defaulters in a single cohort year of defaults than there were graduates in a two-year period." TICAS Comments at 3, AR-H-087211. Put another way, students receiving federal aid to attend these "parasitic programs" were "more likely to default than they [we]re to complete the credential they sought." *Id.*

Borrowers who default face severe consequences, including loan balances that balloon, ruined credit, and the constant threat of wage garnishment, tax refund seizures, and Social Security offsets. *See*, *e.g.*, Gainful Employment Rule, 79 Fed. Reg. at 65,031; Education Trust

Comments at 5, AR-H-074018 (noting that there are currently 115,000 individuals "whose Social Security payments are being garnished for non-payment of student loans").

*      *      *

As the discussion above makes clear, some for-profit schools are a scourge to the students they claim to serve. Permitting these schools to continue to receive federal funding while failing to prepare students for gainful employment harms, rather than benefits, students.

## II.     The Disclosure Requirement Is Consistent with The First Amendment.

APSCU contends (at Pl.'s Summ. J. Memo. at 39) that the rule violates the First Amendment by requiring schools to disclose "[t]he total cost of tuition and fees, and the total cost of books, supplies, and equipment, that a student would incur for completing the program within the length of the program." 34 C.F.R. § 668.412(a)(7). Although APSCU recognizes that the rule permits publication of estimates, it contends that such estimates are "not purely factual," as required for the standard in *Zauderer v. Office of Disciplinary Counsel*, 471 U.S. 626 (1985), to apply, and are thus subject to heightened First Amendment scrutiny. Pl.'s Summ. J. Memo. at 39.

APSCU's assertion lacks merit. As an initial matter, APSCU misreads *Zauderer*, which held that disclosure and other mandatory informational requirements applicable to commercial speech are permissible if "reasonably related" to a permissible state interest. 471 U.S. at 651. In that case, the Supreme Court upheld a state mandate requiring an attorney who advertised contingent-fee services to disclose that clients might still be responsible for certain expenses if they lost. *See* 471 U.S. at 650. The Court described the state mandate as one under which the plaintiff must "include in his advertising purely factual and uncontroversial information about the terms under which his services [would] be available." *Id.* at 651. Properly understood,

20

*Zauderer*'s reference to "purely factual and uncontroversial information" was descriptive with respect to the disclosure at issue and did not purport to set a threshold requirement for *Zauderer*'s application in all cases.

In any event, as used in *Zauderer*, the phrase "purely factual" merely contrasts the disclosures at issue there with unconstitutional speech-compulsion requirements that "prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion or force citizens to confess by word or act their faith therein." *Id.* (quoting *W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 642 (1943)). This contrast posits a distinction between, on the one hand, requirements that commercial speakers disclose accurate information and, on the other, requirements that they subscribe to disputed matters of political, religious, or other forms of opinion. *See Discount Tobacco City & Lottery, Inc. v. United States*, 674 F.3d 509, 559 n.8 (6th Cir. 2012) (Stranch, J., for majority).[2]

The Gainful Employment rule plainly does not bear on APSCU members' political, religious, or other forms of opinion. And because it expressly directs institutions uncertain about program costs to "include a disclaimer advising that . . . data are estimates," 79 Fed. Reg. at 64,978, it does not compel schools to make false statements of fact. That a cost may be an estimate—and accurately described as such—does not transform it into a statement of opinion. Accordingly, the cost disclosure requirement is consistent with the First Amendment. *See, e.g.,*

---

[2] APSCU's invocation of *National Ass'n of Manufacturers v. SEC*, 748 F.3d 359 (D.C. Cir. 2014), is misplaced. That case did not hold, as APSCU contends, that *Zauderer* applies only where a disclosure is both purely factual and uncontroversial. Rather, its singular holding with respect to *Zauderer* hinged on the conclusion—since overruled—that *Zauderer* could not apply to a consumer disclosure requirement that furthers a government purpose other than the prevention of consumer deception. *See Am. Meat Institute v. U.S. Dep't of Agric.*, 760 F.3d 18, 22-23 (D.C. Cir. 2014) (*en banc*). Although the D.C. Circuit is considering "the meaning of [the phrase] 'purely factual and uncontroversial information' as used in *Zauderer*," *see* Order for Supplemental Briefing, *Nat'l Ass'n of Mfrs.*, No. 13-5252 (D.C. Cir. Nov. 18, 2014), even under the narrowest reading of that term, the plaintiff's First Amendment claim here fails.

