**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| ASSOCIATION OF PRIVATE SECTOR COLLEGES AND UNIVERSITIES,<br><br>Plaintiff,<br><br><br>v.<br><br><br>ARNE DUNCAN, in his official capacity as Secretary of the Department of Education,<br><br>UNITED STATES DEPARTMENT OF EDUCATION,<br><br>and<br><br>UNITED STATES OF AMERICA,<br><br>Defendants. | Civil Action No. 1:14-cv-01870 (JDB) |

**PLAINTIFF'S CONSOLIDATED MEMORANDUM OF LAW IN OPPOSITION TO
DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT
AND REPLY IN SUPPORT OF PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

## TABLE OF CONTENTS

Page

INTRODUCTION ..................................................................................................1

ARGUMENT ........................................................................................................3

I.  The Debt-To-Earnings Test Is Unlawful ................................................. 3

   A.  The Debt-To-Earnings Test Exceeds The Department's Statutory
      Authority ..........................................................................................3

      1.  The Statutory Text Is Unambiguous And Forecloses The
         Department's Interpretation ............................................4

         a.  The Department's Interpretation Contradicts The
            Plain Meaning Of "Gainful Employment" In The
            HEA ................................................................... 5

         b.  The Rule Conflicts With The HEA's Text In Other
            Ways ................................................................. 7

         c.  The Statutory Context And The Department's Own
            Prior Position Foreclose Its New Reading Of The
            HEA's Text ......................................................... 8

      2.  The Department's Interpretation Undermines The HEA's
         Purpose And Structure ..................................................10

      3.  The Legislative History Does Not Support The
         Department's Test ........................................................14

   B.  The Debt-To-Earnings Test Is Arbitrary And Capricious ........................18

      1.  The Debt-To-Earnings Test Irrationally Makes Title IV
         Eligibility Depend Not On Quality, But On Factors Beyond
         Schools' Control ..........................................................18

      2.  The Department's Metrics And Data Are Arbitrary And
         Unreliable ..................................................................24

      3.  The Department Fails To Confront The Harmful Impact
         That Its Debt-To-Earnings Test Will Have On Students
         And Schools ................................................................33

      4.  The Rule Imposes Unlawfully Retroactive And Overbroad
         Sanctions And Violates Basic Principles Of Fairness ..................36

i

## TABLE OF CONTENTS
### *(continued)*

Page

II. The Disclosure, Reporting, And Certification Requirements Are Unlawful ........ 39

    A. The Disclosure Rules Are Statutorily Unauthorized, Violate The First Amendment, And Are Arbitrary And Capricious ...........................39

        1. The Disclosure Rules Exceed The Department's Statutory Authority ...................................................................................39

        2. The Disclosure Requirements Violate The First Amendment ..................................................................................40

        3. The Disclosure Requirements Are Arbitrary And Capricious ...................................................................................41

        4. APSCU's Challenge To The Disclosure Requirements Is Timely ......................................................................................42

    B. The Reporting Rules Are Unauthorized And Violate 20 U.S.C. § 1015c .....................................................................................43

    C. The Certification Requirements Exceed The Department's Statutory Authority, Contravene The First Amendment, And Violate The APA .....................................................................................45

CONCLUSION .................................................................................................45

# TABLE OF AUTHORITIES

**Cases**                                                                                   Page(s)

*Ala. Power Co. v. EPA,*
   40 F.3d 450 (D.C. Cir. 1994) ................................................................. 41, 45

*Allina Health Servs. v. Sebelius,*
   746 F.3d 1102 (D.C. Cir. 2014) ................................................................ 44

*Am. Bar Ass'n v. FTC,*
   430 F.3d 457 (D.C. Cir. 2005) ............................................................. 11, 12

*Am. Fed'n of Gov't Emps., AFL-CIO v. Glickman,*
   215 F.3d 7 (D.C. Cir. 2000) ...................................................................... 5

*Am. Meat Inst. v. U.S. Dep't of Agric.,*
   760 F.3d 18 (D.C. Cir. 2014) ................................................................... 41

*Am. Petrol. Inst. v. SEC,*
   953 F. Supp. 2d 5 (D.D.C. 2013) ............................................................ 20

*Am. Pub. Gas Ass'n v. Fed. Power Comm'n,*
   567 F.2d 1016 (D.C. Cir. 1977) .............................................................. 32

*Am. Radio Relay League, Inc. v. FCC,*
   524 F.3d 227 (D.C. Cir. 2008) ................................................................ 32

\* *APSCU v. Duncan,*
   870 F. Supp. 2d 133 (D.D.C. 2012) ....................................... 1, 8, 14, 25, 28, 30

\* *APSCU v. Duncan,*
   930 F. Supp. 2d 210 (D.D.C. 2013) ............................................... 1, 43, 44

*Ass'n of Accredited Cosmetology Sch. v. Alexander,*
   979 F.2d 859 (D.C. Cir. 1992) ................................................................ 22

*Bankamerica Corp. v. United States,*
   462 U.S. 122 (1983) .............................................................................. 10

*Bass v. Stolper, Koritzinsky, Brewster & Neider, S.C.,*
   111 F.3d 1322 (7th Cir. 1997) ................................................................. 5

\* *Baystate Med. Ctr. v. Leavitt,*
   545 F. Supp. 2d 20 (D.D.C. 2008) .................................................. 23, 24, 32

---

\* Authorities upon which APSCU chiefly relies are marked with asterisks.

# TABLE OF AUTHORITIES
## *(continued)*

**Cases** *(continued)*          <u>Page(s)</u>

*Biton v. Palestinian Interim Self-Gov't Auth.,*
   412 F. Supp. 2d 1 (D.D.C. 2005) ............................................................. 8

*Bowen v. Georgetown Univ. Hosp.,*
   488 U.S. 204 (1988) .............................................................................. 36

\* *Bus. Roundtable v. SEC,*
   647 F.3d 1144 (D.C. Cir. 2011) ............................................................. 33

*Cardinal Health, Inc. v. Holder,*
   846 F. Supp. 2d 203 (D.D.C. 2012) ................................................. 20, 21

*Cement Kiln Recycling Coal. v. EPA,*
   493 F.3d 207 (D.C. Cir. 2007) ............................................................... 43

*Chevron U.S.A. Inc. v. Natural Res. Def. Council, Inc.,*
   467 U.S. 837 (1984) ............................................................................. 4, 7

*City of Brookings Mun. Tel. Co. v. FCC,*
   822 F.2d 1153 (D.C. Cir. 1987) ............................................................. 32

*City of Chicago v. Envtl. Def. Fund,*
   511 U.S. 328 (1994) ................................................................................ 7

*FCC v. Fox Television Stations, Inc.,*
   556 U.S. 502 (2009) .............................................................................. 10

*Friends of the Boundary Waters Wilderness v. Bosworth,*
   437 F.3d 815 (8th Cir. 2006) ................................................................. 32

\* *FTC v. Bunte Bros.,*
   312 U.S. 349 (1941) .............................................................................. 10

*Fuller v. Winter,*
   538 F. Supp. 2d 179 (D.D.C. 2008) ...................................................... 18

*John Hancock Mut. Life Ins. Co. v. Harris Trust & Sav. Bank,*
   510 U.S. 86 (1993) .................................................................................. 7

*Kapps v. Wing,*
   404 F.3d 105 (2d Cir. 2005) .................................................................. 38

\* Authorities upon which APSCU chiefly relies are marked with asterisks.

# TABLE OF AUTHORITIES
### *(continued)*

**Cases** *(continued)*                                                      <u>Page(s)</u>

*Lacson v. U.S. Dep't of Homeland Sec.*,
   726 F.3d 170 (D.C. Cir. 2013) ........................................................... 44

*Loving v. IRS*,
   742 F.3d 1013 (D.C. Cir. 2014) ........................................................... 4

*MCI Telecomms. Corp. v. Am. Tel. & Tel. Co.*,
   512 U.S. 218 (1994) ........................................................... 8

*MD/DC/DE Broadcasters Ass'n v. FCC*,
   236 F.3d 13 (D.C. Cir. 2001) ........................................................... 44

*Mt. Diablo Hosp. v. Shalala*,
   3 F.3d 1226 (9th Cir. 1993) ........................................................... 32

*Nat'l Ass'n of Home Builders v. U.S. Army Corps of Eng'rs*,
   417 F.3d 1272 (D.C. Cir. 2005) ........................................................... 42

*Nat'l Ass'n of Mfrs. v. SEC*,
   748 F.3d 359 (D.C. Cir. 2014) ........................................................... 40

*Nat'l Cable & Telecomms. Ass'n v. FCC*,
   567 F.3d 659 (D.C. Cir. 2009) ........................................................... 37

*Nat'l Mining Ass'n v. Dep't of Labor*,
   292 F.3d 849 (D.C. Cir. 2002) ........................................................... 36

*New Eng. Power Co. v. Fed. Power Comm'n*,
   467 F.2d 425 (D.C. Cir. 1972) ........................................................... 39

*New York v. United States*,
   505 U.S. 144 (1992) ........................................................... 14

*Nova Plumbing, Inc. v. NLRB*,
   330 F.3d 531 (D.C. Cir. 2003) ........................................................... 4

*Ohio Bell Tel. Co v. Pub. Utils. Comm'n of Ohio*,
   301 U.S. 292 (1937) ........................................................... 38

*Otherson v. Dep't of Justice*,
   711 F.2d 267 (D.C. Cir. 1983) ........................................................... 40

\* Authorities upon which APSCU chiefly relies are marked with asterisks.

## TABLE OF AUTHORITIES
### *(continued)*

**Cases** *(continued)*                                                                                                    Page(s)

*Pension Benefit Guar. Corp. v. LTV Corp.,*
    496 U.S. 633 (1990) ..................................................................................................... 39

\* *Ramaprakash v. FAA,*
    346 F.3d 1121 (D.C. Cir. 2003) ............................................................................. 25, 26

*Raytheon Co. v. White,*
    305 F.3d 1354 (Fed. Cir. 2002) .................................................................................. 32

*R.J. Reynolds Tobacco Co. v. FDA,*
    696 F.3d 1205 (D.C. Cir. 2012) ................................................................................. 41

*Sierra Club v. Mainella,*
    459 F. Supp. 2d 76 (D.D.C. 2006) ........................................................................ 18, 23

*Taniguchi v. Kan Pac. Saipan, Ltd.,*
    132 S. Ct. 1997 (2012) .................................................................................................. 5

*Tripoli Rocketry Ass'n, Inc. v. Bur. of Alcohol, Tobacco, Firearms & Explosives,*
    437 F.3d 75 (D.C. Cir. 2006) ...................................................................................... 23

*Turner Broad. Sys., Inc. v. FCC,*
    512 U.S. 622 (1994) .................................................................................................... 40

*United States ex rel. Carter v. Bridgepoint Educ., Inc.,*
    __ F. Supp. 3d __, 2015 WL 818032 (S.D. Cal. Feb. 20, 2015) ..................................... 35

*United States v. Geiser,*
    527 F.3d 288 (3d Cir. 2008) .......................................................................................... 5

*United States v. Home Concrete & Supply, LLC,*
    132 S. Ct. 1836 (2012) .................................................................................................. 7

*United Steelworkers of Am., AFL–CIO–CLC v. Marshall,*
    647 F.2d 1189 (D.C. Cir. 1980) .................................................................................. 32

*W. Deptford Energy, LLC v. FERC,*
    766 F.3d 10 (D.C. Cir. 2014) ...................................................................................... 25

*Williston Basin Interstate Pipeline Co. v. FERC,*
    165 F.3d 54 (D.C. Cir. 1999) ...................................................................................... 39

\* Authorities upon which APSCU chiefly relies are marked with asterisks.

# TABLE OF AUTHORITIES
## *(continued)*

**Cases** *(continued)*                                                      Page(s)

*Wisc. Valley Improvement v. FERC*,
    236 F.3d 738 (D.C. Cir. 2001) ............................................................. 18, 26

*Yamaha Corp. of Am. v. United States*,
    961 F.2d 245 (D.C. Cir. 1992) ................................................................. 40

*Zauderer v. Office of Disciplinary Counsel*,
    471 U.S. 626 (1985) ................................................................................ 40

**Constitutional Provisions**

U.S. Const. amend. I .................................................................................. 40, 43

**Statutes**

Higher Education Act of 1965,
    Pub. L. No. 89-329, 79 Stat. 1219 ............................................................. 1

National Vocational Student Loan Insurance Act of 1965,
    Pub. L. 89-287, 79 Stat. 1037 .................................................................. 15

5 U.S.C. § 551 ............................................................................................... 2

5 U.S.C. § 706 ............................................................................................... 2

\*   20 U.S.C. § 1001 ............................................................... 4, 7, 9, 39, 45

\*   20 U.S.C. § 1002 ............................................................................. 9, 39

\*   20 U.S.C. § 1015c ............................................................................... 43

    20 U.S.C. § 1070 ............................................................................... 11

    20 U.S.C. § 1085 ............................................................................... 12

    20 U.S.C. § 1087bb ........................................................................... 12

\*   20 U.S.C. § 1088 ............................................................................. 9, 39

    20 U.S.C. § 1092 ............................................................................... 41

\*   20 U.S.C. § 1094 ............................................................................. 4, 13

----

\* Authorities upon which APSCU chiefly relies are marked with asterisks.

# TABLE OF AUTHORITIES
### (continued)

**Statutes** *(continued)*                                                              Page(s)

\* 20 U.S.C. § 1221e-3 ................................................................................. 4, 39, 43

20 U.S.C. § 1231a ......................................................................................... 39, 43

\* 20 U.S.C. § 1232a ............................................................................................... 14

20 U.S.C. § 3403 .................................................................................................. 13

\* 20 U.S.C. § 3474 ....................................................................................... 4, 39, 43

26 U.S.C. § 3304 ................................................................................................... 9

42 U.S.C. § 6371 ...................................................................................................9

**Regulations**

34 C.F.R. § 668.8 ................................................................................................... 9

34 C.F.R. § 668.403 ............................................................................................. 30

34 C.F.R. § 668.404 ....................................................................................... 20, 44

34 C.F.R. § 668.405 ............................................................................................. 38

34 C.F.R. § 668.406 ....................................................................................... 32, 38

34 C.F.R. § 668.410 ............................................................................................. 37

34 C.F.R. § 668.412 ....................................................................................... 41, 42, 43

75 Fed. Reg. 66,832 (Oct. 29, 2010) .................................................................. 40

76 Fed. Reg. 34,386 (June 13, 2011) ............................................................. 25, 30

\* 79 Fed. Reg. 16,425 (Mar. 25, 2014) ........................................................... 29, 38

\* 79 Fed. Reg. 64,889 (Oct. 31, 2014) ....................... 5, 9, 14, 18, 19, 20, 21, 23, 24, 27, 28, 29,
                                                            30, 31, 32, 33, 34, 35, 37, 38, 39, 40, 41, 42, 43

---

\* Authorities upon which APSCU chiefly relies are marked with asterisks.