*Spirit Airlines, Inc. v. Dep't of Transp.*, 687 F.3d 403, 414-15 (D.C. Cir. 2012) (applying *Zauderer* to uphold a rule that aimed to "prevent consumer confusion about the total price they ha[d] to pay" for airline tickets and noting that "it goes without saying that requiring the total price to be the most prominent number is reasonably related to that interest").

It also bears emphasis that, whether under *Zauderer*'s First Amendment standard or the heightened scrutiny for commercial speech restrictions under *Central Hudson Gas & Electric Corp. v. Public Service Commission*, 447 U.S. 557 (1980), the government interest in combating consumer deception and confusion by providing students and their families with information about the cost of their education is sufficient to justify the rule. *See, e.g.*, *Spirit Airlines*, 687 F.3d at 415 (concluding "eas[ily]" that the "government's interest in ensuring the accuracy of commercial information in the marketplace is substantial" (internal quotation marks and alteration omitted)). The administrative record contains numerous stories of students who were surprised by the full program cost, often owing thousands of dollars more than they had expected to pay. *See, e.g.*, HELP Report at 54, AR-G-001412; Veterans' Student Loan Relief Fund Fact Sheet, AR-H-107861-66.

Moreover, as the Department noted in its rule, it has been "concerned that some for-profit institutions have taken advantage of the lack of access to reliable information about [career training] programs to mislead students." Gainful Employment Rule, 79 Fed. Reg. at 65,034. Some for-profit schools seem to train their employees not to provide students with a total cost of the program during the recruitment process. For example, one former recruiter for a for-profit college explained that he was trained to state the cost of the program only for each term. As he noted, "often times the student will automatically assume there are only two or three terms like a traditional school, and there is [sic] in reality, five per year." HELP Report at 54, AR-G-001412.

Another school's internal training manual instructed recruiters to give non-answers to a student's first two questions about program cost and, if asked a third time, "to state the cost per credit hour, but not the number of credits required to graduate in the program." *Id.* at 54-55, AR-H-001412-13. The manual even expressly stated: "Do not give out the complete program cost." *Id.* at 55, AR-H-001413.

The disclosure requirement attempts to address the dearth of cost information that some for-profit schools have been happy to exploit. For-profit institutions do not have a First Amendment right to keep secret the costs of their programs while pocketing billions of dollars in taxpayer money. The requirement should be upheld.

**III.    The Certification Requirement Is Consistent with The First Amendment.**

APSCU also challenges on First Amendment grounds the rule's certification requirement, which directs schools to certify that they meet certain requirements with respect to their accreditation and the sufficiency of their programs to satisfy educational prerequisites for licensure or occupational certifications. *See* 34 C.F.R. § 668.414. APSCU contends that this "vague[]" requirement will expose schools to "frivolous lawsuits" for "purported inaccuracies." Pl.'s Summ. J. Memo. at 44. In APSCU's view, this risk of future litigation renders compliance "an unduly burdensome form of compelled speech, in violation of the First Amendment." *Id.* (citing *Milavetz, Gallop & Milavetz, P.A. v. United States*, 559 U.S. 229, 250 (2010)).