**TABLE OF AUTHORITIES**
*(continued)*

**Legislative History**                                                                 Page(s)

H.R. Rep. No. 89-308 (1965) .............................................................. 17

S. Rep. No. 89-758 (1965) ............................................................. 16, 17

S. Rep. No. 102-58, 1991 WL 153999 (1991) .................................... 12

**Other Authorities**

*In re Acad. for Jewish Educ.*,
    1994 WL 1026087 (Dep't of Educ. Mar. 23, 1994) ................................... 9, 10

Sandy Baum & Saul Schwartz, Project on Student Debt and the College Board,
    *How Much Debt is Too Much? Defining Benchmarks for Manageable Student
    Debt* (2005), http://tinyurl.com/kbm98hf ......................................... 29

*Black's Law Dictionary* (4th ed. 1951) ............................................... 6

BLS, *Consumer Expenditures in 2008* (Mar. 2010), http://tinyurl.com/ncmmtjn ................. 30

Editorial, *Tightening Rules On For-Profit Colleges*,
    Wash. Post, Apr. 27, 2014, http://tinyurl.com/mwnf8yt ................................... 35

Michael Greenstone & Adam Looney, The Hamilton Project, *Where is the Best
    Place to Invest $102,000—In Stocks, Bonds, or a College Degree?*
    (June 25, 2011), http://tinyurl.com/9f2touo ...................................... 27

Keith Greiner, *How Much Student Loan Debt Is Too Much?*,
    26(1) J. Student Fin. Aid 7 (1996), http://tinyurl.com/lomx4on ...................... 29

Steven A. Harrast, *Undergraduate Borrowing:  A Study of Debtor Students and
    their Ability to Retire Undergraduate Loans*,
    34(1) J. Student Fin. Aid 21 (2004), http://tinyurl.com/lqllkzn ..................... 29

Brad Hershbein et al., Hamilton Project, *Major Decisions: Graduates' Earning
    Growth and Debt Repayment* (2014), http://tinyurl.com/nmj76lk .................... 26

IFAP, Dear Colleague Letter, GEN-05-06/FP-05-04 (Apr. 2005),
    http://tinyurl.com/o3w6e25 ....................................................... 44

Tracey King & Ivan Frishberg, *Big Loans, Bigger Problems: A Report on the
    Sticker Shock of Student Loans* (2001), http://tinyurl.com/natv9fy .................. 29

\* Authorities upon which APSCU chiefly relies are marked with asterisks.

**TABLE OF AUTHORITIES**
*(continued)*

**Other Authorities** *(continued)*                                                        Page(s)

NCES, *Unemployment Rates of Persons 16 to 64 Years Old, by Age Group and
    Educational Attainment:  Selected Years, 1975 through 2013,*
    http://tinyurl.com/lg5ca9d........................................................................... 31

*New Standard Dictionary* (Funk & Wagnalls Co. 1946)........................................ 6

OIG, Audit Report, *Numberholders Age 112 or Older Who Did Not Have a Death
    Entry on the Numident* (Mar. 2015), http://tinyurl.com/oxvs6ef..................... 38

Anya Olsen and Russell Hudson, *Social Security Administration's Master
    Earnings File:  Background Information,*
    69(3) Soc. Security Bull. 29 (2009), http://tinyurl.com/o9239rc..................... 38

*Oxford English Dictionary* (1978) ........................................................................ 6

Report of the Task Force on Federal Regulation of Higher Education,
    *Recalibrating Regulation of Colleges and Universities* 35 (Feb. 2015),
    http://tinyurl.com/lr4zzak............................................................................... 3

Patricia M. Scherschel, USA Group Foundation, *Student Indebtedness: Are
    Borrowers Pushing the Limits?* (1998), http://tinyurl.com/l6pjdr7 ................. 29

*Webster's New Collegiate Dictionary* (1975).......................................................... 6

*Webster's New International Dictionary* (2d ed. 1958)........................................6, 7

Jennie H. Woo, Dep't of Educ., *Degrees of Debt: Student Borrowing and Loan
    Repayment of Bachelor's Degree Recipients 1 Year After Graduating:
    1994, 2001, and 2009* (2013), http://tinyurl.com/owuzhnk ..............................28

---

\* Authorities upon which APSCU chiefly relies are marked with asterisks.

**INTRODUCTION**

The Department of Education struggles to defend its overreaching "gainful employment" regulation, promulgated to replace the rule that this Court struck down in *APSCU v. Duncan*, 870 F. Supp. 2d 133, 152–55 (D.D.C. 2012) ("*APSCU I*"); *see also APSCU v. Duncan*, 930 F. Supp. 2d 210, 214–19 (D.D.C. 2013) ("*APSCU II*").  Like the final rule itself, the Department's brief does not grapple with a number of the rule's most serious flaws, dismissing many with conclusory ipse dixit and ignoring others altogether.  The defenses the agency does offer, moreover, only underscore the inconsistency of the rule with the Higher Education Act of 1965, Pub. L. No. 89-329, 79 Stat. 1219 ("HEA"), and the irrationality of the agency's approach.

The Department attempts for the first time in its brief to offer a single theory of what its gainful-employment rule, and its debt-to-earnings test in particular, is designed to achieve:  to measure whether graduates of programs "earn enough to repay their loans."  Defs.' Cross-Mot. Summ. J. 7 (ECF No. 17) ("Dep't Mot."); *see also, e.g., id.* at 9, 15, 18, 25.  That distillation of the rule's purported objective puts the unlawfulness of the endeavor in sharp relief:  The HEA *does not authorize* the Department to make eligibility for federal student aid under Title IV contingent on students' ability to repay their loans; and even if it did, the Department's rule *does not rationally measure* whether programs enable their students to do so.

As the Department understood for nearly five decades, the plain language of the HEA's "gainful employment" provisions requires that programs prepare students for jobs that pay.  Nothing in the statute allows the Department to disqualify schools based on the jobs that students choose to pursue and are able to obtain, or the debt students incur.  Unable to show that the statutory text expressly authorizes that approach, the Department claims out of the gate that the statute has no clear meaning, and that the agency may therefore freely interpret the law to suit itself.  Both the Department's premise and its conclusion are mistaken.  The HEA's "gainful

employment" provisions speak unambiguously to the relevant question, by requiring *only* that programs prepare students for paying jobs. The Department's attempts to muddle that clear meaning are unpersuasive. Even if its claim of ambiguity were defensible, that would not help the Department because its interpretation strays far beyond even the purported ambiguity that it identifies. The HEA's purpose, structure, and history demonstrate that the Department's interpretation is contrary to Congress's intent.

The Department's new gainful-employment rule must be vacated in any event because it is arbitrary and capricious and thus violates the Administrative Procedure Act, 5 U.S.C. §§ 551–706 ("APA"). The agency admits that its rule does not turn on programs' "substantive qualities," but instead "measure[s] student outcomes," Dep't Mot. 13, which depend heavily on students' choices and circumstances that schools cannot control. That alone shows the rule is arbitrary: Assessing the preparation schools provide based on factors beyond schools' control is irrational.

The Department compounds the problem by employing arbitrary, irrational metrics and invented standards and by calculating schools' debt-to-earnings scores based on demonstrably unreliable data—which schools cannot even see, and are expressly forbidden from challenging. The Department's answers to these flaws are superficial. It offers no persuasive explanation for making the new rule even harsher than the rule *APSCU I* struck down. Indeed, the agency's own data show that it will deprive many thousands of students of educational opportunities, harming those disadvantaged students disproportionately served by private-sector schools—schools that the Secretary has admitted "'play a vital role in training young people and adults for jobs'" and help to "'meet the explosive demand for skills'" that other schools cannot. Administrative Record ("AR-") H-055068 (citation omitted). Nor does the Department offer a reasoned justification for the retroactive effects and unfair procedures that the rule imposes or for the

burdens that its unlawful disclosure, reporting, and certification requirements impose on schools. In fact, the agency dramatically invites the Court to *rewrite* one key aspect of its rule—changing the data on which debt-to-earnings rates are calculated—also in violation of the APA.

The Department's bottom-line response to APSCU's well-founded legal challenges—and to the harmful effects that the rule will have on students and schools—is an attack on for-profit education laced with the cursory, self-serving assurance that the agency thought about these issues and made up its mind, and that its decision is not open to second-guessing. That is plainly inadequate to justify a rule that will deprive thousands of students of educational opportunities and that, by design, will force a large swath of the education industry out of business.

The Department had its chance to "fi[x]" the errors that plagued its prior, vacated rule (Dep't Mot. 2), but instead it chose to repeat and exacerbate those errors. The result, as a task force created by a bipartisan group of Senators aptly summarized, is a rule that is based solely on a "two-word phrase that has been part of the HEA for more than 40 years," yielding a "process" that "has been fundamentally flawed and has unnecessarily created heavy regulatory burdens" that the Department has failed to justify.[1] The Court should reject the Department's attempt to distort its statutory authority, and correct the Department's disregard for agencies' fundamental duty to engage in reasoned decisionmaking.

## ARGUMENT

### I.    The Debt-To-Earnings Test Is Unlawful.

#### A.    The Debt-To-Earnings Test Exceeds The Department's Statutory Authority.

The crux of the Department's new rule—the debt-to-earnings test—must be vacated because it exceeds the agency's authority under the HEA. Pl.'s Mot. Summ. J. 12–20 (ECF No.

---

[1]   Report of the Task Force on Federal Regulation of Higher Education, *Recalibrating Regulation of Colleges and Universities* 35 (Feb. 2015), http://tinyurl.com/lr4zzak (all Internet sites last visited March 27, 2015).

13) ("Pl.'s Mot."). The Department claims that the debt-to-earnings test measures whether a

program "enables" students "to pay back [their] loans." Dep't Mot. 21. That goal has no basis

in the plain meaning of the statutory phrase that the agency claims authorizes the test: "prepare

students for gainful employment in a recognized occupation." 20 U.S.C. § 1001(b)(1); *see also*

Pl.'s Mot. 12–14. The agency's reading of "gainful employment" also conflicts with the HEA's

purpose and structure, and with the legislative history, on which the Department heavily relies.

Pl.'s Mot. 16–20. The Department's efforts to show that "gainful employment" is ambiguous are

unavailing, as are its efforts to square its reading with the HEA's purpose, structure, and history.[2]

### 1. The Statutory Text Is Unambiguous And Forecloses The Department's Interpretation.

The plain language of the HEA's "gainful employment" provisions forecloses the

agency's interpretation. Pl.'s Mot. 12–14. The ordinary meaning of "gainful employment" is a

job that pays, and the HEA requires that a program "prepare" students for such jobs—regardless

of what jobs students choose, let alone what debt they incur. *Id.* That ordinary meaning is

unambiguous, and thus dispositive. *See Loving v. IRS*, 742 F.3d 1013, 1016 (D.C. Cir. 2014).

Tellingly, the Department does not attempt to show that the plain meaning of "gainful

employment" makes Title IV eligibility contingent on students' ability to repay their debts.

Instead, the Department immediately retreats to *Chevron U.S.A. Inc. v. Natural Resources*

---

[2] As APSCU has shown, two other statutory provisions on which the Department relied in the new rule, 20 U.S.C. §§ 1221e-3 and 3474, also do not (and could not constitutionally) authorize the debt-to-earnings test, and indeed elsewhere in the rule the Department conceded that those provisions do not independently support the rule. Pl.'s Mot. 15–16. The Department mentions those provisions in its brief in passing, but does not attempt to show that they authorize its debt test. Dep't Mot. 8 n.6. It also cites for the first time (*see* Dep't Mot. 8–9 n.6) another provision, 20 U.S.C. § 1094(c)(1)(B), but it did not invoke that provision in adopting the rule, and thus cannot rely upon it now. *See Nova Plumbing, Inc. v. NLRB*, 330 F.3d 531, 539 (D.C. Cir. 2003). In any event, the Department fails to explain how Section 1094(c)(1)(B)—which focuses on the schools' "financial responsibility" in, and "appropriate institutional capability" for, administering student aid—authorizes (or has anything to do with) its debt test.

*Defense Council, Inc.*, 467 U.S. 837 (1984), asserting that "gainful employment" has *no* plain meaning, and that the agency therefore may choose its own interpretation, to which the Court must defer.  Dep't Mot. 9–11.  The Department's argument fails at both steps.  The phrase "gainful employment" as used in the HEA is *not* ambiguous; even if it were ambiguous, the Department's interpretation exceeds the purported ambiguity it alleges and is therefore invalid.

### a.    The Department's Interpretation Contradicts The Plain Meaning Of "Gainful Employment" In The HEA.

As it did in adopting the rule, the Department argues that "gainful employment" is ambiguous because "*Congress* provided no definition of the phrase" in the statute.[3]  Case law is clear, however, that "the lack of a statutory definition does not render a term ambiguous." *Am. Fed'n of Gov't Emps., AFL-CIO v. Glickman*, 215 F.3d 7, 10 (D.C. Cir. 2000); *accord*, *e.g.*, *United States v. Geiser*, 527 F.3d 288, 294 (3d Cir. 2008); *Bass v. Stolper, Koritzinsky, Brewster & Neider, S.C.*, 111 F.3d 1322, 1325 (7th Cir. 1997).  The reason is simple:  "When a term goes undefined in a statute, [courts] give the term its ordinary meaning." *Taniguchi v. Kan Pac. Saipan, Ltd.*, 132 S. Ct. 1997, 2002 (2012).  The absence of a specific statutory definition does not mean an agency may make up its own, but "simply leads [a court] to give the term its ordinary, common meaning." *Am. Fed'n of Gov't Emps.*, 215 F.3d at 10.  If the "ordinary, common meaning" is clear, it controls.  *See id.* (rejecting agency claim of ambiguity that arose after "ninety or so years since passage" of statute, in which time the term was given its ordinary meaning).  That is the case here:  "Gainful employment" means a job that pays; it does not mean a job that pays enough to service debt in the amount of X.  Pl.'s Mot. 12–13.

---

[3]  Dep't Mot. 9; *see also* 79 Fed. Reg. 64,889, 64,893 (Oct. 31, 2014) ("Congress did not provide a definition for the phrase 'gainful employment' or 'gainful employment in a recognized occupation' in either the statute or its legislative history.  *Thus, the phrase is ambiguous* and Congress left further definition of the phrase to the Department." (emphasis added)).