APSCU's First Amendment argument is legally erroneous. Although courts consider whether a commercial disclosure requirement is "unduly burdensome" when determining whether the requirement passes muster under the First Amendment, *Zauderer*, 471 U.S. at 651, APSCU's attempt to shoehorn downstream litigation costs into this analysis lacks support in the case law. A disclosure may be unduly burdensome if it limits companies' "ability to convey their

message," *Int'l Dairy Foods Ass'n v. Boggs*, 622 F.3d 628, 643 (6th Cir. 2010), for example, by monopolizing limited reporting space, *see*, *e.g.*, *Ibanez v. Fla. Dep't of Bus. & Prof'l Regulation*, 512 U.S. 136, 146-47 (1994). But nothing about the certification requirement limits schools' ability to do so here. Moreover, if the threat of litigation based on disclosure inaccuracies were enough to render a disclosure requirement unduly burdensome, no such requirement could survive if the government or the public had any remedies available to them to combat such inaccuracies. Such an outcome is untenable.

## CONCLUSION

For the foregoing reasons, APSCU's motion for summary judgment should be denied and the Department's cross-motion for summary judgment granted.

Dated:  March 6, 2015

Respectfully submitted,

/s/ Julie A. Murray
Julie A. Murray
D.C. Bar No. 1003807
Allison M. Zieve
D.C. Bar No. 424786
PUBLIC CITIZEN LITIGATION GROUP
1600 20th Street NW
Washington, DC 20009
(202) 588-1000
jmurray@citizen.org

*Counsel for Amici Curiae*

# APPENDIX: DESCRIPTIONS OF AMICI

## Air Force Sergeants Association

The Air Force Sergeants Association represents its 110,000 dues-paying members by advocating for their interests to America's elected officials and military leaders. It is a federally-chartered, 501(c)(19) veteran service organization headquartered in Suitland, Maryland.

## American Federation of Teachers, AFL-CIO

The American Federation of Teachers is a union of 1.6 million professionals that champions fairness; democracy; economic opportunity; and high-quality public education, healthcare and public services for our students, their families and our communities. We are committed to advancing these principles through community engagement, organizing, collective bargaining and political activism, and especially through the work our members do.

## Center for Public Interest Law

The Center for Public Interest Law (CPIL), founded in 1980 at the University of San Diego School of Law, serves as an academic center of research and advocacy in regulatory and public interest law. In addition to its academic program, in which law student interns learn the substantive law governing the operation and decision making of state regulatory agencies, CPIL has an advocacy component in which it represents the interests of the unorganized and underrepresented in California's legislature, courts, and regulatory agencies.

## Center for Responsible Lending

The Center for Responsible Lending is a nonprofit, non-partisan research and policy advocacy organization that works to protect homeownership and family wealth by fighting predatory lending practices. Since we began in 2002, we have witnessed, studied, and fought against outrageous lending abuses that strip billions of dollars from American families. CRL strives to advance financial opportunity, security, and wealth for families and communities. We are particularly focused on promoting fair and sustainable lending practices and ending abusive financial practices that have a disproportionate impact on people of color, low- and moderate income families, and other populations including immigrants, students, seniors, women, and military personnel. These populations have too often received reduced access to responsible products and are intentionally targeted for predatory lending. Our affiliation with Self-Help, a lender to traditionally underserved borrowers, confirms that fairness and opportunity can be at the center of a thriving financial marketplace for all.

## Children's Advocacy Institute

The Children's Advocacy Institute (CAI), founded at the nonprofit University of San Diego School of Law in 1989, is one of the nation's premier academic, research, and advocacy organizations working to improve the lives of children and youth. In addition to its academic component, in which CAI trains law students and attorneys to be effective child advocates, CAI seeks to leverage change for children and youth through impact litigation, regulatory and legislative advocacy, research, and public education at the state and federal levels.

**Consumer Action**

Through multilingual financial education materials, community outreach, and issue-focused advocacy, Consumer Action empowers underrepresented consumers nationwide to assert their rights in the marketplace and financially prosper.

**Consumer Federation of California**

The Consumer Federation of California (CFC) is a non-profit advocacy organization. Since 1960, CFC has been a voice for consumer rights, campaigning for state and federal laws that place consumer protection ahead of corporate profit. Each year, CFC testifies and advocates before the California legislature on dozens of bills that affect millions of our state's consumers, and it appears before state agencies in support of consumer regulations.