The Department offers dictionary definitions, trying to manufacture ambiguity where none exists.  Dep't Mot. 9 & nn.8–9.  But its dictionaries confirm APSCU's position that "gainful" employment is employment that is *paying*.[4]  The agency rejoins that some dictionaries also define "gainful" as "profitable."  Dep't Mot. 9.  And "profitable," the agency claims, means "having something left over after one's expenses are paid"—in this context, having "enough to cover one's major expenses, including student loans."  *Id.*  But the dictionary definitions it cites refute its convoluted construction:  Each defines "profitable" broadly, to include activities that are "useful," "helpful," or "lucrative," confirming that "gainful employment" is a job that pays.[5]

Even if "gainful" could also mean "profitable" in the HEA, that would not support the Department's interpretation.  That a term may have two ordinary meanings does not mean that the agency can define the term however it sees fit.  The agency may only choose *between those readings*; it cannot pick a *third* reading that "goes beyond the scope of whatever ambiguity [the

---

[4]   *See Oxford English Dictionary* Vol. IV, 13 (1978) ("[l]eading to pecuniary gain; lucrative, remunerative"); *Webster's New Collegiate Dictionary* 469 (1975) ("productive of gain"); *Webster's New International Dictionary* 1026 (2d ed. 1958) ("*Webster's 2d*") ("[p]roductive of gain; profitable; lucrative"); *Black's Law Dictionary* 807 (4th ed. 1951) ("[p]rofitable, advantageous, or lucrative"); *New Standard Dictionary* 1000 (Funk & Wagnalls Co. 1946) ("[y]ielding gains; profitable; lucrative").

[5]   *See Webster's 2d* 1976 (defining "profitable" as "[y]ielding or bringing profit or gain; lucrative; useful; helpful"); *New Standard Dictionary* 1979 (defining "profitable" as "producing or resulting in profit or advantage; yielding gain; lucrative; useful," and "profit" as "[a]ny accession or increase of good from labor or exertion" and, secondarily, "[v]alue acquired over and above the value parted with in the course of acquirement"); *Webster's New Collegiate Dictionary* 919 (defining "profitable" as "affording profits" or "yielding advantageous returns"). The Department claims that "gainful" must be construed to mean jobs paying a certain amount relative to a graduate's expenses to avoid superfluity:  A secondary definition of "employ," it argues, is "to provide with a job that pays wages or a salary," *Webster's New Collegiate Dictionary* 373, so "gainful" must mean more than "paying" to avoid redundancy.  Dep't Mot. 9–10.  The same dictionary gives as the primary definitions of "employ" "to make use of," "to occupy . . . advantageously," and "to use or engage the services of."  *Webster's New Collegiate Dictionary* 373.  The word "employment," in short, *can* mean a paying job, but it does not *always* mean that.  Congress thus included the word "gainful" in the HEA to clarify that in this context, programs must prepare students for paying jobs to retain their Title IV eligibility.

statute] contains."  *City of Chicago v. Envtl. Def. Fund*, 511 U.S. 328, 339 (1994); *see also John*

*Hancock Mut. Life Ins. Co. v. Harris Trust & Sav. Bank*, 510 U.S. 86, 109 (1993).  Ambiguity, in

other words, is not a binary, all-or-nothing question; a statutory term is not ambiguous with

respect to the "precise question at issue" (*Chevron*, 467 U.S. at 842) if all of the plausible

definitions foreclose the agency's interpretation.  "It does not matter," for example, "whether the

word 'yellow' is ambiguous when the agency has interpreted it to mean 'purple.'"  *United States*

*v. Home Concrete & Supply, LLC*, 132 S. Ct. 1836, 1846 n.1 (2012) (Scalia, J., concurring in

part and concurring in the judgment).

The purported ambiguity that the Department alleges regarding "gainful"—*i.e.*, either

"paying" *or* "profitable"—is irrelevant because the agency interprets the term to mean something

*else*.  Even if "gainful" in the HEA could mean "profitable" in the ordinary sense of that term,

that at most would mean that the job for which a graduate is prepared must "brin[g] profit or

gain."  *Webster's 2d* 1976.  But the agency does *not* read "gainful employment" to mean that the

job must be profitable; rather, the agency claims that "gainful employment" means a job that

pays "enough to cover one's major expenses."  Dep't Mot. 9; *see also id*. at 27 n.20 (fact that

investment is "profitable in the long term" is insufficient).  That interpretation cannot be squared

with any plausible reading of "profitable."  If an investor buys $10,000 worth of stock and earns

a 20% return, any reasonable speaker would say that the investment was "profitable."  No one

would conclude the investment was not profitable because the $2,000 return did not cover the

investor's *other* expenses, such as mortgage or car payments.  So, too, one cannot read "gainful

employment," as the agency does, to mean a job that pays enough to cover "major expenses."

### b.      The Rule Conflicts With The HEA's Text In Other Ways.

The Department's statutory interpretation also conflicts with the HEA's text in other

ways.  The word "gainful" modifies the word "employment."  20 U.S.C. § 1001(b)(1); *see also*

Pl.'s Mot. 14.  Whatever the correct reading of "gainful," it is the *job* for which a student is prepared that must be gainful.  But the Department's test does not attempt to measure whether the jobs for which students are prepared are gainful.  Instead, it purports to determine whether the entire process of embarking on a program of study is gainful, impermissibly comparing graduates' short-term earnings against the average costs of attending a program of study years earlier.  The agency has no answer to this, which independently dooms its debt-to-earnings test.

The Department's interpretation also disregards that the HEA requires programs to "prepare" students for gainful employment and does not tether programs' Title IV eligibility to the jobs graduates actually pursue and obtain.  Pl.'s Mot. 14.  The agency responds that the HEA "does not tell the Department how to determine" whether a program prepares students for gainful employment.  Dep't Mot. 10.  That is no excuse for its debt-to-earnings test, which does not *try* to ascertain the jobs for which students are "prepared," and asks only how much they earn.[6]

### c.      The Statutory Context And The Department's Own Prior Position Foreclose Its New Reading Of The HEA's Text.

The Department also fails to square its reading of the HEA's text with context, including Congress's usage of that phrase, and the agency's own historical view.  *Cf.* Pl.'s Mot. 13–14; *see also MCI Telecomms. Corp. v. Am. Tel. & Tel. Co.*, 512 U.S. 218, 226–29 (1994).

---

[6]   The Department quotes *APSCU I*'s statement that the agency's prior, vacated "'regulations [were] an attempt to assess whether certain programs in fact provide such preparation.'"  Dep't Mot. 10 (quoting 870 F. Supp. 2d at 146).  But the Court was only paraphrasing the Department's stated objective.  The agency has never persuasively explained how considering the jobs graduates *actually* choose to pursue and obtain (as its rule does) reflects whether their programs *prepared* them for gainful employment (as the HEA requires).  Moreover, despite claiming that other aspects of *APSCU I* are "dicta," Dep't Mot. 40 n.29, the Department does not mention that the case's discussion of the "gainful employment" provisions also was dictum.  As APSCU has shown, that entire discussion was unnecessary to the Court's ruling invalidating the prior debt-to-earnings test, and thus has neither precedential nor preclusive force here.  Pl.'s Mot. 13 & n.15.  The Department nowhere disputes this, which puts the issue to rest.  *See, e.g., Biton v. Palestinian Interim Self-Gov't Auth.*, 412 F. Supp. 2d 1, 5 (D.D.C. 2005) ("Defendants have not rebutted any of the Plaintiffs' arguments [regarding the preclusive effect of prior cases] and the Court deems the matter conceded.").

***Other Statutes Using "Gainful Employment."***  Numerous other provisions in Title 20 use the phrase "gainful employment" in contexts where it cannot plausibly mean jobs that pay at least a certain amount relative to student debt.  Pl.'s Mot. 13 & n.16.  The Department rejoins that these other provisions—unlike 20 U.S.C. §§ 1001, 1002, and 1088, on which it relies for its rule—do not refer to gainful employment "in a recognized occupation."  Dep't Mot. 10.  But the agency fails to explain how or why that additional language in Sections 1001, 1002, and 1088 is significant here.  The rule does not purport to measure whether students are prepared for (or find) jobs in a recognized field:  The Department has admitted that its debt-to-earnings test does not distinguish between earnings from a recognized occupation and income from other sources.  *See* 79 Fed. Reg. at 64,953.  Whatever the phrase "in a recognized occupation" may require, it has no bearing on the meaning of "gainful," and does not support reading "gainful" to require that a job pay enough to cover one's "major expenses."  Congress *never* used the phrase with that reading in mind.[7]

***Department's Prior Interpretation.***  The Department's claim that it has "never formally expressed a view" on the meaning of "gainful employment" (Dep't Mot. 11) is wrong.  The Department does not respond to the fact that one of its own rules, still in force, 34 C.F.R. § 668.8(e)(1)(ii), uses the phrase "gainful employment" in a setting where it necessarily means simply a job that pays.  Pl.'s Mot. 14 n.17.  And it brushes aside in a footnote its own prior adjudication that applied the "gainful employment" provisions without any consideration of students' earnings or debt.  *See In re Acad. for Jewish Educ.*, 1994 WL 1026087, at *3 (Dep't of Educ. Mar. 23, 1994); Dep't Mot. 10 n.11.  The agency's self-serving ipse dixit that its decision

---

[7]   The phrase "gainful employment in a recognized occupation" also appears in statutes outside Title 20 where it cannot reasonably refer to jobs paying a certain level of earnings relative to debt.  *See* 42 U.S.C. § 6371(6)(c) (definition of "school" for purposes of energy-conservation rules); 26 U.S.C. § 3304(a)(6), (f)(3) (statute regarding permissible terms of state laws governing unemployment compensation for employees of certain educational institutions).

in *Academy for Jewish Education* did not have to *reach* the question of students' earnings and debt is spurious; nothing in the ruling suggested that debt and earnings were part of the analysis at all.  To be sure, an agency may change its position over time.  But in doing so, it must "display awareness that it *is* changing position," and "may not, for example, depart from a prior policy *sub silentio* or simply disregard rules that are still on the books."  *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009).  The Department has defaulted on those duties here.[8]

The Department also does not deny that, until 2011, nearly five decades after the HEA's enactment, it never construed the HEA's "gainful employment" requirement to mean anything resembling its debt-to-earnings test.  *See* Dep't Mot. 11.  The Department offers the truism that "'[a]uthority actually granted by Congress . . . cannot evaporate through lack of administrative exercise.'"  *Id.* (quoting *FTC v. Bunte Bros.*, 312 U.S. 349, 352 (1941)).  But here the question is *whether* Congress has "actually granted" such authority.  The agency's long-running failure ever to assert such authority is strong evidence that such authority was never conferred.  *See Bunte Bros.*, 312 U.S. at 352 ("[J]ust as established practice may shed light on the extent of power conveyed by general statutory language, so the want of assertion of power by those who presumably would be alert to exercise it, is equally significant in determining whether such power was actually conferred."); *Bankamerica Corp. v. United States*, 462 U.S. 122, 131 (1983).

### 2. The Department's Interpretation Undermines The HEA's Purpose And Structure.

The Department's interpretation of the HEA underlying its debt-to-earnings test also is untenable in the context of the statutory purpose and structure.  Pl.'s Mot. 16–19.

---

[8]   The Department's ruling in *Academy of Jewish Education* also refutes its suggestion that APSCU seeks "to prevent th[e] statutory [gainful-employment] requirement from having any force whatsoever."  Dep't Mot. 1.  As that ruling—which held a program ineligible for Title IV funding, 1994 WL 1026087, at *1–3—shows, the gainful-employment requirement is not rendered toothless merely because it does not focus on graduates' earnings and debt.

The Department makes little effort to square its debt-to-earnings test with the HEA's explicit "purpose":  "to assist in making available the benefits of postsecondary education to eligible students."  20 U.S.C. § 1070(a).  Indeed, the agency's test is antithetical to Congress's aim of *broadening* access to higher education, because it will severely curtail the opportunities available to many students.  Pl.'s Mot. 16–17.  The Department instead attacks a straw man, claiming that APSCU reads the HEA "to provide federal funding for any program of higher education no matter how poor its quality or outcomes for students."  Dep't Mot. 11.  That caricature is grossly inaccurate.  Congress did not pursue its aim of broadening access to higher education at all costs; indeed, Congress itself carefully crafted restrictions on Title IV funding, and the HEA's aim of making the benefits of higher education more broadly available must be carried out consistently with the requirements and limitations that *Congress* built into the HEA.

Far from respecting the limitations that Congress imposed, however, the Department's debt-to-earnings test conflicts with them.  The Department largely ignores that, in enacting and amending the HEA, Congress established a detailed, complex scheme for regulating institutions of higher education, which by itself undercuts the agency's claim that Congress left the area open for the Department to regulate freely.  *See Am. Bar Ass'n v. FTC*, 430 F.3d 457, 469 (D.C. Cir. 2005).  In *American Bar Association*, the D.C. Circuit analyzed an FTC interpretation that allowed the FTC to regulate the practice of law based on a statute that regulated financial institutions.  *Id.* at 459.  The statute defined "financial institution" as an institution that "engag[es] in financial activities," but the agency claimed that the language was ambiguous and sought to apply the relevant statutory requirements to attorneys engaged in the practice of law, if they were also "significantly engaged" in financial activities.  *Id.* at 465.  The D.C. Circuit rejected the agency's reading:  "When we examine a scheme of the length, detail, and intricacy

of the one before us, we find it difficult to believe that Congress, by any remaining ambiguity, intended to undertake the regulation" reaching a subject that was "never before regulated" and "never mentioned in the statute." *Id.* at 469.  That aptly describes the HEA, which also created a multifaceted, reticulated scheme that leaves little room for agency improvisation.  Pl.'s Mot. 4–5.

Indeed, the Department's debt-to-earnings test brings the rule into conflict with several specific provisions of the HEA.  Pl.'s Mot. 17–19.  For example, Congress's creation (and updating) of a statutory, institutional cohort-default-rate ("CDR") metric shows that Congress recognized the issue of student-loan defaults and chose how to address that issue itself.  *Id.* at 17. The Department draws the opposite inference, asserting that Congress not only left the agency free to impose additional requirements, but "enacted the CDR provision to *direct* the Department to increase its regulatory and oversight activities in this area."  Dep't Mot. 12 (emphasis added). Nothing in the statutory text suggests that counterintuitive aim.  20 U.S.C. §§ 1085(m)(1), 1087bb(g)(1).  The agency cites a Senate Report that discussed student default rates, and that highlighted the Department's failure adequately to enforce existing eligibility and certification requirements.[9]  Congress may have created the CDR scheme to correct the agency's failings, but it hardly follows that, by choosing institutional cohort-default rates as the statutory test, Congress meant to entrust the Department with even *greater* discretion to adopt different, additional tests.

The Department claims that its debt-to-earnings test "complements" the statutory cohort-default-rate metric because its test "serve[s] the same general goal" as the statutory CDR metric. Dep't Mot. 12.  That cannot suffice to authorize an agency to superimpose additional requirements by regulation on top of detailed statutory requirements specified by Congress.

---

[9]   Dep't Mot. 13 (citing S. Rep. No. 102-58, 1991 WL 153999, at *25 (1991)).  The "investigation revealed that the Department of Education has failed to efficiently or effectively carry out its [statutory] responsibilities.  Virtually every witness described instances of gross mismanagement, ineptitude, and/or neglect in the Department's performance of its [Guaranteed Student Loan Program]-related regulatory and oversight functions."  S. Rep. No. 102-58, at *24.