**Demos**

Demos is a public policy and research organization working for an America where we all have an equal say in our democracy and an equal chance in our economy. Demos views an affordable, quality higher education system as a pillar of our nation's commitment to equity and upward mobility and believes that a robust Gainful Employment rule is key to ending abusive practices among some institutions in our higher education system and ensuring that students are not overburdened by debt from institutions that provide little value in the job market.

**The Institute for College Access & Success**

The Institute for College Access & Success (TICAS) is an independent, non-profit organization that works to make higher education more available and affordable for people of all backgrounds. Through nonpartisan research, analysis, and advocacy, we aim to improve the processes and public policies that can pave the way to successful educational outcomes for students and for society.

**League of United Latin American Citizens**

The League of United Latin American Citizens (LULAC) is the nation's largest and oldest civil rights volunteer-based organization that empowers Hispanic Americans and builds strong Latino communities. Headquartered in Washington, DC, with 1,000 councils around the United States and Puerto Rico, LULAC's programs, services, and advocacy address the most important issues for Latinos, meeting critical needs of today and the future.

**Military Officers Association of America**

MOAA is the nation's largest and most influential association of military officers. We are a powerful force speaking for a strong national defense and representing the interests of military officers, their families, and all veterans and survivors at every stage of their lives and careers.

**Mississippi Center for Justice**

The Mississippi Center for Justice is a nonprofit, public interest law firm committed to advancing racial and economic justice. Supported and staffed by attorneys, community leaders, and volunteers, the Center develops and pursues strategies to combat discrimination and poverty statewide.

**National Council of La Raza (NCLR)**

NCLR—the largest national Hispanic civil rights and advocacy organization in the United States—works to improve opportunities for Hispanic Americans. To achieve its mission, NCLR conducts applied research, policy analysis, and advocacy in five key areas—assets/investments, civil rights/immigration, education, employment and economic status, and health. Given the disproportionate enrollment of Latino students at for-profit schools, their high loan default rates, and low graduation rates, NCLR and seven other civil rights organizations authored a white paper, available at http://www.nclr.org/index.php/publications/gainful_employment_a_civil_ rights_perspective/, calling for strong Gainful Employment regulations to protect thousands of Latino students from poorly performing for-profit institutions.

**New Economy Project**

New Economy Project works with New York City groups to promote community economic justice and to eliminate discriminatory economic practices that harm communities and perpetuate inequality and poverty. New Economy Project employs a range of strategies—including direct representation, impact litigation, policy advocacy, coalition building, community education, and research—to address pressing economic justice issues. The issues raised in this litigation are of vital interest to the communities that New Economy Project serves, as many low-income New Yorkers have been saddled by student loan debt incurred after attending sham, for-profit schools.

**Public Advocates Inc.**

Public Advocates Inc. is a nonprofit law firm and advocacy organization that challenges the systemic causes of poverty and racial discrimination by strengthening community voices in public policy and achieving tangible legal victories advancing education, housing, and transit equity. We spur change through collaboration with grassroots groups representing low-income communities, people of color, and immigrants, combined with strategic policy reform, media advocacy and litigation, "making rights real" across California since 1971.

**Public Citizen, Inc.**

Public Citizen, Inc. is a non-profit consumer advocacy organization founded in 1971. We represent consumer interests through lobbying, litigation, administrative advocacy, research, and public education on a broad range of issues, including consumer rights in the marketplace, financial regulation, and corporate accountability. Public Citizen supports robust regulation of predatory, for-profit educational institutions and student lending practices that leave many students with overpriced educations that do not prepare students for the workplace. Public Citizen also has substantial interest and expertise in the commercial speech doctrine invoked by the plaintiff in this case. Its lawyers argued, among other cases, *Virginia State Board of Pharmacy v. Virginia Citizens Consumer Council, Inc.*, 425 U.S. 748 (1976), and *Zauderer v. Office of Disciplinary Counsel*, 471 U.S. 626 (1985).