Otherwise, agencies would always be free—without specific congressional authorization, even where Congress has struck a careful balance—to impose more stringent and intrusive rules than Congress adopted, on the theory that additional regulation moves in the same general direction as the statute.  For example, under the Department's theory, if Congress established specific vehicle emissions standards, delegating enforcement authority to the EPA, the EPA could unilaterally ratchet up those standards, making them more rigorous, or expand the list of vehicles to which they apply; the EPA's stricter standards would "serve the same general goal," *id.*, which by the Department's lights is sufficient.  Neither *Chevron* nor the APA gives agencies such free rein.

The Department's debt-to-earnings test also cannot be reconciled with the HEA's express prohibition on the agency's "exercis[ing] any direction, supervision, or control" over "the curriculum, program of instruction, administration, or personnel of any educational institution," or over "any accrediting agency," 20 U.S.C. § 3403(b), or with the absence in the HEA of any provision authorizing the Department to regulate tuition.  Pl.'s Mot. 18.  The Department pays only lip service to "Congress's determination that the government not set tuition rates or control curriculum choices."  Dep't Mot. 14.  The agency claims that its new "regulations do not require institutions to lower their tuition," *id.*, but most of the ways it describes that schools can avoid ineligibility consist of only that:  "'decreasing prices for students,'" "'[p]roviding an institution's own financial aid to students with the least ability to pay in order to reduce the number of students borrowing and the amount of debt that students must repay upon completion,'" "'[r]educing program costs," and "replacing or reducing the loan debts of current students for the remainder of their program with scholarships or tuition discounts."[10]

---

[10]  Dep't Mot. 34, 36 (citation and brackets omitted).  By pressuring schools to lower program tuition, the debt-to-earnings test also puts them at risk of violating the "90/10" rule established by 20 U.S.C. § 1094(a)(24).  Pl.'s Mot. 19.  The Department's response—that one

*[Footnote continued on next page]*

Moreover, the avenues the Department describes to avoid ineligibility besides lowering costs concern curriculum and administration—"'improving the quality'" of training, "tailoring a program to existing job opportunities," and "improving their job placement services," Dep't Mot. 14, 34, 36 (citation omitted)—are also areas in which Congress forbade the agency from interfering. Pl.'s Mot. 18; 20 U.S.C. § 1232a. That the new rule admittedly does not turn on the "substantive qualities a program should have" and instead "measure[s] student outcomes" (Dep't Mot. 13) hardly saves it from invalidity (but only confirms that the rule is arbitrary, *see infra* pp. 18–24). The rule's unabashed aim—and inevitable, impermissible effect—is to compel schools to change aspects of their programs that Congress placed beyond the Department's reach.

That the Department itself does not specifically direct schools either to lower tuition or to alter their programs, but allows schools to choose one or the other, does not render the rule any less unlawful. An agency cannot force parties to choose between alternatives that the agency itself could not lawfully prescribe. *Cf. New York v. United States*, 505 U.S. 144, 176 (1992) ("A choice between two unconstitutionally coercive regulatory techniques is no choice at all."). The Department cannot evade limits on its authority by forcing schools to pick their poison.

### 3.    The Legislative History Does Not Support The Department's Test.

Unable to find authority for its debt-to-earnings test in the text, purpose, or structure of the HEA, the Department leans heavily on legislative history, and emphasizes that the *APSCU I* Court relied on the same legislative history. Dep't Mot. 15–17 (citing *APSCU I*, 870 F. Supp. 2d at 139–40, 146). It is telling that, despite searching in nooks and crannies, the Department still

---

study found "no correlation between an institution's tuition rate and its average 90/10 rate," Dep't Mot. 14—misses the point. What matters is that, for schools that are already near the 90/10 threshold—*i.e.*, that derive close to 90% of their revenues for tuition, fees, and institutional charges from Title IV aid—lowering tuition further will put them in jeopardy of violating the 90/10 rule because their students may still receive the same or nearly the same amount of Title IV aid. *See* AR-H-074219–20. As the Department's data show, 21% of schools have ratios "of 85 to 90 percent," 79 Fed. Reg. at 64,949, and are thus at risk.

cannot point to *anything* in the HEA's legislative history showing that Congress intended to condition Title IV eligibility based on graduates' short-term earnings and debt.  Indeed, as APSCU has shown, the legislative history is inconsistent with the Department's reading of the HEA.  Pl.'s Mot. 19–20.

The Department's legislative-history argument does not concern the HEA itself.  It relies instead almost entirely on the history of the National Vocational Student Loan Insurance Act of 1965, Pub. L. 89-287, 79 Stat. 1037 ("NVSLIA"), which the agency asserts (without citation) is "commonly understood to be the predecessor to the gainful employment statutory requirement." Dep't Mot. 15.  But the NVSLIA used a different phrase—"useful employment," not "gainful employment"—and thus does not support the Department's interpretation.  Pl.'s Mot. 20.  The agency, citing *APSCU I*, asserts that the change from "useful" to "gainful" "was not substantive," Dep't Mot. 17, but *APSCU I* did not say that.  The Department also disregards that "gainful employment" already appeared in the HEA *before* it was merged with the NVSLIA in 1968.  Pl.'s Mot. 20 n.29.  And if "gainful" in the HEA were meant as a synonym for "useful," that only further undermines the agency's reading of the HEA:  The phrase "useful employment" cannot plausibly refer to jobs yielding a certain level of earnings relative to debt.

In fact, the NVSLIA's history only reinforces APSCU's reading:  The statute's principal author made clear that it was *not* the purpose of that statute to allow the Department, "'by rule or regulation,'" to "'build barriers that will keep students from attending the so-called privately owned schools if they desire to do so.'"  Pl.'s Mot. 20 (citation omitted).  The Senate committee that drafted the NVSLIA's "useful employment" provision "intended that the bill be as liberal as possible" with respect to institutions eligible to participate; its main concern was eliminating "'fly by night'" programs, but it "resolved th[at] problem" by a clause limiting eligibility to

schools that were "in existence for 2 years." S. Rep. No. 89-758, at 12 (1965). The Department

has no answer to these clear statements of legislative intent. The closest it comes is its oblique,

conclusory assertion that "any general aspiration that students should be able to attend for-profit

schools [does not] undermine the force of" the legislative history the Department offers. Dep't

Mot. 17. But the clear, emphatic articulations of the statute's aim by the bill's principal author

and the committee that crafted it are far more probative than the materials the Department cites.

Citing snippets of various individual witnesses' testimony, the Department claims that

Congress "receiv[ed] assurances" that students who completed programs would be able to repay

their loans, and that, relying on those assurances, Congress enacted the "useful employment"

requirement to limit aid to programs that enabled students to do so. Dep't Mot. 3; *see also id.* at

16–17. That account is the Department's own invention; it fails to identify any such assurances,

much less evidence that Congress enacted the "useful employment" phrase in *reliance* on them.

The witnesses the Department discusses focused primarily on graduates' ability to obtain

paying jobs, period. As it did in *APSCU I*, the agency leans on the testimony of Dr. Kenneth B.

Hoyt from the University of Iowa. Dep't Mot. 15–16. Dr. Hoyt examined school-completion

and job-placement rates and concluded that "all data presented here support the reasonableness

of making loan funds available to students attending trade, technical and business schools."

S. Rep. No. 89-758, at 8. While one of the questions posed by Dr. Hoyt was whether such

students "could repay [their loans] following training," the data he presented to Congress

concerned students' employment prospects without regard to debt. *Id.* at 7. That data showed

that roughly 95% of the students completing such programs "found employment," that a large

majority "found training related employment," and that their median weekly income was

between $40 and $100, varying based on whether the student enrolled in a trade, technical, or

business program.  *Id.* at 7–8.  Nowhere did Dr. Hoyt engage in the type of analysis of debt and

earnings that the Department's rule entails.

The other "assurances" cited by the Department also fail to support the Department's

position.  Dep't Mot. 16–17.  For example, the testimony of the executive vice president of the

Capitol Radio Engineering Institution mentioned that students completing vocational programs

would be able to repay their loans; but the primary point of his testimony was that the statute

would "extend the benefits of higher education to that substantial number of secondary school

graduates who have the ability and scholastic background required for advanced education, but

who are now prevented by their limited financial resources [from] going on to college."  S. Rep.

No. 89-758, at 10 (internal quotation marks omitted).  To describe this testimony as "assurances"

that graduates would secure employment and earnings sufficient to repay their debts grossly

distorts what the witnesses said.[11]

In any event, the notion that Congress relied on those ersatz "assurances" in crafting the

NVSLIA's definition of eligible institution (let alone the HEA's distinct language) is entirely

unsupported—and is contradicted by the explanation of the Senate committee responsible for the

NVSLIA's "useful employment" provision, *see* S. Rep. No. 89-758, at 12.  The Department

points to nothing indicating that Congress crafted the "useful employment" provision in reliance

on promises made by private witnesses, or on the general understanding that program graduates

would be able to repay their debts promptly and easily.  The notion that Congress intended the

phrase "useful employment" to impart far-reaching authority to a federal agency to impose

intricate restrictions on programs' eligibility based on graduates' earnings and debt outcomes

---

[11]   The data provided to Congress by the New York Higher Education Assistance Corp., which the Department cites, Dep't Mot. 17, are even less probative.  The House Report itself explained that the small, limited New York program was an outlier, "largely unmatched by any other loan insurance program for any category of student."  H.R. Rep. No. 89-308, at 6 (1965).

finds no more support in the legislative history than it does in the statutory text—which may

explain why for nearly five decades even the Department never claimed otherwise.

**B.      The Debt-To-Earnings Test Is Arbitrary And Capricious.**

The Department's debt-to-earnings test—which is based on the debt-to-earnings and

debt-to-discretionary-income ratios—is also unlawful because it is irrational in many respects

and thus flunks the APA.  Pl.'s Mot. 21–38.  Although the "scope of review under the arbitrary

and capricious standard is narrow . . . [t]he court must be satisfied that the agency has examined

the relevant data and articulated a satisfactory explanation for its action including a rational

connection between the facts found and the choice made." *Sierra Club v. Mainella*, 459 F. Supp.

2d 76, 90 (D.D.C. 2006) (Bates, J.) (internal quotation marks and alterations omitted).  The court

must set aside agency action as arbitrary and capricious if the agency has not considered "'all of

the evidence before it,'" failed to explain fully "'why evidence contrary to the final [rule] was

disregarded or given less weight,'" *Fuller v. Winter*, 538 F. Supp. 2d 179, 186 (D.D.C. 2008)

(Bates, J.) (citation omitted), or "abruptly depart[ed] from a position it previously held without

satisfactorily explaining its reason for doing so." *Wisc. Valley Improvement v. FERC*, 236 F.3d

738, 748 (D.C. Cir. 2001).  The Department's rule is arbitrary in all of those respects.

**1.      The Debt-To-Earnings Test Irrationally Makes Title IV Eligibility
Depend Not On Quality, But On Factors Beyond Schools' Control.**

As it did in the final rule, 79 Fed. Reg. at 64,915, the Department admits that the debt-to-

earnings test does not measure "the substantive qualities a program should have," but instead

"measure[s] student outcomes," Dep't Mot. 13, in the form of students' short-term earnings and

debt load.  Those "outcomes" depend on students' circumstances, job-market conditions, and

students' choices, which have nothing to do with program quality and are beyond schools'

control.  Pl.'s Mot. 21–24.  Indeed, the agency does not deny that high-quality programs with

perfect job-placement rates can fail, while poorly performing programs can retain Title IV eligibility if enough students receive grants instead of loans.  *See* Dep't Mot. at 43 n.31; *cf.* Pl.'s Mot. 31–32.  The Department claims that students' earnings and debt are "sufficiently within [schools'] control," Dep't Mot. 19, but its contentions come up short.

**Students' Employment And Earnings.**   The jobs that a program's graduates pursue and obtain depend heavily on (among other things) students' employment choices and personal circumstances.  Pl.'s Mot. 22–23.  The Department defends the rule's focus on students' employment outcomes because it claims that "there is an inherently rational connection between the quality of education and training a program provides and the type of jobs its students are able to obtain."  Dep't Mot. 18.  But many factors besides the quality of preparation a program offers—from market conditions to personal ability and family circumstances—affect what jobs students take, regardless of the quality of training a student receives.  That undoubtedly is part of the reason that many high-quality, "traditional" programs would fare badly on the debt-to-earnings test were it applied to them.[12]  Students who graduate during a recession, for instance, or during a downturn in their particular field, will inevitably have fewer opportunities than students who graduate when the relevant industry is experiencing rapid growth; those outcomes prove nothing about the quality of preparation students received.  *See* Pl.'s Mot. 22 & n.33.  Indeed, the agency has conceded that schools should not be penalized for market conditions beyond their control, 79 Fed. Reg. at 64,926, but its debt-to-earnings test does just that.

The Department now halfheartedly argues that it is powerless to account for market conditions because the statutory gainful-employment requirement "does not contain any exceptions for local market conditions or national recessions."  Dep't Mot. 19.  That claim

---

[12]   *See* Pl.'s Mot 10 n.12.  Indeed, the Department itself has found that 26% of graduates of public four-year schools and 39% of those from non-profit four-year schools would not be deemed "gainfully employed" under the Department's new test.  *See id.*

contradicts both the agency's position in the final rule that its debt metrics *should* be designed to avoid penalizing schools based on job-market conditions, 79 Fed. Reg. at 64,926, and its position in litigating this case that the gainful-employment provisions are ambiguous, Dep't Mot. 9–11; *cf. Am. Petrol. Inst. v. SEC*, 953 F. Supp. 2d 5, 21 (D.D.C. 2013) (Bates, J.) (rejecting agency's claim that creating exemption would conflict with statute's text, and deeming arbitrary agency's refusal to make exemption).   The agency further argues that its rule *does* "take account of market and economic conditions," Dep't Mot. 19, which is another admission that the rule should do so.

The Department's claims that the rule adequately accounts for economic conditions are unpersuasive.  It asserts that the four years programs in the "zone" are given before they lose eligibility provide "plenty of time" because "on average" recessions do not last that long.  Dep't Mot. 19–20 & n.14.  The agency's response ignores that, regardless of the length of a recession as officially declared by economists, a recession's lingering effects can hinder students' job prospects long afterward.  Pl.'s Mot. 22 n.33; AR-H-074302–06.  The Department also asserts that the two-year and four-year cohorts of students that the debt-to-earnings test analyzes "'reduc[e] the impact of short term fluctuations in the economy,'" Dep't Mot. 20, but that is not so:  Although the students in a given cohort will have *graduated* in different years, the agency calculates the mean and median *earnings* for all students in a cohort based on the "most recently available calendar year." 79 Fed. Reg. at 64,929; 34 C.F.R. § 668.404(c)(1).  If the most recent year included a severe, industry-wide downturn, the entire cohort will be negatively affected.[13]

---

[13]   The Department's reliance on *Cardinal Health, Inc. v. Holder*, 846 F. Supp. 2d 203 (D.D.C. 2012), for the proposition that it could consider the average length of recessions, without regard to recessions' lingering effects, Dep't Mot. 20 n.14, is badly misplaced.  *Cardinal Health* concerned a challenge to the Drug Enforcement Administration's suspension of a drug-distribution facility's federal registration.  846 F. Supp. 2d at 225.  The court upheld the suspension for several reasons, including that the facility was distributing quantities of controlled drugs that "exceeded state and national averages," "the rampant pharmaceutical drug problem

*[Footnote continued on next page]*

In any event, the debt-to-earnings test does not measure what jobs a program's "students are *able* to obtain," Dep't Mot. 18 (emphasis added), but what jobs they choose to pursue, obtain, and keep in the first few years after graduation.  The jobs students pursue in their early years may not correlate at all with the quality of the program.  Two law schools, for example, may provide training of identical quality; but if more of one school's graduates pursue lower-paying judicial clerkships or government jobs—in order to gain valuable experience and to enhance their skills and *future* job prospects—the Department's debt-to-earnings test would irrationally *punish* that school.  It is no answer that the test measures *cohorts* of students rather than individual students.  The average earnings of a cohort is simply the aggregate result of students' individual choices; if some students in a cohort elect not to pursue the highest-paying job for which they are prepared, their choices will distort the debt-to-earnings rate for the entire cohort.