**Public Counsel**

Public Counsel is the largest not-for-profit law firm of its kind in the nation. It is the public interest arm of the Los Angeles County and Beverly Hills Bar Associations and is also the Southern California affiliate of the Lawyers' Committee for Civil Rights Under Law. Established in 1970, Public Counsel is dedicated to advancing equal justice under law by delivering free legal and social services to indigent and underrepresented children, adults and

families throughout Los Angeles County.  In 2013, Public Counsel assisted more than 30,000 people with direct legal services and assisted hundreds of thousands more through filing impact lawsuits, influencing policy, and sponsoring legislation. Many of our clients suffer from the practices of for-profit colleges described in this brief, including foster youth, veterans, and at-risk students who are often the first in their families to go to college.

**Public Good Law Center**
The Public Good Law Center is a public interest organization dedicated to the proposition that all are equal before the law. Through participation in cases of particular significance for consumer protection and civil rights, Public Good seeks to ensure that the protections of the law remain available to everyone.

**Public Law Center**
The Public Law Center is committed to providing access to justice to Orange County, California's low-income residents, and does so by providing free civil legal services, including counseling, individual representation, community education, and strategic litigation and advocacy to challenge societal injustices. The Public Law Center regularly assists low-income students who have enrolled in for-profit schools because of false promises and misinformation and subsequently have to deal with paying for an education that they cannot use. The Public Law Center supports the Gainful Employment rule because it will allow students to make informed decisions about their education.

**Service Employees International Union (SEIU)**
The Service Employees International Union (SEIU) represents over two million members in health care, education, public services, and property services who need, for themselves or their families, accessible, quality higher education and training opportunities. SEIU also unites over 23,000 faculty who are an important voice for a higher education system that prioritizes student learning, invests in educators, and reduces student debt to build a 21st century workforce.

**United States Student Association**
The United States Student Association, the country's oldest, largest, and most inclusive national student-led organization, develops current and future leaders and amplifies the student voice at the local, state, and national levels by mobilizing grassroots power to win concrete victories on student issues.

**University of San Diego School of Law Veterans Legal Clinic**
The University of San Diego School of Law Veterans Legal Clinic provides free legal services to veterans struggling to resolve disputes with for-profit education companies over the use of GI Bill funds and related loans. The Veterans Legal Clinic also represents veterans appealing Veterans Affairs disability determinations and veterans seeking to change the characterization of service of their military discharge.

**Veterans Education Success**
Veterans Education Success is a non-profit organization dedicated to protecting and defending the integrity of the GI Bill and other federal education programs for veterans and service

members. Veterans Education Success provides individual assistance to veterans who have been deceived or defrauded by predatory colleges.

**Veterans' Student Loan Relief Fund**
The Veterans' Student Loan Relief Fund is a national non-profit organization that provides grants to veterans who have been defrauded by for-profit schools.

**VetJobs**
Veteran-of-Foreign-Wars-sponsored VetJobs is the leading military job board on the internet assisting transitioning military, veterans, National Guard & Reserve, and their family members in finding quality employment.

**Vietnam Veterans of America**
Vietnam Veterans of America (VVA) is the nation's only congressionally chartered veterans service organization dedicated to the needs of Vietnam-era veterans and their families. VVA's founding principle is "Never again will one generation of veterans abandon another."

**Woodstock Institute**
Woodstock Institute is a leading nonprofit research and policy organization in the areas of fair lending, wealth creation, and financial systems reform. Woodstock Institute works locally and nationally to create a financial system in which lower-wealth persons and communities of color can safely borrow, save, and build wealth so that they can achieve economic security and community prosperity.

**Young Invincibles**
Young Invincibles is a national research and advocacy organization committed to amplifying the voices of young adults ages 18 to 34 and expanding economic opportunity for the Millennial generation.