Even if it were rational to measure students' employment outcomes, the agency bypassed alternatives proposed by commenters that are far more tailored to determining whether programs prepare students for gainful employment—such as job-placement rates in the relevant field.  *See*, *e.g.*, AR-H-083850; 79 Fed. Reg. at 64,912.  The Department dismissed such alternatives solely because they do not also measure students' ability to repay their debt.  79 Fed. Reg. at 64,915.

The Department also fails to justify the debt-to-earnings test's focus on the *gross* earnings of a program's graduates shortly after graduation, rather than the *increase* in students' earnings as a result of completing the program.  Pl.'s Mot. 23.  Even if the boost in earnings a student achieves after attending a program were a reflection of how well the program prepared the student, the student's earnings in absolute terms after graduating may turn on *other* factors, such as the industry and his ability, education, and experience before enrolling in the program.

in Florida," and the distributor's "history of inadequate anti-diversion controls."  *Id.*  Nothing in the case supports the Department's notion that it can rely on the average length of recessions without consideration of how recessions adversely affect students after the recessions end.

***Students' Debt.***  The amount of debt that students borrow also is beyond schools' control, and has nothing to do with program quality.  Pl.'s Mot. 23–24.  The Department does not deny that schools cannot dictate how much students borrow.  It does assert that, in calculating debt-to-earnings rates, the new rule caps students' debt for attending a program at the amount of tuition, fees, and certain other expenses, which a school can determine.  Dep't Mot. 20.  But that means only that schools can set what become the *maximum* costs that are counted toward debt-to-earnings rates.  Students' circumstances and choices determine how much of that total cost they finance through loans:  Students' financial resources dictate whether and how much they borrow; and students, aware of their circumstances, choose whether to attend a program.[14]

The Department further argues that *Association of Accredited Cosmetology Schools v. Alexander*, 979 F.2d 859 (D.C. Cir. 1992) ("*AACS*"), forecloses any argument that the debt-to-earnings test is irrational because the test depends on students' debt decisions that schools cannot control.  Dep't Mot. 20.  But the Department distorts that case's holding.  *AACS* dealt with a due-process challenge to a CDR requirement established by statute and a rule implementing that statute.  979 F.2d at 861–62, 866.  The rule was rational because it implemented the statutory command.  *See id.* at 866.  The court held that the statute's creation of a CDR requirement was a rational means of decreasing student-loan defaults, which the court deemed a legitimate government interest for *constitutional* purposes.  *See id.*  The question here is starkly different: whether measuring students' debt and earnings is a rational way to achieve the goal that *Congress* established in the HEA, *i.e.*, to ensure that programs prepare students for gainful employment.  *AACS* has no bearing on whether the rule here rationally furthers that objective.

---

[14]   The Department also contends that schools have "some control" over other "causes of excessive debt, high default rates, and low earnings," such as alleged "aggressive or deceptive marketing practices," Dep't Mot. 20, but it does not explain how such purported practices have any effect on the amount of a program's cost that students elect to finance with debt.

***Student Outcomes & Demographics.***   The Department also fails to refute the alarming

evidence that the results of its debt-to-earnings test in large part reflect students' demographics.

Pl.'s Mot. 24.  Indeed, it admitted in the final rule that "many of the demographic variables" in

its regression "are statistically significant."  79 Fed. Reg. at 65,054.  By the Department's own

calculation, 44% of the variance in debt-to-earnings rates is explained by demographics and

other factors unrelated to program quality.  *Id.*  The agency now disputes this, noting that the

44% figure includes attributes of programs, rather than students, such as the sector and credential

level.  Dep't Mot. 22.  But it fails to explain how those attributes are related to program *quality*.

The Department also reiterates the final rule's assertion that, even though demographics

and other variables collectively explain at least 44% of variance in student outcomes (the R-

squared value in its regression), student characteristics such as family resources and race

*individually* have "'little impact on annual earnings rates'" because the regression coefficients

for those characteristics are "'small.'"  Dep't Mot. 21–22 (quoting 79 Fed. Reg. at 65,054).  As

this Court has held in similar contexts, however, labels like "small," "minimal," "minor," and

"not major" are "subjective and conclusory label[s] applied without reasoned analysis."  *Baystate*

*Med. Ctr. v. Leavitt*, 545 F. Supp. 2d 20, 43 (D.D.C. 2008) (Bates, J.).  Such "unbounded term[s]

cannot suffice to support an agency's decision because [they] provid[e] no objective standard for

determining what kind of differential makes one impact more or less significant than another."

*Id.* (internal quotation marks omitted); *see also Tripoli Rocketry Ass'n, Inc. v. Bur. of Alcohol,*

*Tobacco, Firearms & Explosives*, 437 F.3d 75, 81 (D.C. Cir. 2006); *Sierra Club*, 459 F. Supp. 2d

at 101.

The Department's "rejection of data based on a finding that the percentage change is

'small' is particularly problematic in light of this Circuit's recognition that even a modest

percentage difference can be 'substantial'" in certain circumstances. *Baystate*, 545 F. Supp. 2d at 43. That is the case here because, under the Department's debt-to-earnings test, all that matters is whether a program scores below the passing (8%) or zone (12%) thresholds. Consequently, even a small change in a program's debt-to-earnings rate can mean the very dramatic difference between eligibility and ineligibility, between educating students and shutting up shop. The agency's own data indicate that student characteristics such as race *do* affect whether many programs pass, fail, or fall in the zone. The Department's data, for example, imply that, if each African-American student were replaced by a student who had the debt-to-earnings ratio of the average white student, then 12.8% of programs in the "zone" would have *passed* the debt-to-earnings test, and 4.8% of failing programs would be in the zone.[15]

The debt-to-earnings test, in short, measures not program quality, but factors that schools cannot control and that are significantly influenced by demographics (because demographics reflect attributes such as income, family resources, and age, among others). Determining programs' eligibility for federal student aid on that basis epitomizes irrational decisionmaking.

### 2. The Department's Metrics And Data Are Arbitrary And Unreliable.

The Department employs metrics and data that are arbitrary and unreliable. Pl.'s Mot. 25–32. The agency's defense is unpersuasive.

---

[15]  The coefficient for the African-American variable in the Department's regression is 0.019, meaning that for every 1% increase in the percentage of students in a program who are African-American, the program's debt-to-earnings rate should increase 0.019%. The average percentage of African-American students across all programs is 18.4%, 79 Fed. Reg. at 65,044, which means that, according to the Department's regression findings, substituting students with the average debt-to-earnings rate among white students for African-American students would on average decrease those programs' debt-to-earnings rates by 0.35%. Of the programs that the Department calculated were in the "zone," approximately 12.8% have debt-to-earnings rates between 8.00% and 8.35%, *see* AR-F-00578 (columns AT and AM), meaning that those 12.8% of programs in the zone would have passed. Similarly, approximately 4.8% of programs the agency calculated were failing have debt-to-earnings rates between 12.00% and 12.35%, *see id.*, and thus would have been in the zone rather than failing.

*Reliance On A Single Debt Test.*   The Department's reliance in the new rule on the debt-to-earnings test *alone* to measure "gainful employment" is irrational in light of its concession in *APSCU I* that that test by itself—or any single test—is insufficient.  Pl.'s Mot. 25.  The agency attempts to escape the contradiction by playing word games, claiming that the debt-to-earnings test is in fact "*two* measures" because a program can pass the debt-to-earnings test based either on its graduates' gross earnings or their discretionary income.  Dep't Mot. 28.  Such "'ad hocery'" is only further proof of the agency's arbitrariness.  *Ramaprakash v. FAA*, 346 F.3d 1121, 1130 (D.C. Cir. 2003) (Roberts, J.) (citation omitted).  The agency made clear in *APSCU I* that the debt-to-earnings test—which in the prior rule, as in the new rule, included both earnings and discretionary-income metrics—was not designed to operate independently, but only in tandem with the (now-vacated) loan-repayment-rate test.  Indeed, it insisted that it "has no magic mirror through which it can identify programs that are not preparing their students for gainful employment."[16]  The Court, relying on these "repeate[d]" statements "emphasiz[ing] the ways in which the [loan-]repayment and debt-to-income tests were designed to work together," held that "the tests are obviously 'intertwined,'" and thus, upon vacating the loan-repayment-rate test, also vacated the debt-to-earnings test.  870 F. Supp. 2d at 154; *see also id.* at 141–42, 144, 152–53.

Whether the debt-to-earnings test is now labeled one test or two, the Department made clear in *APSCU I* that it could not stand alone, and the *APSCU I* Court took the agency at its word.  Because the Department has not even attempted to justify departing from that previous position, its new rule is arbitrary and should be vacated.  *See, e.g.*, *W. Deptford Energy, LLC v. FERC*, 766 F.3d 10, 20 (D.C. Cir. 2014) (explaining that "[i]t is textbook administrative law that

---

[16]   Dep't Reply 11, *APSCU*, No. 11-1314 (D.D.C. Feb. 2, 2012) (ECF No. 20) ("Dep't *APSCU I* Reply"); *see also* Dep't Mot. 24, *APSCU*, No. 11-1314 (D.D.C. Dec. 13, 2011) (ECF No. 16); *cf.* 76 Fed. Reg. 34,386, 34,388 (June 13, 2011) ("[u]nder the [vacated 2011] regulations," a program "los[t] eligibility" "only after failing both debt measures"—referring to debt-to-earnings and loan-repayment-rate tests—for three out of four consecutive years).

an agency must 'provid[e] a reasoned explanation for departing from precedent or treating

similar situations differently,'" and vacating agency decision that "failed to provide a reasoned

explanation" for "deviation from precedent" (citation omitted)); *Ramaprakash*, 346 F.3d at 1122,

1125–30 (vacating agency action where the agency "failed adequately to explain its departures

from its own precedent"); *Wisc. Valley Improvement*, 236 F.3d at 748 (vacating where agency

"offered no explanation—far less a reasoned one—for [its] abrupt departure" from prior view).[17]

   ***Arbitrarily Short Time Period For Measuring Earnings And Debt.***  The Department

also fails to justify the irrational time periods for which both components of its debt-to-earnings

test—the debt-to-earnings ratio and debt-to-discretionary-income ratio—calculate graduates'

earnings and debt.  By considering earnings only in the first few years after graduation, the test

ignores the long-term benefits of college education, which are not realized in the first few years.

Pl.'s Mot. 26.[18]  The agency admits that "'long-term earnings outcomes'" are a "'better proxy for

career success'" than short-term earnings.  Dep't Mot. 26 n.19 (citation omitted).  If the

Department were truly concerned with comparing the "reward" programs offer to the "burdens"

of attending, *id.* at 33 n.24—to determine whether students' investments in education are

"profitable" in that sense, *see supra* pp. 6–7—then it would consider the gains students earn over

their entire careers.  Yet its rule ignores long-term earnings entirely.  Indeed, it penalizes

programs whose students pursue entry-level jobs like internships, fellowships, or clerkships—

---

   [17]   The Department misleadingly asserts that it is APSCU that has changed positions because
APSCU "successfully challenged" the loan-repayment-rate test.  Dep't Mot. 27–28.  That is an
error:  APSCU argued that both the loan-repayment-rate test and the debt-to-earnings test were
unlawful and arbitrary.  *See* Pl.'s Mot. Summ. J. 26–30, *APSCU v. Duncan*, No. 11-1314
(D.D.C. Nov. 15, 2011) (ECF No. 15) ("Pl.'s *APSCU I* Mot.").  APSCU certainly never argued
that the Department could cure the unlawfulness and arbitrariness of the 2011 rule by eliminating
the loan-repayment-rate test and relying solely on the debt-to-earnings test.

   [18]   *See also* Brad Hershbein et al., Hamilton Project, *Major Decisions: Graduates' Earning
Growth and Debt Repayment* 3 (2014), http://tinyurl.com/nmj76lk (finding that "across all
majors," college graduates' "earnings growth is 65 percent within five years").

which, as commenters explained, enhance graduates' skills and experience, *see*, *e.g.*, AR-H-055489, -074206, -100219—simply because such jobs provide lower short-term earnings.  The Department responds that using short-term earnings provides "more meaningful feedback to schools," Dep't Mot. 26, but the opposite is true:  By using such a short time horizon, the rule provides a misleading picture of actual earnings, and irrationally steers students away from programs that substantially increase their long-term earnings.[19]

The Department also claims that considering only short-term earnings is necessary to "ensure that students earn enough to pay back their student loans."  Dep't Mot. 26.  Even if that were a legitimate aim for a rule designed to test "prepar[ation] . . . for gainful employment," the rule distorts students' ability to repay debt in the short term, by using arbitrarily short loan-repayment timelines.  Pl.'s Mot. 27–28.  The agency's answer that "the majority" of students meet these deadlines (Defs.' Mot. 27) is literally true but misleading:  The agency adopted a 10-year timeline for associates' degrees, yet it admitted that just 55 percent of "undergraduate borrowers from two-year institutions who entered repayment in 2002" had "fully repaid their loans" by 2012, meaning that 45% did not.  79 Fed. Reg. at 64,939.  Setting a rule based on repayment timelines that the agency knows nearly half of students do not meet is irrational.

Moreover, the Department does not respond at all to the final rule's failure to account for various federal programs, including programs adopted by Congress, such as income-based repayment plans, that reduce students' loan payments in their early years.  Pl.'s Mot. 28 & n.46.

---

[19]   The Department posits that even investments that are profitable in the long-term—like a "desirable" "five-bedroom home"—are not wise choices for an individual who cannot afford them in the short-term.  Dep't Mot. 27 n.20.  The example misses the mark because it is well-established that a college degree is a much better investment than other alternatives.  The average returns of a four-year college degree are more than five times those of home ownership. *See* Michael Greenstone & Adam Looney, The Hamilton Project, *Where is the Best Place to Invest $102,000—In Stocks, Bonds, or a College Degree?* (June 25, 2011), http://tinyurl.com/9f2touo.

The Department's refusal to account for such programs, in a rule supposedly designed to assess whether graduates are actually able to pay the amounts they owe, is arbitrary and irrational.[20]

*Arbitrary Debt Thresholds.*   The rule exacerbates all of these serious errors by judging programs against arbitrary debt thresholds.   The Department's 8% passing threshold for the debt-to-earnings test bears no relation to reality; its own data show that, even among students who were "employed" and "repaying their loans 1 year after graduation," the average rate in 2009 for bachelor's degree graduates at *all* schools was *13%*.[21]   The agency still fails to explain why it is rational to apply a draconian threshold that the average college graduate does not meet.[22]

Like the loan-repayment-rate test that *APSCU I* invalidated, 870 F. Supp. 2d at 154, the Department's 8% passing threshold—imported illogically from the mortgage-lending context—is based on nothing but ipse dixit.  Pl.'s Mot. 28–30.  The agency claims that the 8% threshold was not "thoughtlessly borrowed from mortgage practice" but is backed by "several studies." Dep't Mot. 23 (citing 79 Fed. Reg. at 64,919 nn.100–103).   But the purported "studies" cited in the final rule, none of which was cited in the notice of proposed rulemaking, offer no support for the 8% threshold:  None performed any empirical analysis establishing an appropriate maximum

---

[20]   The Department compounds these problems by refusing to annualize earnings of students who obtain jobs part-way through a given year.  Pl.'s Mot. 27 n.43.  The Department claims that annualizing data does not capture students' "'actual outcomes,'" Dep't Mot. 27 (quoting 79 Fed. Reg. at 64,952), but it is the Department's refusal to annualize that yields misleading results: The Department's test illogically treats a graduate who earns $10,000 annually and starts work on January 1 the same as a graduate who begins a $120,000 job on December 1.

[21]   Jennie H. Woo, Dep't of Educ., *Degrees of Debt: Student Borrowing and Loan Repayment of Bachelor's Degree Recipients 1 Year After Graduating: 1994, 2001, and 2009*, at 11 (2013), http://tinyurl.com/owuzhnk.  For graduates of non-profit schools, the average rate was 16%.  *Id.*

[22]   Moreover, the Department's passing and zone thresholds do not adequately account for differences in the *level* of students' earnings.  Even if a graduate earning $20,000 per year could not afford to spend more than 8% of earnings ($1,600), or more than 20% of "discretionary income" ($733 based on 2011 data, *see* 79 Fed. Reg. at 65,038), on repaying loans, a graduate earning $100,000 might well be able to afford to spend much more than 8% of annual earnings ($8,000) or 20% of discretionary income ($16,733) repaying debt.

debt-to-earnings rate; rather, each took the 8% threshold for granted based on mortgage-industry practice.[23]  All of those studies, interestingly, were reviewed in the one decade-old study that the NPRM cited, which found that the 8% threshold "arose from mortgage underwriting standards," *and* that there is no "particular merit or justification" for applying it to student debt.[24]

The Department continues to offer no rational justification for applying this mortgage-lending benchmark to loans to college students—the overwhelming majority of whom *do not have* mortgages in the first few years after graduation.[25]  The Department notes that graduates without mortgages still have significant housing expenses, often "in the form of rent," Dep't Mot. 23 n.16, but the statistics it cites only further undermine its 8% threshold.  The Department justified the 8% threshold by assuming that students spend 31% of their income on housing expenses.  79 Fed. Reg. at 64,919.[26]  But the agency now admits that students spend significantly

---

[23]   79 Fed. Reg. at 64,919 nn.100–103 (citing Keith Greiner, *How Much Student Loan Debt Is Too Much?*, 26(1) J. Student Fin. Aid 7, 10 (1996), http://tinyurl.com/lomx4on; Patricia M. Scherschel, USA Group Foundation, *Student Indebtedness: Are Borrowers Pushing the Limits?* 9 (1998), http://tinyurl.com/l6pjdr7; Steven A. Harrast, *Undergraduate Borrowing: A Study of Debtor Students and their Ability to Retire Undergraduate Loans*, 34(1) J. Student Fin. Aid 21, 22–23 (2004), http://tinyurl.com/lqllkzn; Tracey King & Ivan Frishberg, *Big Loans, Bigger Problems: A Report on the Sticker Shock of Student Loans* 17 (2001), http://tinyurl.com/natv9fy). The Department downplays (Dep't Mot. 24 n.17) its prior admission in response to a Freedom of Information Act request that, "[u]nfortunately, [it] was unable to locate any" communications with experts on this issue.  Compl., Ex. 5, *APC*, No. 14-8838 (S.D.N.Y. Nov. 6, 2014) (ECF No. 1-5); *see also* Pl.'s Mot. 29 & n.48.  But that admission confirms that the threshold must stand or fall based on the cited studies, which do not support it.

[24]   Sandy Baum & Saul Schwartz, Project on Student Debt and the College Board, *How Much Debt is Too Much? Defining Benchmarks for Manageable Student Debt* 6, 8 (2005), http://tinyurl.com/kbm98hf, *cited in* 79 Fed. Reg. 16,425, 16,443 (Mar. 25, 2014).  The authors' observation that "[t]his is not to say that 8% is . . . unreasonable" merely recognized that *future* studies—which the agency does not identify, and evidently did not perform—might provide "stronger justification than has thus far been forthcoming."  Baum & Schwartz, *supra*, at 8.

[25]   Pl.'s Mot. 28 & n.47; *see also* 79 Fed. Reg. at 64,914 ("since the Great Recession, student debt has been found to be associated with reduced home ownership rates").

[26]   The Department, citing Federal Housing Administration guidance, asserted that students should spend no more than 43% of pretax income on all debt, including no more than 31% on

*[Footnote continued on next page]*

less than that on housing:  It cites Bureau of Labor Statistics ("BLS") data showing that the

"average Associate's degree recipient pays" only "27% of income toward housing costs," Dep't

Mot. 23–24 n.16 (citing AR-H-000148).  The same data show that bachelor's degree recipients

pay only 25% toward housing.  *See* AR-H-000148 (citing BLS, *Consumer Expenditures in 2008*

(Mar. 2010), http://tinyurl.com/ncmmtjn).  The difference between 25% or 27% and 31% is very

significant:  It means that, by the agency's own logic, its 8% threshold is far too low, and the

passing level should be 12% or 14%—which would be a 50% or 75% increase in the standard.

Indeed, in the vacated 2011 rule the Department itself set the debt-to-earnings rate much

higher—at 12%—by starting with the 8% threshold and then increasing it by 50% to account for

graduates "who may have left the workforce voluntarily or are working part-time."  76 Fed. Reg.

at 34,400; *see also* 870 F. Supp. 2d at 152–53.  The Department's new rule, however, abandons

that 50% "tolerance" (Dep't Mot. 25) without adequate justification.  The Department claims

that it "incorporat[ed] tolerance into the new rules via the zone approach."  *Id.*  But the "zone" is

nothing like the prior rule's "tolerance":  For one thing, under the 2011 rule, programs with debt-

to-earnings rates between 8% and 12%, even for four straight years, *remained* eligible for Title

IV; under the new rule, they *lose* eligibility.  34 C.F.R. § 668.403(c).  The Department also

attempts to justify the change based on "data that was not available when the 2011 Rules were

promulgated."  Dep't Mot. 25.  But its analysis of that new data does not address its prior

concern:  the need to account for graduates who "left the workforce voluntarily."  76 Fed. Reg. at

34,400.  It thus fails to justify the agency's about-face.[27]

---

"housing debt" and 2.25% on credit-card debt.  79 Fed. Reg. at 64,919.  That left 9.75% for "all
other debt, including student loan debt."  *Id.*  The agency then stated that an 8% level for student-
loan debt is "appropriate," without explaining the downward jump from 9.75% to 8%.  *Id.*

[27]   The Department again inaccurately suggests that APSCU has changed its positions since
*APSCU I*, portraying APSCU as opposing "increasing the annual earnings rate from 8% to 12%."
*[Footnote continued on next page]*

***Skewed, Unreliable Data.***  The many flaws in the Department's metrics are made worse still by its use of unreliable, unrepresentative data to calculate debt-to-earnings and debt-to-discretionary-income rates.  Pl.'s Mot. 30–31.  The rule's test calculates graduates' earnings based on Social Security Administration ("SSA") earnings data—from SSA's Master Earnings File ("MEF")—but it fails to overcome serious flaws in that database.  The Department admits that SSA generally cannot "match" 4% of the earnings reports it receives to any individual, and that in such cases SSA inputs earnings of *zero*.  Dep't Mot. 29–30.  The Department discounts this serious flaw in the SSA data, but its responses are makeweights.  It claims that "many" mismatches "result from the employment of unauthorized non-citizens who are not eligible for federal student aid," but does not attempt to show how many mismatches involve such persons.  *Id.* at 29.  The Department also asserts that SSA attempts to reconcile mismatches throughout the year, but does not say whether or to what extent these reconciliation efforts succeed.  *Id.* at 30.[28]

The Department also does not deny that the SSA's MEF database excludes massive amounts of underreported or unreported income—estimated to exceed $100 billion annually, Pl.'s Mot. 31 n.55—and fails to justify relying on the MEF in spite of this glaring inaccuracy.

Dep't Mot. 25.  APSCU argued that the 8% threshold itself was "arbitrary," and also that the 8% threshold could not be salvaged by "arbitrarily inflating" it by 50%.  Pl.'s *APSCU I* Mot. 27 (emphasis omitted).  That remains APSCU's position today.

[28]  The agency also claims that missing earnings reports *might* reflect unemployed persons, and assumes that this *is* the case because the level of zero-earnings reports is "consistent with unemployment rates."  Dep't Mot. 30 (citing 79 Fed. Reg. at 64,953–55).  But it compared the number of zero-earnings reports to *general* unemployment rates, without regard to educational attainment; the debt-to-earnings test, however, applies only to *college graduates*, for whom the unemployment rate (according to its own data) is much lower, and thus cannot explain all of the missing earnings reports.  *Compare* 79 Fed. Reg. at 64,954–55 (citing NCES, *Unemployment Rates of Persons 16 to 64 Years Old, by Age Group and Educational Attainment:  Selected Years, 1975 through 2013*, http://tinyurl.com/lg5ca9d ("*Unemployment Rates*")) (showing 2011 unemployment rates of 18.1% for persons aged 20-24 and 10% for ages 25-34), *with Unemployment Rates*, *supra* (showing 2011 unemployment rates for persons with bachelor's degrees or higher of 8.7% for ages 20-24 and 4.3% for ages 25-34).  Even if the relevant unemployment rate coincidentally matched the aggregate number of zero-earnings reports, that would not show that unemployment explains the zero-earnings reports for any given *program*.

31

The Department repeats the final rule's assertion that individuals are legally required to report their income.  Dep't Mot. 29.  But that is beside the point:  Whatever the reason for the MEF's incompleteness, the Department cannot blindly rely on a database that undisputedly is inaccurate.

Unable to deny these serious flaws in the SSA data, the Department answers that it was nevertheless entitled to rely on that data because no better data were "available."  Dep't Mot. 31. That is incorrect, both as a matter of fact and law.  Commenters did identify alternatives, such as the well-established method (which the Department itself applies elsewhere) of imputing earnings instead of assuming that persons with no earnings report on file earned nothing.  Pl.'s Mot. 31; *e.g.*, AR-H-109275–81.[29]  The Department also distorts the legal standard.  The APA certainly requires agencies to use "the best available data."  Dep't Mot. 31; *see also Baystate*, 545 F. Supp. 2d at 41.  But agencies also may not rely on objectively "'inadequate data.'"  *Am. Radio Relay League, Inc. v. FCC*, 524 F.3d 227, 237 (D.C. Cir. 2008) (citation omitted).  Using data that are unreliable—and here, systematically understated—is arbitrary and unlawful even if no better data exist.  *See, e.g.*, *Friends of the Boundary Waters Wilderness v. Bosworth*, 437 F.3d 815, 824–27 (8th Cir. 2006); *Raytheon Co. v. White*, 305 F.3d 1354, 1366 (Fed. Cir. 2002); *United Steelworkers of Am., AFL-CIO-CLC v. Marshall*, 647 F.2d 1189, 1300 (D.C. Cir. 1980). If the available data are inadequate, the agency must forgo using that data to regulate.[30]

---

[29]   The Department dismissed this proposal on the ground that it could not distinguish between programs.  79 Fed. Reg. at 64,955–56; Dep't Mot. 31.  Yet the Department permits schools to file appeals using data that do not do so either.  *See* 34 C.F.R. § 668.406.

[30]   The cases the Department cites do not undermine this basic principle.  Dep't Mot. 30–31. The court in *City of Brookings Municipal Telephone Co. v. FCC*, 822 F.2d 1153, 1169 (D.C. Cir. 1987), held that an agency acted arbitrarily in failing to consider viable alternatives.  In *Mt. Diablo Hospital v. Shalala*, 3 F.3d 1226, 1233 (9th Cir. 1993), Congress had recognized that the agency should act even with imperfect data, and the agency was working on developing superior data.  And the agency in *American Public Gas Association v. Federal Power Commission*, 567 F.2d 1016, 1045–46 (D.C. Cir. 1977), was also planning to verify data independently, and the court permitted it to proceed because its action was merely provisional.

The Department's defense of computing debt-to-earnings and debt-to-discretionary-income ratios based solely on the earnings and debt of graduates who received Title IV aid—thus excluding the earnings and debt of students who finance their education by other means without federal assistance—fails for the same reason.  Pl.'s Mot. 30.  The agency asserts, correctly, that it is barred by *APSCU II* from maintaining personally identifiable data on non-Title IV recipients.  Dep't Mot. 43.  But it does not follow that the agency may therefore regulate based on whatever data remain.  The agency never confronts the effect of excluding non-Title IV recipients on its results nor explains how it is rational to judge programs based on the employment outcomes of only the subset of students who are most likely to have fewer resources.  Pl.'s Mot. 30.

### 3. The Department Fails To Confront The Harmful Impact That Its Debt-To-Earnings Test Will Have On Students And Schools.

The Department's irrational approach yields irrational and harmful results—including depriving many students of educational opportunities—which the agency failed adequately to consider.  Pl.'s Mot. 32–34.  The Department—quoting *itself*—claims that it "issued the rules 'only on a reasoned determination that [the rules'] benefits justify their costs.'"  Dep't Mot. 33 (quoting 79 Fed. Reg. at 64,993).  But the agency's self-serving claim that its decision was "reasoned" is insufficient.  The APA requires the *Court* to decide whether the agency in fact rationally accounted for the costs of its rule.  *See Bus. Roundtable v. SEC*, 647 F.3d 1144, 1151–52 (D.C. Cir. 2011) (rejecting agency's claim that it properly accounted for costs of rule).

***Depriving Students of Opportunities.***  By the Department's own estimate, programs currently serving hundreds of thousands of students would not pass its new standards, putting many students at risk of losing educational opportunities altogether.  Pl.'s Mot. 32–33.  The agency disingenuously responds that its rule "will not close a single program," but merely renders programs ineligible for federal aid.  Dep't Mot. 33.  That claim disregards the reality

that, as commenters explained, the loss of Title IV eligibility will sound the death knell for large numbers of programs. *See*, *e.g.*, AR-H-074207, -088805. Programs deemed ineligible would have to compete with programs that continue receiving federal aid, and those programs and their students would be at an extreme competitive disadvantage.[31]

The Department admitted that "about 32 percent of students in in-person zone and failing programs will not have nearby transfer options." 79 Fed. Reg. at 65,074. It now downplays this, noting that only 6% of students in zone and failing programs will have no alternatives, because some students enrolled in in-person programs may find online training. Dep't Mot. 33 & n.23. But for students who chose in-person training—especially in hands-on fields, such as health care or culinary training—an online course may not be an adequate alternative. Even the 6% figure means that tens of thousands of students will have *no* alternative. 79 Fed. Reg. at 65,064. It is unlikely that *those* students agree with the Department's claim that "all students" are better off (Dep't Mot. 33 n.24) when programs that do not pass the rule's arbitrary test are forced to close.

The Department also attempts to diminish the disproportionate effect of program closures on disadvantaged students. Dep't Mot. 33 n.24. But it does not grapple with its own admissions in the final rule that for-profit schools "are more likely to enroll students who are older, women, Black, Hispanic, . . . with low incomes . . . [are] [s]ingle parents, [have] a certificate of high school equivalency, and [have] lower family incomes"; and that for-profit schools account for *99%* of the programs deemed failing under the new rule, 79 Fed. Reg. at 64,904, 65,064, which means that programs tailored to those groups are among the most likely to close.

Indeed, the Department and its *amici* applaud the new rule's harmful effect on for-profit schools, and digress at length on purported disadvantages of for-profit programs and allegations

---

[31]  The agency estimates that more than 160,000 students will drop out of higher education in the first three years, and that students who drop out or who remain in programs deemed ineligible will lose $423 million in aid on an annualized basis. *See* 79 Fed. Reg. at 65,081–82.

of aggressive marketing and other practices by such schools.  Dep't Mot. 3–5, 20 (citing 79 Fed. Reg. at 65,028–35); Br. of *Amici* Air Force Sergeants Ass'n et al. 8–15 (ECF No. 19) ("*Amici* Br."). Tellingly, the Department *never* denies that the new regulation was crafted specifically to target for-profit schools—as a senior administration official publicly admitted, Pl.'s Mot. 7–8 & n.8, and as the rule's lopsided effect on for-profit schools confirms. The agency's and its *amici*'s disparaging remarks about private-sector schools are unfounded.  *See, e.g.*, AR-H -060744–47, -074181–92, -109071.[32]  More importantly, the allegations are irrelevant.  The rule is concerned not at all with marketing practices, but with debt and earnings of program graduates; alleged marketing practices cannot justify singling out for-profit schools in the rule.

> *Perverse Incentives.*  The agency also fails to confront the immense pressure that the new rule will impose on schools to exclude the very students who would benefit most from higher education.  Pl.'s Mot. 34.  The *Washington Post* put it bluntly:  The "likely outcome . . . is that schools will admit only students who pose the least risk," Editorial, *Tightening Rules On For-Profit Colleges*, Wash. Post, Apr. 27, 2014, http://tinyurl.com/mwnf8yt—*i.e.*, students who will not have lower earnings or higher debt after graduation, either of which would adversely affect

---

[32]  As APSCU previously explained, for-profit schools also produce graduates at a lower cost than public and non-profit schools and often have higher graduation rates. Pl.'s Mot. 16–17; *see also* Compl. ¶¶ 27–28, 159–60, 166 (ECF No. 1).  The Department and its *amici* rely heavily for their allegations of purportedly aggressive marketing practices on a flawed, partisan document that they misleadingly label as a report of the Senate Committee on Health, Education, Labor and Pensions.  *See* 79 Fed. Reg. at 65,033; *Amici* Br. 8–9, 11, 13–14.  That document—on which the Committee never voted—is unreliable for many reasons, *see* Compl. ¶ 76, and does not reflect a congressional finding at all, as a federal magistrate recently ruled in addressing this very document.  *See United States ex rel. Carter v. Bridgepoint Educ., Inc.*, __ F. Supp. 3d __, 2015 WL 818032, at *2 (S.D. Cal. Feb. 20, 2015) (magistrate ruling) ("[A] congressional report is not a finding of fact or proof of a wrong committed as a matter of law, regardless of what it may be as 'a matter of public record.'  As this particular document's title indicates, moreover, it is not even the formal congressional report accompanying an enacted bill, one of the rare pieces of legislative history occasionally worthy of some judicial solicitude." (citation omitted)).

the program's debt-to-earnings rate.[33]  The agency's only answer is that schools can also avoid

ineligibility in other ways.  Dep't Mot. 33–34.  But nearly all of those other ways to "improve

student outcomes" boil down to decreasing costs directly or indirectly, *id.*, which the agency

lacks authority to require, and which for many programs is not practical, *see* Pl.'s Mot. 18–19.

> **4.**      **The Rule Imposes Unlawfully Retroactive And Overbroad Sanctions
> And Violates Basic Principles Of Fairness.**

*Impermissible Retroactive Sanctions.*  The Department's rule is independently arbitrary

and capricious because it punishes schools for outcomes of students who graduated years earlier.

Pl.'s Mot. 35–36.  The Department does not dispute that the HEA does not convey "in express

terms" any "power to promulgate retroactive rules," which means the new rule cannot lawfully

do so.  *Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 208 (1988).  The response that the rules

"are not retroactive because they have only future effect" (Dep't Mot. 34) is true only in the

trivial sense that *all* laws and regulations only impose sanctions in the future.  The proper

analysis calls for "'a commonsense, functional judgment about whether the new provision

attaches new legal consequences to events completed before its enactment.'"  *Nat'l Mining Ass'n*

*v. Dep't of Labor*, 292 F.3d 849, 859–60 (D.C. Cir. 2002) (per curiam) (citation omitted).  The

new rule is retroactive in that way.  Schools' scores, which determine Title IV eligibility, depend

on the earnings and debt of students who enrolled up to a decade earlier.  Pl.'s Mot. 35.  The

agency cites the "transition period," Dep't Mot. 35–36 & n.25, but does not deny that even in the

transition period it still relies on earnings of students who graduated years earlier.  Pl.'s Mot. 36.

The rules also fail to "balance the harmful 'secondary retroactivity' of upsetting prior

expectations or existing investments against the benefits of applying their rules to those

---

[33]   Schools, for example, might scrutinize applicants' prior employment and earnings, credit
score, financial resources, parental support, status as a parent, and other factors to predict future
earnings, debt, and likelihood of part-time employment due to life circumstances.

preexisting interests." *Nat'l Cable & Telecomms. Ass'n v. FCC*, 567 F.3d 659, 670–71 (D.C. Cir. 2009). The rules upset institutions' significant investment in programs, based on reasonable expectations that they would remain eligible for Title IV funding if they complied with the HEA. The rule punishes schools that have fully complied with the regulatory requirements to date, simply because they did not anticipate the Department's new, arbitrary debt metrics.[34]

**Overbroad Punishments.** The Department also fails to justify sanctioning schools whose programs lose eligibility by barring them from establishing a new program, at any credential level, within the same broad subject area, *i.e.*, the same four-digit CIP code. *See* 34 C.F.R. § 668.410(b)(2); Pl.'s Mot. 36–37. The agency claims that this prohibition is designed to prevent schools from "circumvent[ing]" the rule by "creating new, similar programs to replace ineligible ones." Dep't Mot. 36. But it has no answer to APSCU's argument that schools cannot readily transform a program at one credential level into one at a different level. Pl.'s Mot. 36–37.[35]

**No Meaningful Opportunity To Challenge Department's Determinations.** The Department also offers no persuasive justification for the rule's failure to provide schools any

---

[34] The Department argues that the regulations are nonetheless "reasonable" because the agency "determined that the need to remove poorly performing programs . . . was too great to delay implementation" to address retroactivity concerns. Dep't Mot. 35 (citing 79 Fed. Reg. at 64,947–49). That distorts the administrative record. The Department claimed only that "delaying implementation" would not "provide institutions with an incentive to make improvements." 79 Fed. Reg. at 64,948. But declining to delay implementation is very different from imposing backward-looking sanctions.

[35] The agency also does not adequately explain barring schools from establishing eligibility for any program in the same broad, four-digit CIP code. Pl.'s Mot. 36 & n.68. A school could not readily transform a program from one *six*-digit CIP code (which is more specific) to another six-digit CIP code; banning any new program in the entire *four*-digit CIP code is arbitrary. The Department stresses that this sanction bars schools only from establishing Title IV eligibility for new programs, Dep't Mot. 36, but that limitation makes the sanction even *less* rational as a means to prevent hypothetical circumvention. Section 668.410(b)(2) applies only *after* programs have been declared "ineligible" or voluntarily discontinued. It apparently would not bar a school whose program is on the verge of losing eligibility from creating a new, similar program to replace it so long as the new program's Title IV eligibility is established *before* the old program is found ineligible or discontinued. As an "anti-circumvention" tool, that is irrational.

meaningful opportunity to challenge the agency's debt-to-earnings calculations.  *Cf.* Pl.'s Mot.

37–38.  The Department does not deny that the rule expressly bars schools from challenging the

SSA earnings data on which it relies, and that such challenges are impossible in any event

because schools cannot lawfully access that data.  *See id.*; 34 C.F.R. § 668.405(f)(3)(i).[36]

The agency argues instead that it has no obligation to provide due process to schools

beyond the express requirements of the APA, and accuses APSCU of "attempt[ing] to graft Due

Process Clause protections onto the APA."  Dep't Mot. 37.  But the agency fails to confront its

own admissions that "due process warrants allowing" schools to challenge debt-to-earnings rates.

79 Fed. Reg. at 16,460.[37]  Despite those admissions, the rule relies on earnings data that schools

are legally barred from challenging or even accessing.  The rule thus fails to afford schools the

most basic due-process protections.  *See Ohio Bell Tel. Co v. Pub. Utils. Comm'n of Ohio*,

301 U.S. 292, 300 (1937) ("reporting its conclusion, but not the underlying proofs" is "not the

fair hearing essential to due process"); *Kapps v. Wing*, 404 F.3d 105, 124 (2d Cir. 2005)

---

[36]  Schools have many reasons to be skeptical of SSA earnings data.  *See supra* pp. 31–32.
Even if the SSA is able to match an earnings report with a name in its database, the earnings data
may still be inaccurate.  Indeed, a recent audit by SSA's Inspector General found that tens of
thousands of earnings reports with social-security numbers that matched the database
nevertheless had the wrong individual's name.  *See* OIG, Audit Report, *Numberholders Age 112
or Older Who Did Not Have a Death Entry on the Numident* 2 (Mar. 2015), http://tinyurl.com/
oxvs6ef.  The same audit found that the SSA's database erroneously reflected that more than 6
million individuals were above the age of 112.  *See id.* at 3–6.  Even the SSA has warned
researchers that its "earnings records could be incomplete" and that "there is no indicator to warn
that an individual's earning record is erroneous."  Anya Olsen and Russell Hudson, *Social
Security Administration's Master Earnings File:  Background Information*, 69(3) Soc. Security
Bull. 29, 37, 39 (2009), http://tinyurl.com/o9239rc.  Schools, which never see the SSA data, thus
cannot know whether aggregate earnings figures for a program's graduates are inaccurate, and
certainly cannot make that determination in the 14 days the rule gives them to appeal the
Department's calculations, *see* 34 C.F.R. § 668.406(e)(1)(i).

[37]  *See also*, *e.g.*, 79 Fed. Reg. at 16,457 ("In the interest of fairness and due process, the
proposed regulations are intended to provide institutions with an adequate opportunity to correct
the list that would be submitted to SSA and to challenge the loan data on which the draft D/E
rates are calculated."); *id.* at 64,965 ("In the interest of fairness and due process, we have
provided for a challenge and appeals process in the regulations.").

(meaningful challenge requires access to underlying evidence).  Subjecting schools to severe

sanctions based on data they cannot challenge, despite the agency's acknowledgment that "due

process warrants" permitting meaningful appeals, is at a minimum arbitrary and capricious.[38]

## II.    The Disclosure, Reporting, And Certification Requirements Are Unlawful.

### A.    The Disclosure Rules Are Statutorily Unauthorized, Violate The First Amendment, And Are Arbitrary And Capricious.

#### 1.    The Disclosure Rules Exceed The Department's Statutory Authority.

As APSCU demonstrated, the new disclosure rules must be vacated because the

Department lacks statutory authority to impose them.  Pl.'s Mot. 38.  The Department does not

dispute that the statutes that the rule itself cited as authority for these requirements—"20 U.S.C.

1001, 1002, [and] 1088," the gainful-employment provisions, 79 Fed. Reg. at 65,015—do not in

fact authorize the disclosure rules.  Dep't Mot. 39.  In its motion, the agency cites only 20 U.S.C.

§§ 1221e-3, 3474, and 1231a.  *Id.*  But it does not rebut APSCU's arguments that Sections

1221e-3 and 3474 are "implementary rather than substantive" and do not confer freestanding

authority, *New Eng. Power Co. v. Fed. Power Comm'n*, 467 F.2d 425, 430–31 (D.C. Cir. 1972),

and that Section 1231a directs the *Secretary*, not *schools*, to disclose information.  Pl.'s Mot. 38.

The Department instead relies on *APSCU I*'s conclusion that the agency's 2011

disclosure rules were authorized by Sections 1221e-3 and 3474.  Dep't Mot. 39.  But that

---

[38]   The rule also contravenes the APA's "mandat[e] that an agency take whatever steps it needs to provide an explanation that will enable the court to evaluate the agency's rationale at the time of the decision."  *Pension Benefit Guar. Corp. v. LTV Corp.*, 496 U.S. 633, 654 (1990). Without the underlying data, schools cannot make a meaningful presentation of arguments, and a reviewing court could not fully evaluate the decision to cut off aid.  *See Williston Basin Interstate Pipeline Co. v. FERC*, 165 F.3d 54, 64 (D.C. Cir. 1999).  To be sure, schools can also offer a contrary presentation using earnings data from an institutional survey or State-sponsored data system.  Dep't Mot. 38 n.27.  But those alternatives are inadequate in multiple respects. Pl.'s Mot. 37–38.  Other than its claim that the inadequacy of the institutional-survey alternative is "speculative"—on the revealing ground that the Department itself has not yet released the "standards" for such surveys, Dep't Mot. 32 n.22—the Department offers no answer to the deficiencies that APSCU identifies.

erroneous conclusion does not foreclose APSCU's challenge to the new disclosure rules.

*APSCU I* addressed different rules, and the parties never "actually litigated" the issue whether

Sections 1221e-3 and 3474 authorize the Department to compel disclosures by schools.

*Otherson v. Dep't of Justice*, 711 F.2d 267, 273 (D.C. Cir. 1983).[39]

## 2.    The Disclosure Requirements Violate The First Amendment.

The disclosure requirements also violate the First Amendment because they compel

schools to disclose speculative estimates of total cost.  Pl.'s Mot. 39–40.  Because they "compel

speakers to utter or distribute speech bearing a particular message," the rules "are subject to the

same rigorous scrutiny" as "regulations that suppress . . . speech," *Turner Broad. Sys., Inc. v.*

*FCC*, 512 U.S. 622, 642 (1994), and must be "narrowly tailored" to a "substantial government

interest" that is "directly and materially advanced by the restriction."  *Nat'l Ass'n of Mfrs. v.*

*SEC*, 748 F.3d 359, 372 (D.C. Cir. 2014).  The Department cannot meet this standard.  *See* Pl.'s

Mot. 39–40.  It briefly asserts that the rule requiring schools to disclose cost estimates satisfies

heightened scrutiny because it advances the interest of "inform[ing] . . . prospective student[s]."

Dep't Mot. 40.  But speculative estimates are more likely to mislead than to "inform."  The rule

also is not narrowly tailored to that purported interest because the Department could achieve the

same end by requiring schools to disclose past averages rather than speculate about future costs.

The Department argues that the cost-disclosure requirement should be reviewed under the

less demanding test of *Zauderer v. Office of Disciplinary Counsel*, 471 U.S. 626 (1985).  Dep't

---

[39]    As the Department recognized at the time, APSCU "d[id] not dispute," as it does now,
"that the regulations f[e]ll within" Sections 1221e-3 and 3474, but argued only that the agency
could not rely on those provisions because its "proposed rule failed to cite [them]."  Dep't
*APSCU I* Reply 24.  *APSCU I* also has no preclusive effect because APSCU lacked the same
incentive to litigate that issue in *APSCU I* that it has here:  The *3,118,160*-hour burden the new
disclosure rules impose on schools and students, 79 Fed. Reg. at 65,001, is more than *371 times*
the 8,402-hour burden the agency estimated under the prior rules, 75 Fed. Reg. 66,832, 66,934
(Oct. 29, 2010).  *See Yamaha Corp. of Am. v. United States*, 961 F.2d 245, 254 (D.C. Cir. 1992)
(preclusion would "work a basic unfairness" if party has "vastly greater" stakes in second case).

Mot. 39–40.  But cost estimates "do not constitute the type of 'purely factual and uncontroversial' information . . . to which the *Zauderer* standard may be applied" because they are not "indisputably accurate," and will inevitably be "misinterpret[ed] by consumers" as guarantees rather than guesses.  *R.J. Reynolds Tobacco Co. v. FDA*, 696 F.3d 1205, 1216 (D.C. Cir. 2012), *abrogated on other grounds by Am. Meat Inst. v. U.S. Dep't of Agric.*, 760 F.3d 18, 22–23 (D.C. Cir. 2014) (en banc); *see also* Pl.'s Mot. 39 & n.75.  The agency now contends that the need for "estimates" is "speculative" because "[s]chools must, of course, know their costs in order to . . . charge their students."  Dep't Mot. 39.  But it admitted in adopting the final rule that "institution[s] may not know" their future costs.  79 Fed. Reg. at 64,977.  The rule requires schools to disclose the "*total* cost" over "the length of the program," 34 C.F.R. § 668.412(a)(7) (emphasis added), which depends on unknowns that schools must necessarily estimate.  Future tuition costs, for example, will turn on *future* economic conditions, and the costs of "books, supplies, and equipment" (*id.*) are often impossible to predict years in advance.[40]

### 3. The Disclosure Requirements Are Arbitrary And Capricious.

The disclosure rules are also arbitrary because they ignore Congress's choice to require disclosure of school-level rather than program-level data.  *See*, *e.g.*, 20 U.S.C. § 1092(a)(1); Pl.'s Mot. 40.  That choice did not leave a statutory "gap," as the Department claims (Dep't Mot. 41), but reflected a deliberate decision by Congress about the "key data" that will most aid students.[41] The Department's attempt to "'substitute its policy judgment for that of Congress'" must be rejected.  *Ala. Power Co. v. EPA*, 40 F.3d 450, 456 (D.C. Cir. 1994) (citation omitted).

---

[40]   That factor also distinguishes disclosure statutes, such as 20 U.S.C. § 1092(a)(1)(E) (*see* Dep't Mot. 39), that, unlike the Department's disclosure rules, do not specifically compel disclosure of total costs over the full length of an educational program, including future years, but instead appear to allow disclosure of annual costs for tuition, fees, books, and supplies, etc.

[41]   AR-H-087188 (40 Members of Congress, from both parties, expressing concern that new disclosure items are "inconsistent" with existing, congressionally mandated disclosures and "could actually lead to *reduced* transparency" (emphasis added)).

The requirement that programs disclose the abandoned pCDR metric is also arbitrary and capricious.  Pl.'s Mot. 41.  The Department counters that "[t]he level of default associated with a particular program is useful information to students."  Dep't Mot. 41.  That breezy response ignores comments explaining that pCDR was "not [a] reliable metri[c] for many graduate programs," including because it reflects the "lag in time between when students enter these programs and when they experience increased earnings gains."  79 Fed. Reg. at 64,897.  Because the agency abandoned that metric, it never addressed these criticisms.  And it now concedes that the pCDR "[is] not currently supported by sufficient evidence."  Dep't Mot. 28.  Requiring schools to disclose the pCDR metric that the agency *admits* is unsupported is arbitrary.[42]

**4.      APSCU's Challenge To The Disclosure Requirements Is Timely.**

The Department attempts to sidestep these many legal defects in its disclosure rules by contending that APSCU's challenges are unripe, arguing that, even though "the rules list 16 items of information" the agency "may" demand that schools disclose, the Department has not specified "exactly" which items to require.  Dep't Mot. 38.  That is incorrect.  The fact "[t]hat the [Department] retains some measure of discretion" over the contents of the disclosure template "does not make [APSCU's] purely legal challenge [to the disclosure rule] unripe."  *Nat'l Ass'n of Home Builders v. U.S. Army Corps of Eng'rs*, 417 F.3d 1272, 1282 (D.C. Cir. 2005).  The requirement that schools "*must* use the disclosure template provided by the Secretary" once it is issued (34 C.F.R. § 668.412(a) (emphasis added)) is not "'contingent [on] future events that may not occur.'"  Dep't Mot. 38 (citation omitted).  APSCU's "facial challenge" is ripe because it

---

[42]    The Department also fails to refute APSCU's showing that the requirement to provide non-English language warnings is unduly vague and thus arbitrary.  Pl.'s Mot. 40 n.77.  The Department again cites the one test suggested in the rule's preamble as proof that it is possible to comply.  Dep't Mot. 41 n.30.  But even now it does not claim that that test provides a safe harbor and cites no binding statement that complying with that test protects schools from sanctions.  The single test the agency cites thus does nothing to provide schools certainty about their obligations and affords no guarantee that the agency will not determine that *other* steps are required.

involves "'purely legal'" questions about the validity of an "unquestionably 'final'" rule, and "would not 'benefit from a more concrete setting.'" *Cement Kiln Recycling Coal. v. EPA*, 493 F.3d 207, 215 (D.C. Cir. 2007). Immediate review is also proper because the agency relies on the disclosure rule to justify its unlawful reporting rules, which also take effect July 1, 2015.[43]

## B.    The Reporting Rules Are Unauthorized And Violate 20 U.S.C. § 1015c.

The Department similarly fails to refute APSCU's showing that the new reporting rules also are unauthorized and contravene 20 U.S.C. § 1015c. *Cf.* Pl.'s Mot. 41. The reporting rules are not, as the Department argues, authorized by the Department's power to "carry out" other functions (20 U.S.C. §§ 1221e-3, 3474) because the functions that the reporting rules purportedly help carry out—"calculat[ing] D/E rates and . . . disclosure items," Dep't Mot. 41–42—are also unlawful, *see supra* pp. 3–42. Nor are the reporting rules authorized by the agency's authority to measure program "'effectiveness . . . in achieving the intended purposes of such programs'" (Dep't Mot. 42 (quoting 20 U.S.C. § 1231a)) because the debt-to-earnings rates that they help calculate do not measure program effectiveness. *See supra* pp. 18–24. If the debt-to-earnings test or the disclosure rules are invalidated, the reporting rules must fall also.

Compelling programs to report *private*-borrowing information also contravenes 20 U.S.C. § 1015c. Pl.'s Mot. 41–43. As in *APSCU II*, the Department seeks to circumvent Section 1015c by "graft[ing]" the new data it seeks to collect "onto a preexisting database," the National Student Loan Data System ("NSLDS"). 930 F. Supp. 2d at 221; *see* Dep't Mot. 42. Just as in *APSCU II*, that attempt fails. Contrary to the Department's claim, private-loan data do not fit with the NSLDS's purpose as articulated by the Department: to hold "information related to an

---

[43]    There is similarly nothing contingent about the cost disclosures that APSCU challenges on First Amendment grounds. Although the agency claims that it "'does not intend to include all of the disclosure items listed in § 668.412 on the disclosure template,'" Dep't Mot. 38–39 (citation and brackets omitted), it certainly intends to require disclosure of "program costs," which it views as among "the most critical information for students," 79 Fed. Reg. at 64,976.

individual's receipt of *Federal* student financial aid *authorized under Title IV*."[44]  Nor are

private-loan data "consistent with the types of information already collected" (Dep't Mot. 43),

which concerns Title IV borrowers and their federal Title IV loans, not private loans.  Section

1015c thus bars adding private-borrowing data to the NSLDS.[45]

The unlawfulness of this aspect of the reporting rules also dooms the debt-to-earnings test

and related disclosures, which cannot "function sensibly" (*MD/DC/DE Broadcasters Ass'n v.*

*FCC*, 236 F.3d 13, 22 (D.C. Cir.), *reh'g denied*, 253 F.3d 732 (D.C. Cir. 2001)) without the

private-loan data needed to calculate the debt-to-earnings rates.  Pl.'s Mot. 43.  Seeking to

salvage the debt-to-earnings test, the Department urges the Court, if it vacates the private-loan

reporting requirement, to *rewrite* the formula for calculating student-loan debt in that test, by

treating private-loan amounts as "zero" and calculating debt-to-earnings rates solely based on

federal loans.  Dep't Mot. 44 n.33.[46]  That proposal has no basis in the rule and was not vetted by

notice-and-comment rulemaking; for both reasons, the agency cannot rely on it now.  *See Lacson*

*v. U.S. Dep't of Homeland Sec.*, 726 F.3d 170, 177 (D.C. Cir. 2013) (court "can sustain an

agency action only on a ground upon which the agency itself relied"); *Allina Health Servs. v.*

*Sebelius*, 746 F.3d 1102, 1107–08 (D.C. Cir. 2014) (rule must be "'logical outgrowth'" of

proposal (citation omitted)).  Moreover, the Department's conclusory assertion that the rule can

"function sensibly" without private-loan data (Dep't Mot. 44 n.33) fails to explain how it could

---

[44]   IFAP, Dear Colleague Letter, GEN-05-06/FP-05-04 (Apr. 2005), http://tinyurl.com/ o3w6e25 (emphases added); *see also APSCU II*, 930 F. Supp. 2d at 216 (NSLDS was created "'to establish . . . [a] student loan data system containing information regarding *loans' made through* [certain] *federal programs*" (emphasis added)).

[45]   That the Department at times adds *non-personally identifiable*, *program-level* data to the NSLDS (Dep't Mot. 43 n.32) is irrelevant, as Section 1015c does not bar collecting such data.

[46]   If the Court were to adopt the Department's proposal, it also would need to rewrite the rule to treat "credit[s] . . . extended by or on behalf of [an] institution"—another component of student-loan debt under 34 C.F.R. § 668.404(d)(1)(iii)—as zero, since that personally identifiable data are also unrelated to federal loans and cannot be stored in the NSLDS under Section 1015c.

achieve its purported aim of ensuring that students are able to pay their loans if the test considers only *some* loans.

### C. The Certification Requirements Exceed The Department's Statutory Authority, Contravene The First Amendment, And Violate The APA.

The Department's defense of the new certification rules also fails. Congress chose to condition Title IV funds on accreditation at the "institution" level, not the program level, based on standards set by "accrediting agenc[ies]," not by States. 20 U.S.C. § 1001(a)(5). The agency's attempt to condition funds on *program*-level compliance with *state* accrediting and licensure requirements is yet another unlawful attempt to "substitute its policy judgment for that of Congress." *Ala. Power Co.*, 40 F.3d at 456 (internal quotation marks omitted); Pl.'s Mot. 43–44. The Department's conclusory response (Dep't Mot. 44) offers nothing to refute this conflict.

The certification requirements are also unconstitutionally vague, and arbitrary and capricious, because they fail to define the occupations whose licensure requirements a program must meet. Pl.'s Mot. 44. The Department belatedly attempts to clarify that schools must certify that programs meet licensure requirements for occupations listed on their disclosure templates. Dep't Mot. 44–45. But the Department does not expressly say that that is *all* schools must do. Absent a binding rule to that effect, schools face continued, unlawful uncertainty as to whether they must certify that they meet licensure requirements for additional occupations.

### CONCLUSION

For the foregoing reasons and those set forth in APSCU's memorandum in support of its motion for summary judgment, the Court should grant APSCU's motion for summary judgment (ECF No. 13), deny the Department's cross-motion for summary judgment (ECF No. 17), and declare the gainful-employment regulation to be unlawful, vacate it, and enjoin its enforcement.

Dated:  March 27, 2015

Respectfully submitted,

/s/ Douglas R. Cox

| | |
|---|---|
| TIMOTHY J. HATCH, D.C. Bar #374694 | DOUGLAS R. COX, D.C. Bar #459668 |
| THatch@gibsondunn.com | DCox@gibsondunn.com |
| GIBSON, DUNN & CRUTCHER LLP | JONATHAN C. BOND, D.C. Bar #1003728 |
| 333 South Grand Ave. | JBond@gibsondunn.com |
| Los Angeles, CA  90071-3197 | ROBERT GONZALEZ, D.C. Bar #995834 |
| Telephone:  (213) 229-7000 | RGonzalez2@gibsondunn.com |
| Facsimile:  (213) 229-7520 | GIBSON, DUNN & CRUTCHER LLP |
| | 1050 Connecticut Ave., N.W. |
| | Washington, D.C.  20036 |
| | Telephone:  (202) 955-8500 |
| | Facsimile:  (202) 467-0539 |

*Attorneys for Plaintiff Association of Private Sector Colleges and Universities*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 27th day of March, 2015, a true and correct copy of the

attached **PLAINTIFF'S CONSOLIDATED MEMORANDUM OF LAW IN OPPOSITION**

**TO DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT AND REPLY IN**

**SUPPORT OF PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT** was filed and

served pursuant to the Court's electronic filing procedures using the Court's CM/ECF System.

/s/ Douglas R. Cox
DOUGLAS R. COX, D.C. Bar #459668
DCox@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Ave., N.W.
Washington, D.C.  20036
Telephone:  (202) 955-8500
Facsimile:  (202) 467-0539

*Attorney for Plaintiff Association of Private Sector Colleges and Universities*